1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                    :
                                              Docket #21cv10611
 PAYSAFE LIMITED f/k/a FOLEY           :
 TRASIMENE ACQUISITION CORP. II
 SECURITIES LITIGATION                 : New York, New York
                                         May 5, 2022
------------------------------------- :

PROCEEDINGS BEFORE
THE HONORABLE KATHARINE H. PARKER,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff-Movant        GLANCY PRONGAY & MURRAY LLP
Lisa Wiley and Campbell     BY:  CHARLES H. LINEHAN, ESQ.
Capital Management:         1925 Century Park East, Suite 2100
                            Los Angeles, California 90067


For Plaintiff-Movants       KESSLER TOPAZ MELTZER & CHECK, LLP
Viani and Price:            BY:  RICHARD A RUSSO, JR., ESQ.
                                 NAUMON AMJED, ESQ.
                            280 King of Prussia Road
                            Radnor, Pennsylvania 19087


For Defendants Paysafe,     SIMPSON THACHER & BARTLETT LLP
McHugh, and Dawood:         BY:  CRAIG WALDMAN, ESQ.
                            425 Lexington Avenue
                            New York, New York 10017


For Defendants Massey,      WEIL, GOTSHAL & MANGES LLP
Coy, and Foley:             BY:  JOHN NEUWIRTH, ESQ.
                                 EVERT CHRISTENSEN, ESQ.
                            767 Fifth Avenue
                            New York, New York 10153




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---|---|---|---|---|---|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

3

THE CLERK:  Calling cases 21cv10611, Wiley v. Paysafe and Paysafe Ltd., and calling 22cv567, O'Brien v. Paysafe Ltd.  I'll being with counsel for the plaintiffs, please make your appearance for the record.

MR. CHARLES LINEHAN:  Charles Linehan from Glancy Prongay & Murray on behalf of the plaintiff Lisa Wiley, plaintiff-movant, Campbell Capital Management.

THE COURT:   Okay.

MR. RICHARD RUSSO:  Good morning, Your Honor, Richard Russo, Kessler Topaz Meltzer & Check for movants Robert Viani and Eric Price.

MR. NAUMON AMJED:  Good morning, Your Honor, Naumon Amjed, also from Kessler Topaz Meltzer & Check on behalf of movants Viani and Price.  Thank you.

MR. CRAIG WALDMAN:  Good morning, Your Honor –

THE CLERK:  Counsel for the defendants please make your appearance for the record.

MR. WALDMAN:  Good morning, Your Honor, Craig Waldman from Simpson Thacher for Paysafe, Mr. McHugh, and Mr. Dawood.

MR. JOHN NEUWIRTH:  Good morning, Your Honor, John Neuwirth from Weil, Gotshal & Manges on behalf of defendants Massey, Coy, and Foley.

MR. Evert Christensen:  Good morning, Evert John

4

Christensen from Weil Gotshal & Manges also on behalf of defendants Foley, Massey, and Coy.

THE COURT:   Okay, nice to see everyone.  Thank you for coming in today.  I wanted to talk about the pending motions and a couple of other items.  So the main thing I see to do is, one, consolidate the two cases which is unopposed which I do intend to do.  The next thing is to appoint lead plaintiff and lead counsel, and really there's only two entities vying for that position.  So I did want to hear the parties' position on that, and I'm particularly interested in why it would be appropriate to consider Campbell Capital Management given the aggregation of all of the different smaller investors and the allegations that not all of the assignments are valid.  So I want to talk about that.

And then separately, as I understand, the claims or the argument with respect to Viani and Price is that they have no preexisting relationship and potentially can't get along and how to manage the case as a lead plaintiff.  So I'd like to talk about that.  And then I also want to talk about the theory because the two cases have slightly different allegations.  One has a theory of one corrective disclosure and the other has a theory of two corrective disclosures or a partial and then a full

corrective disclosure.

So, first, let me hear from CCM as to why you think you should be, and your client should be lead plaintiff and I'd like to hear what you have to say specifically about this, the allegations regarding aggregation and the assign, the problem with some of the assignments.

MR. LINEHAN:   Do you prefer I stand or sit?

THE COURT:   What would be helpful is if you could speak into the microphone so that everybody can hear you.  So just pull it close to you.  We have a shortage of court reporters, so I couldn't have a court reporter here, so speak clearly.  State your name before you speak so if you ask for a transcript, the court reporter will know who is speaking.

MR. LINEHAN:   This is Charles Linehan from Glancy Prongay & Murray.  So at first as to the aggregation of these clients, this method of investment advisors having their clients assign their claims and being appointed as a lead plaintiff is pretty well established.  We cite cases in our opposition and reply where district courts have permitted this.  The Second Circuit case in our reply and our opposition which has endorsed the method that a client of investment advisor

6

can assign their claim and their investment advisor can bring those claims.

So this method of having an investment advisor have their clients (indiscernible) claims and be a claim that financial interest and be appointed as lead plaintiff is pretty well established in the case law. I think I'm not aware of any case, and I don't think counsel for Price, Mr. Price and Mr. Viani have cited to an instance where assignments were conducted in this way and the investment advisor was rejected on the basis that they were an investment advisor when the assignments are appropriately conducted.

With respect to Your Honor's question about the assignments themselves and the allegations of improprieties with the assignments, I think this point was made, and there was a throwaway line in one of the two briefs. There's not a lot of meat on the bone about any issues with the assignment. So going back, I think there were, these are what I recall to be the potential issues with the assignments. One was that there's a question, they throw out the question of maybe some of the people who signed these assignments didn't have authority to sign on behalf of, say, the trust they were signing on behalf of.

7

They do.  There's no reason provided as to why they didn't or maybe they don't.  If the Court would require additional proof, we could probably obtain records for that.  But these are based on records that are maintained by CCM who handles the accounts for these entities, and they have on record the people who are associated with the accounts and have authority to act on behalf of them.  So that's the information we used.  I don't see any reason why there would be issues with that, and Mr. Price and Mr. Viani's counsel haven't stated anything substantive as to why there would be an issue.

The other potential issue with the assignments that was mentioned is that some of the assignments contain illegible signatures.  Essentially the people that signed them, their signatures are illegible.  If that were – there's no court that I've that has taken an illegible signature on an assignment or a certification to mean that it's an invalid certification.  I don't see any reason to do so here.  There's no allegation that the person, there's no substance to any allegation that any of these signatures were forged or anything like that.  So that's not the case.

And if illegible signatures were to, you know, have these assignments thrown out, and there's probably a

8

lot of briefing of mine which would also be thrown out. But, yeah, so there's no substance to that, there's no legal basis to throw the assignments out on that basis.

And then the final one is that – there was a complaint that there was one account, the James Campbell Trust Account, sorry, there was one allegation that the James Campbell Trust IRA d/b/a, that there's no corresponding, there's assignments from those individuals but no corresponding account information.  We note in footnote 3 to my reply brief that there actually is account information for those.  It's just that the, on the account information that the account is labeled James Campbell Trust Account II as a shorthand.  And then there's an assignment from Kendall Campbell; however, in the loss chart we mistakenly forgot to include his loss in the loss chart.  The loss chart is not required to be filed with the PSLRA, just a certification.  We provide the loss chart as a courtesy and to be helpful to the Court.  If you include his losses, it would increase CCM's financial interest by a little less than $4,000.

That's all the issues with the assignments, if you want to call it issues, with the assignments that I've seen.  None of them are substantive, there's no meat on them.  They were thrown in kind at the end of the brief

9

because I think counsel for Mr. Viani and Mr. Price somewhat acknowledge that these are not really strong attacks.  If they were, they would have put them in the front.  So that's it with the assignments.

Just as a general matter I don't think Mr. Price or Viani have cited any authority which would permit a group of two unrelated investors to add their losses together to leapfrog over qualified individual lead plaintiff-movant.  Here CCM is an individual plaintiff-movant because all the claims were assigned one after on behalf of all those claims.

One – if the Court will permit, one additional thing I'd like to point out before passing back is that there's been a lot of discussion of the *Varghese* case which requires a showing of, that the unrelated lead plaintiffs can work together.  The language of *Varghese* actually states and which is consistent with a lot of the other case law cited, which is that if the district court determines that either they cannot work together cohesively because of a lack of evidence that they put forward that they can't or that that's one reason to disqualify them.  The other reason is it appears that they were put together solely for the basis of aggregating their losses, that is also itself an independent reason to

10

not permit them to leapfrog over an individual.

So there are cases where unrelated investors are put together because maybe one has standing under one claim and one has standing under another claim. That would be a reason the courts have cited for having two unrelated lead plaintiff-movants. But where there is no connection and they're just put together for the purpose of leapfrogging, that's not permitted.

In fact, CCM probably had an opportunity to do the same thing at the time that lead plaintiff-movants were in contact with other potential applicants who had losses above a million dollars, that if we offered the opportunity, very likely would have agreed to move jointly. But based on the case law in this circuit and knowing that that's not permitted, CCM, we did not add anyone to CCM's, you know, we didn't form a group because doing so would essentially violate the case law and kind of create this race to the bottom where people are just trying to add as many plaintiffs together as it can without getting too large to be cumbersome to aggregate the largest loss.

THE COURT: Well, I mean you formed a group through assignment of all the claims of CCM's clients essentially. Right? That's how CCM is now a single

11

plaintiff because the aggregated individual claims were all assigned to CCM.

MR. LINEHAN:   Yes, that is correct that through assignments it's in a way an aggregation, but the courts do allow assignments in aggregation when the parties have a professional relationship or family relationship, something like that.  So we'd actually argue that CCM's assignments are not an aggregation of unrelated claims or individuals, it's one individual who was the investment advisor overseeing investments, taking responsibility for the investments on which he was defrauded.  And because they had this working relationship, you know, there would be no issues if, say, he had, you know, if you're one advisor with a group of five people and they all assign their claims because, or if they were to move as a group, that would be fine because they all this preexisting relationship that's about the securities at issue.

They're not purely coming together out of unrelated just for the purpose of aggregating the losses. They all have losses under CCM and their --

THE COURT:   And CCM has the largest individual loss I note.  It's the 2.9 as opposed to I think Mr. Viani has a 2.6 individually, but when aggregated with Mr. Price it's the 3.9.  Okay.

12

I'd like to hear next from counsel for Viani and Price why you think it's appropriate for your clients to have, to be aggregated together, how did they come together, what's their preexisting relationship.

MR. AMJED:    Your Honor, if it's okay, I'd like to --

THE COURT:    Sure.

MR. AMJED:    Thank you, Your Honor.  Naumon Amjed from Kessler Topaz Meltzer & Check on behalf of Viani and Price.  In terms of Viani and Price being able to group together, the law in this district as set forth by Judge Marrero in *Varghese* establishes that a preexisting relationship is not necessary.

The analysis here is not check the box, did you know each other; the analysis is have you provided evidence of your ability to work together.  That's why Judge Marrero's opinion in *Varghese* sets out a number of criteria that courts should look to.  Preexisting relationship is one.  But also the involvement of the members in the litigation to date, the plans for cooperation, the sophistication, and how the investors went about selecting counsel.

Your Honor, my clients have been active in this litigation from the start.  As set forth in the

13

declaration that they submitted with their opening brief, which is the only evidence actually before the Court, they knew that they were not obligated to seek appointment as lead plaintiff.  They knew they were not obligated to select my firm as lead counsel.  They knew that there are other law firms issuing releases alerting the class to their rights.  With this information they affirmative contacted my firm and asked my firm to represent them and retained my firm to represent them.  They were fully aware of their options when they retained my first.

Following retention, they continued to stay active.  They personally spoke to each other surrounding the circumstances of their investments in Paysafe, the obligations that they would undertake as lead plaintiff. They explained why they were moving jointly which is because they have such significant losses and because they wanted to ensure that the case was litigated properly by lead plaintiffs who are incentivized given their loss and that they wanted to seek appointment together.  They also talked about the benefits that they believe that the class would receive from their appointment by allowing them to confer with each other, allowing joint decision-making, and, again, Your Honor, as you pointed out, each of them has very significant losses individually.  So given the

14

size of their losses, they have a very strong interest in making sure this case is properly litigated.

Since the initial lead plaintiff motions, they've continued to communicate, they've exchanged contact information from one another, and very recently we had another discussion where we talked about the processes and protocols that we would continue should the Court appoint them as lead plaintiff.

In terms of their sophistication, they're both very sophisticated men.  Mr. Viani operates 40 franchise locations across four states, and Mr. Price has a multi-million dollar real estate portfolio and an MBA.  So in terms of their sophistication they fulfill all the qualifications of what you would consider to be sophisticated people.

Your Honor, their active retention of counsel, their ongoing involvement in litigation, the commitment to ensure that the class is actively represented, and the way they went about selecting counsel fulfills all the requirements under *Varghese* for their appointment as lead plaintiff.

Campbell Capital has not cited a single fact undermining any of the representations in our declaration. On this point, Your Honor, we have very recent circuit

15

level authority from the Ninth Circuit in the *Mersho* opinion which addresses some of the issues before the Court today. *Mersho* makes two relevant points for our consideration. Number one, it rejects the notion that a preexisting relationship is needed. What it looks to is whether groups are actually functioning which is the test all throughout this circuit and all throughout the district courts across the United States.

And, second, it reiterates that the PSLRA demands proof if you want to unseat a movant that has the largest loss and misgivings and non-speculative arguments based on a group not having a relationship under *Mersho* is not sufficient. And that is consistent with the statutory framework and the burdens of proof demanded by the PSLAR.

So given the evidence that is before the Court, again, which is Viani and Price's declaration, and given the absence of any facts undermining any representations in their declaration, they are the presumptively most adequate plaintiff, and under the PLSRA and under the guidance we just received from the Ninth Circuit, it's Campbell Capital's burden to come forth with evidence that we're not operating as a cohesive group, and all the evidence before the Court suggests that they are.

Unless the Court has any questions about the

16

group, I can turn to the assignment issue of Campbell Capital.

As the Court correctly noted in its questioning of counsel, Campbell Capital's standing and their entire financial interest is based on an amalgamation of a hundred or so assignments.  In our briefing we pointed out that the manner in which the assignment were executed raises questions that defendants could delve into, and that creates a unique issue because now every time there's a question about the assignments, Campbell Capital has to find these hundred people, figure out what the answers are, and provide that to the Court or defense counsel or in this litigation at some point.

And that's the issue that we have, it's that the process by which these assignments were collected, there's no information about the sophistication of the assignees, of the assignors, do they understand what the assignment means, do they understand that it's irrevocable.  What happens if they divest from Campbell Capital and close their account, what happens to their assignment?  Do they understand all those things?  And those are questions that have not been answered by Campbell Capital.

Now, one of the cases that Campbell Capital cites throughout their papers in support of their

17

appointment is the *LJM* case from the Northern District of Illinois, and that was authored by Judge Dow, in *LJM* the court appointed an investment firm like Campbell Capital who had 200 plus assignments.  So Campbell Capital says we're just like them.  But in the *LJM* opinion Judge Dow notes that the movant there explains in some detail how it secured the assignments.

I pulled the declaration that the movants submitted in that case, and I have it if the Court was interested, but what they did there was very different than what Campbell Capital has put forward here.  There the movants who received the assignments said they consulted extensively with each of our respective clients about the class action litigation and explained precisely how the assignment process would work under the PSLAR. They also said they advised each and every client to consult with their own advisor and counsel prior to signing and returning the settlement of claim in order to ensure that the interest of each client were aligned with their own understanding of the case.

Furthermore, the people executing the declaration were the personal liaison between the clients and the firm to ensure that any questions that came up were answered by them.

18

Campbell Capital has provided none of those assurances. Their basic argument is trust us, we're fine, it's – our assignments are valid as a matter of law. Well, that's not the standard at this stage. If the way they went about securing the assignments and the lack of information that they provided creates as issue that the class now has to answer and the class is going to be distracted from answering that question because they have to go back and survey a hundred people, then under the case law we cited in our brief, the *Snap* case, the *Array* opinion from Marrero, and the *Central European* case, they're not appropriate as a lead plaintiff.

So the test at this stage isn't are you ultimately right? The test is have you created an issue that's going to distract you from litigating the case in the class's best interest? Thank you, Your Honor.

THE COURT: Does CCM want to make any other comments based on that argument?

MR. LINEHAN: Your Honor, I'd like to make one. So we did explain to the – I just want to make a point that we did explain to the individuals who were signing the assignments what the nature of assignments would do, what their legal affect would be, and we also did advise that if they had questions, they were free to consult

19

their own counsel, in addition to us or CCM, about the issue.  It's after that that they signed them.

THE COURT:  Okay.  Let me invite defendants, do you have any position on this?

MR. WALDMAN:  No, Your Honor.  No position from Paysafe.

MR. NEUWIRTH:  Nothing to add, Your Honor.

THE COURT:  Okay.  I will take this under advisement.  I will consolidate the case, the cases so that will be issued.  Today or tomorrow you'll get a notice on the consolidation, and I will make the decision on the lead counsel, lead plaintiff and counsel shortly.

One question I have, and this is really for both plaintiffs' firms.  I assume that you may want to do an amended complaint after these, after the Court issues a decision on lead counsel.  I assume regardless both firms would want to do that.  Am I correct in that assumption.

MR. AMJED:  Yes, Your Honor.

MR. LINEHAN:  Yes, Your Honor.

THE COURT:  Okay.  And – okay.  So what I'd also like to do then is to set a schedule for the filing of an amended complaint and then for a briefing schedule.  So what I'm thinking is that an amended complaint should be filed within 30 days after I issue the decision on lead

20

counsel.  Is that enough time?

MR. AMJED:  I would request 45 days, but we would work under the Court's preference if is 30 days, Your Honor.

THE COURT:  If that was you.  What about --

MR. LINEHAN:  I would request longer, but, again, we'd be willing to work within the Court's schedule if 30 days if what the Court would prefer.

THE COURT:  Okay.  What's happened to the Paysafe stock at this point?  I'm just wondering.  Has it gone up?

MR. AMJED:  The last I checked, it was hovering around $3, maybe a little higher than $3.

THE COURT:  All right.  Okay.  And in terms of a motion to dismiss, would you want 30 days or 60 days after the filing of the amended complaint?

MR. WALDMAN:  Your Honor, we would propose 60/60/45 which is the schedule we typically would propose to plaintiffs.

MR. AMJED:  We agree with that, Your Honor.

THE COURT:  Yeah?  Okay.  All right, so what I'm going to say is that within 45 days after the Court issues a decision on lead counsel, the lead counsel will file an amended complaint.  The consolidated action will

21

be the In Re Paysafe litigation. And the filings would go in the first filed matter which would be Wiley, the 21cv10611. And then I'll adopt the 60/60/45 schedule. This matter's – let's see. Hold on one second.

(pause in proceeding)

THE COURT: Just looking at the docket for a second.

(pause in proceeding)

THE COURT: Okay, it will be the district judge, Judge Ramos now. It was originally Judge Nathan who's now on the circuit. So Judge Ramos will ultimately decide the motion to dismiss. You do have an option to consent to me if you wish. And I think that's – I think that's it. Once we have the schedule, once you have the briefing, then you'll take it from there. But discovery will be stayed pending the outcome of the motion to dismiss.

Have the parties talked at all about early resolution of the case?

MR. AMJED: We have not, Your Honor. I think we'd need a lead plaintiff appointment.

THE COURT: Yeah, okay. All right, so I'll get on that decision shortly. Is there anything that either plaintiffs would like to raise at this time?

22

MR. AMJED:   Nothing further from us, Your Honor.

MR. LINEHAN:   Nothing further, Your Honor.

THE COURT:   And is anything that defense counsel would like to raise?

MR. WALDMAN:   No, Your Honor, thank you for your time.

MR. NEUWIRTH:   No, Your Honor, thank you.

THE COURT:   Okay, so I'll issue the scheduling order, the consolidation order, and then in short order the lead counsel.  Okay?  And lead plaintiff.  Thank you, we're adjourned.

MR. LINEHAN:   Thank you, Your Honor.

(Whereupon the matter is adjourned.)

23

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, IN RE PAYSAFE LIMITED f/k/a FOLEY TRASIMENE ACQUISITION CORP. II SECURITIES LITIGATION, Docket #21cv10611, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

                    Carole Ludwig

Date:  May 22, 2022