**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYSAFE LIMITED f/k/a FOLEY TRASIMENE ACQUISITION CORP. II SECURITIES LITIGATION | Master File No. 1:21-cv-10611 (ER) (KHP) |
| | CLASS ACTION |
| | **JURY TRIAL DEMANDED** |
| This Document Relates To:<br>        ALL ACTIONS | |

**CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION AND OVERVIEW ............................................... 1

II.   JURISDICTION AND VENUE ................................................................... 6

III.  PARTIES ................................................................................................. 7

    A.    Plaintiffs ........................................................................................ 7

    B.    Defendants .................................................................................... 7

        1.    Paysafe .................................................................................... 7

        2.    Individual Defendants ........................................................... 7

IV.   SUBSTANTIVE ALLEGATIONS ............................................................. 9

    A.    Defendant Foley Founds FTAC as a Blank Check Company ............... 9

    B.    Shortly After Its IPO, FTAC Announces a Proposed Merger with
        Paysafe ......................................................................................... 10

    C.    Background on Paysafe ................................................................... 13

        1.    Paysafe's Revenue Generation ............................................. 14

        2.    Paysafe's Presence in the German iGaming Market ............... 15

        3.    Prior to the Merger, Germany Announced Material
            Changes to Its Online Gambling Regulations ........................ 16

        4.    Defendants Were Aware of the Forthcoming
            Amendments to the German Gambling Regulations
            Throughout the Class Period .................................................. 18

        5.    Germany's Revised Gambling Regulations Were
            Reasonably Likely to Have a Material Adverse
            Impact on Paysafe's Revenues ............................................... 20

    D.    Defendants Failed to Disclose Known Changes in German
        iGaming Regulations That Were Reasonably Likely to Have an
        Adverse Impact on Paysafe's Business .......................................... 22

    E.    FTAC Shareholders Approve the Merger ........................................ 26

    F.    Following the Merger, Paysafe, McHugh, Dawood, and Foley
        Continued to Conceal from Investors the Likely Adverse Impact of
        the Fourth Interstate Treaty on Gambling ...................................... 27

V.    THE TRUTH EMERGES ......................................................................... 29

|  | A. | Defendants Announce Lower Earnings Guidance Attributable to Softness in the European Gaming Market | 29 |
|  | B. | Defendants Belatedly Reveal that the Fourth Interstate Treaty on Gambling Is Adversely Affecting Paysafe's Revenues | 30 |
| VI. | | POST CLASS PERIOD EVENTS AND DISCLOSURES | 32 |
| VII. | | DEFENDANTS VIOLATED ITEM 303 OF REGULATION S-K, ITEM 5 OF FORM 20-F, AND ITEM 14(g)(1) OF FORM F-4 | 34 |
| VIII. | | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS | 37 |
|  | A. | December 7, 2020 Form 8-K | 37 |
|  | B. | December 7, 2020 Form 425 | 38 |
|  | C. | December 21, 2020 Form F-4 | 40 |
|  | D. | February 1, 2021 First Amended Form F-4 | 42 |
|  | E. | February 25, 2021 Second Amended Form F-4 | 43 |
|  | F. | February 26, 2021 Joint Proxy Statement and Prospectus | 45 |
|  | G. | March 30, 2021 Form 8-A | 46 |
|  | H. | April 1, 2021 Form 20-F | 48 |
|  | I. | May 19, 2021 Form F-1 | 49 |
|  | J. | June 2021 Paysafe Blog Post | 50 |
|  | K. | August 16, 2021 Form 6-K | 51 |
|  | L. | September 10, 2021 Deutsche Bank Technology Conference | 52 |
| IX. | | ADDITIONAL ALLEGATIONS OF SCIENTER | 53 |
|  | A. | iGaming-Related Transactions in Germany were a Core Operation of Paysafe | 54 |
|  | B. | Defendants Publicly Discussed and Touted Their Monitoring of Regulatory Changes | 55 |
|  | C. | Defendants' Class Period Disclosures Repeatedly Referenced European Gambling Markets and, More Specifically, Changes to Germany's Gambling Regulations | 56 |
|  | D. | Defendants Admitted that Paysafe Had "Anticipated" a Negative Impact From the Cross-Operator Deposit Limit | 56 |
|  | E. | Defendant Foley Had Financial Motives to Commit Fraud | 57 |
|  | F. | FTAC's Management Conducted Significant Due Diligence Examinations of Paysafe Prior to the Merger | 58 |
| X. | | LOSS CAUSATION | 59 |

XI.    APPLICATION OF THE FRAUD-ON-THE-MARKET PRESUMPTION OF
       RELIANCE.................................................................................................... 62
XII.   INAPPLICABILITY OF SAFE HARBOR ........................................................ 64
XIII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS............................................ 64
XIV.   CAUSES OF ACTION ...................................................................................... 66
       COUNT I ........................................................................................................ 66
       COUNT II ....................................................................................................... 68
       COUNT III...................................................................................................... 70
XV.    PRAYER FOR RELIEF .................................................................................... 71
XVI.   JURY TRIAL DEMANDED ............................................................................. 72

Lead Plaintiffs Robert J. Viani ("Viani") and Eric C. Price, as trustee for the Eric C. Price & Kristen B. Hennig-Price Rev. Living Trust UA 05/27/2015 ("Price," and together with Viani, "Plaintiffs"), bring this action under the federal securities laws, individually and on behalf of the following persons and entities (the "Class"): all persons and entities who purchased or otherwise acquired Foley Trasimene Acquisition Corp. II ("FTAC") common stock and/or Paysafe Limited f/k/a Foley Trasimene Acquisition Corp. II ("Paysafe" or the "Company") common stock during the period from December 7, 2020 through November 11, 2021, inclusive (the "Class Period"), and were damaged thereby.

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based upon, among other things, the independent investigation of Plaintiffs' undersigned counsel, conducted under Plaintiffs' supervision. The investigation included the review and analysis of, among other things: (i) public filings with the United States Securities and Exchange Commission ("SEC"); (ii) wire and press releases; (iii) shareholder communications, conference calls, and investor presentations; (iv) analyst reports and advisories; (v) media reports; (vi) data reflecting the price of FTAC's and Paysafe's common stock; and (vii) other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.      Paysafe is a financial technology company that provides payment processing services and facilitates online transactions through the use of digital wallets and online cash transactions. Paysafe's digital wallets and e-cash services allow consumers and merchants to complete online transactions anonymously using cash, prepaid cards, and alternate payment

methods like cryptocurrencies without the use of a bank account or credit card. Paysafe's payment services are often used for transactions within video games and online gambling.

2.       At all relevant times, Paysafe divided its business into three main operating segments: (i) Integrated Processing, which processed payments for merchants; (ii) Digital Wallet, which enabled consumers to make digital payments using a variety of currencies for purposes like e-commerce purchases, transactions within video games, and online gambling; and (iii) e-Cash Solutions, which allowed consumers to use cash for digital payments through the purchase of prepaid digital vouchers.

3.       Each of Paysafe's segments generated revenue through per-transaction fees charged to merchants and/or customers. Depending on the type of transaction, the fee charged by Paysafe was either a flat fee or a percentage of the total amount of the transaction.

4.       Prior to the start of the Class Period, Paysafe operated as a private company. On December 7, 2020, however, FTAC—a publicly-traded special purpose acquisition company ("SPAC") formed for the sole purpose of entering into a business combination with a company in the financial technology industry—announced it had entered into a merger agreement with Paysafe (the "Merger"). If consummated, the Merger would result in FTAC shareholders becoming Paysafe shareholders and Paysafe becoming a publicly-traded company without conducting a traditional initial public offering.

5.       According to the terms of the merger agreement dated December 7, 2020 (the "Merger Agreement"), the Merger was dependent upon, among other things, a majority of FTAC shareholders approving the deal. In addition, if FTAC's share price fell below $10.00, the Merger could have been jeopardized. Thus, after the Merger was announced, FTAC, Paysafe, and their officers, including Defendant William Foley, embarked upon a scheme to inflate FTAC's share

2

price and ensure that the Merger was consummated. This included making, furnishing, and/or disseminating materially false and misleading statements to FTAC investors that portrayed Paysafe as an established and highly-successful financial technology company that was poised to capitalize on the burgeoning online gambling, or "iGaming," market.

6.      These statements misstated and omitted material facts concerning, among other things, the risks that forthcoming iGaming regulations in Germany, Paysafe's second largest geographic market, posed to the Company's business.

7.      Specifically, in 2020, Germany passed legislation that would significantly change its regulation of the gambling industry. As relevant here, the new legislation set a €1,000 monthly deposit limit on each user across all gambling websites. The new German regulations, including the cross-operator monthly deposit limit, were announced by no later than March 2020.

8.      Because, unbeknownst to investors, Paysafe's Digital Wallet and e-Cash operating segments catered to high-roller clients and generated fees based on the amount of each transaction, a cross-operator monthly deposit limit applicable to one of its most successful geographic markets for online gambling was reasonably likely to have a significant negative impact on Paysafe's revenues. Yet despite: (i) being aware of this forthcoming change in German gambling regulations, (ii) anticipating that it would have an adverse impact on the Company (as Defendants later admitted), and (iii) *specifically referencing* these new regulations in their Class Period statements to the market, Defendants did not disclose that this change was reasonably likely to have a material negative impact on the Company's financial performance.

9.      Instead, Defendants misleadingly painted the new German gaming regulations as a *positive* development for Paysafe, stating:

> Although the general trend in gambling regulation over the last ten years has been to seek to restrict the activities of online-based operators, in the EU this has

3

generally resulted in a move towards controlled regulation, rather than absolute prohibition. For example, the regimes in Italy and France have both moved away from state-run monopoly-based markets to controlled regulation (and **_Germany has moved from prohibition to controlled regulation_**).[1]

10.     These same statements were repeated in subsequent filings, including: (i) Paysafe's February 1, 2021 Amendment No. 1 to its Form F-4 ("First Amended Form F-4"); (ii) Paysafe's February 25, 2021 Amendment No. 2 to its Form F-4 ("Second Amended Form F-4"); and (iii) the February 26, 2021 Joint Proxy Statement and Prospectus filed on Schedule 14A and pursuant to Rule 424(b)(3). Each of these disclosures, which was made, furnished, or disseminated by Defendants, misleadingly concealed the massive impact that the monthly deposit limit was reasonably likely to have on Paysafe's revenues and overall financial condition.

11.     Shareholders approved the Merger on March 25, 2021, and the Merger was consummated on March 30, 2021.

12.     Following the Merger, Paysafe executives and directors continued to make false and misleading statements and continued to omit any mention of the anticipated adverse impact of the German gaming regulations on the Company's financial condition. For example, the statements discussed above were repeated in Paysafe's Form 20-F filed with the SEC on April 1, 2021—just two days after the Merger was complete. They were also repeated in Paysafe's Form F-1 filed with the SEC on May 19, 2021.

13.     The new German regulations, including the cross-operator deposit limit, took effect on July 1, 2021. On August 16, 2021, Paysafe disclosed its earnings for the second quarter of its 2021 fiscal year. The Company reported positive results with growth in all of its segments, but it shocked investors by disclosing that it would be lowering its guidance for the third quarter, which also began on July 1, 2021. Defendants forecasted that Paysafe's third quarter revenue would be

---

[1]      Unless otherwise stated, all emphasis is added.

between $360 and $375 million, well below the market consensus of $389 million. On this news, the price of Paysafe common stock declined $1.58 per share, or more than 15%.

14.    During an earnings call held that same day, Defendants attributed the Company's weak guidance to "softness" in the European online gambling market. However, Defendants still did not disclose the specific impact of the new German regulations on Paysafe's financial condition. Instead, Defendants falsely characterized this "softness" as transitory and assured investors that Paysafe's earnings would rebound strongly in the fourth quarter of 2021. Indeed, Defendants reaffirmed Paysafe's full-year revenue guidance of $1.53 billion to $1.55 billion.

15.    By November 11, 2021, however, when Defendants announced Paysafe's financial results for the third quarter of 2021, they could no longer conceal the truth from investors. On that day, Defendants disclosed that Paysafe had failed to meet its reduced third quarter guidance. In explaining this miss to investors, Defendants disclosed, for the first time, the negative impact that the new German gambling regulations—and more specifically, the cross-operator monthly deposit limit—had on Paysafe's business. In making this disclosure, Defendant McHugh admitted that Paysafe "had anticipated" that the amended regulations would have a negative impact on the Company's operations. Defendants further disclosed that Paysafe would not meet its previously-disclosed full-year 2021 revenue guidance, which it lowered to just $1.47 billion to $1.48 billion.

16.    On this news, the price of Paysafe common stock plummeted from $7.27 per share on November 10, 2021, to $4.24 per share on November 11, 2021—a decrease of $3.03 per share, or more than *41%.*

17.    After the markets closed on November 11, 2021, Defendant Ismail (Izzy) Dawood, CFO of Paysafe, also admitted on Twitter that Paysafe had, in fact, been "anticipat[ing]" that changes in the German gambling laws were going to have a negative impact on Paysafe's revenues.

5

When Paysafe subsequently filed its annual Form 20-F for fiscal year 2021, and after investors had already suffered significant harm, Defendants belatedly made the disclosure that they should have made during the Class Period, warning investors that the new German regulations contain "***certain restrictive measures that could adversely impact the Company***" including "a mandatory deposit limit of 1,000 euros per month across all providers for online gambling."

18.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market price of the Company's securities when the truth was revealed to the market, Plaintiffs and other members of the Class have suffered significant monetary damages. This action seeks to recover those damages.

## II.    JURISDICTION AND VENUE

19.     Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Paysafe's shares are traded on the New York Stock Exchange ("NYSE") and many of the acts and conduct that constitute the violations of law complained of herein, including the making, furnishing, and dissemination to the public of materially false and misleading information, occurred in this District.

22.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

#### A.    Plaintiffs

23.    Lead Plaintiff Viani is a resident of New York. As set forth in Exhibit A attached hereto, Viani purchased FTAC common stock and Paysafe f/k/a Foley Trasimene Acquisition Corp. II common stock at artificially inflated prices in December 2020, March 2021, May 2021, and July 2021, and suffered damages as a result of the violations of the federal securities laws alleged herein.

24.    Lead Plaintiff Price is a resident of California and the trustee for the Eric C. Price & Kristen B. Hennig-Price Rev. Living Trust UA 05/27/2015. As set forth in Exhibit B attached hereto, Price purchased Paysafe f/k/a/ Foley Trasimene Acquisition Corp. II common stock at artificially inflated prices in June 2021, July 2021, and August 2021, and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### B.    Defendants

##### 1.    Paysafe

25.    Defendant Paysafe Limited f/k/a Foley Trasimene Acquisition Corp. II is a Bermudian corporation headquartered at Victoria Place, 31 Victoria Street, Hamilton H10, Bermuda.

##### 2.    Individual Defendants

26.    Defendant William P. Foley, II ("Foley") is the founder of FTAC. Foley was the Chairman of the FTAC Board of Directors ("FTAC Board") from the start of the Class Period until April 2021, and served as the Chairman of the Paysafe Board of Directors ("Paysafe Board") throughout the remainder of the Class Period. During the Class Period, Foley signed the Joint Proxy Statement and Prospectus filed on February 26, 2021 and Paysafe's Form F-1 filed on May 19, 2021.

27.    Defendant Richard N. Massey ("Massey") was the CEO of FTAC and a member of the FTAC Board from July 2020 until the Merger was completed on March 30, 2021. Massey was a member of the FTAC Board at the time the Joint Proxy Statement and Prospectus was filed on February 26, 2021.

28.    Defendant Bryan D. Coy ("Coy") was the CFO of FTAC from July 2020 until the Merger was completed on March 30, 2021. Coy was a member of the FTAC Board at the time the Joint Proxy Statement and Prospectus was filed on February 26, 2021.

29.    Defendant Philip McHugh ("McHugh") was the CEO of Paysafe from June 2019 through the end of the Class Period. Prior to the Merger, McHugh, on behalf of Paysafe, signed the Form F-4 filed by FTAC on December 21, 2020, and the amendments filed on February 1, 2020 and February 25, 2021. After the Merger was executed, McHugh also signed Paysafe's Form 8-A filed on March 30, 2021, Form 20-F filed on April 1, 2021, and Form F-1 filed on May 19, 2021. In addition, McHugh made materially false and misleading misstatements on September 10, 2021, during the Deutsche Bank Technology Conference. On April 7, 2022, Paysafe announced that Defendant McHugh resigned from his role as CEO and stepped down as a member of the Paysafe Board.

30.    Defendant Ismail (Izzy) Dawood ("Dawood") was the Chief Financial Officer of Paysafe from September 2020 through the end of the Class Period. During the Class Period, Dawood signed the Form F-4 filed with the SEC on December 21, 2020, and the amendments filed on February 1, 2020 and February 25, 2021, the Form F-1 filed with the SEC on May 19, 2021, and the Form 6-K filed with the SEC on August 16, 2021. In late 2022, Dawood resigned from his role as CFO.

31.    Defendants Foley, Massey, Coy, McHugh, and Dawood are collectively referred to herein as the "Individual Defendants." Paysafe and the Individual Defendants are collectively referred to herein as "Defendants."

32.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Paysafe's and FTAC's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the FTAC and Paysafe reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Defendant Foley Founds FTAC as a Blank Check Company**

33.    Foley founded FTAC on July 15, 2020 as a SPAC. Sometimes referred to as a blank check company, SPACs do not maintain any operations as a traditional company would. Instead, Foley formed FTAC for the sole purpose of raising capital from investors to consummate "a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses."

34.    Three months after its formation, on August 18, 2020, FTAC conducted an initial public offering ("IPO"), selling 130 million IPO "units" to investors at a price of $10 per unit. Each unit consisted of one share of FTAC Class A common stock (which traded on the NYSE under the ticker symbol "BFT") and one-third of one redeemable FTAC warrant, with each full

warrant representing the right to purchase FTAC Class A common stock at a purchase price of $11.50 upon consummation of a business combination. Shortly after the IPO, FTAC sold over 20 million additional warrants in two private placements, and it sold over 16 million units through a partial exercise of an over-allotment option by the underwriters of the IPO. FTAC raised approximately $1.4 billion in capital through these offerings, which it held in a trust account pending a potential business combination.

35.    According to FTAC's public filings with the SEC, FTAC intended to use these funds to target a business combination in the financial technology or business process outsourcing industries. If FTAC was unable to consummate such a combination within 24 months of the IPO, then pursuant to the terms of FTAC's certificate of incorporation, it was required to redeem its public shares (at a purchase price equal to each share's pro rata share of the cash held in the trust account) and promptly liquidate and dissolve. In such a scenario, warrants issued in the IPO and sold in the post-IPO private placements would expire worthless.

**B.    Shortly After Its IPO, FTAC Announces a Proposed Merger with Paysafe**

36.    Less than four months after its IPO, on December 7, 2020, FTAC filed a Form 8-K with the SEC (the "December 7 Form 8-K") announcing a proposed Merger between FTAC and Paysafe, a Bermuda-based integrated payments platform company operating in the United States and abroad. Paysafe was a direct subsidiary of Paysafe Group Holdings Limited ("PGHL"), a privately-held company controlled by private equity firms Blackstone Group and CVC Capital Partners. Following the Merger, the Company would continue to do business as "Paysafe Limited."

37.    According to the December 7 Form 8-K and the terms of the Merger Agreement (which was attached as an exhibit to the December 7 Form 8-K), FTAC proposed to acquire Paysafe through a combination of cash and stock consideration. In particular, FTAC planned to fund the Merger with: (i) the $1.4 billion in cash held in its trust account; (ii) $150 million in

proceeds raised through a forward purchase agreement with Cannae Holdings, Inc. ("Cannae"); (iii) $2 billion raised through a private placement with certain institutional investors, including, Fidelity National Title Insurance Co., Chicago Title Insurance Co., Commonwealth Land Title Insurance Co., Fidelity & Guarantee Life Insurance Co., Third Point LLC, Suvretta Capital Management, Hedosophia, the Federated Hermes Kaufmann Funds, and an additional $350 million investment from Cannae (collectively, the "PIPE Investors"); and (iv) shares of Paysafe common stock (in an amount to be determined pursuant to a formula described in the Merger Agreement).

38.    As set forth in the December 7 Form 8-K, upon consummation of the Merger, each outstanding share of FTAC common stock (except for certain excluded shares) would be converted into the right to receive one share of Paysafe common stock, which would trade on the NYSE following the Merger. Thus, in connection with the Merger, FTAC shareholders would effectively have their FTAC shares transformed into an equivalent number of Paysafe shares. At the same time, Paysafe would transform itself into a publicly-traded company without having to meet all of the requirements of a traditional IPO.

39.    For the Merger to be consummated, however, Defendants needed to satisfy at least three conditions. *First*, pursuant to FTAC's IPO documents, Paysafe's fair market value had to equal at least 80% of the assets held in FTAC's trust account, which stood at $1.467 billion as of December 31, 2020. Accordingly, if Paysafe's fair market value fell below $1.17 billion, the Merger would not be consummated. Notably, the FTAC Board "did not obtain a third party valuation or fairness opinion" in connection with the Merger, a decision which forced investors to "rely[] solely on the judgment of the FTAC Board in valuing [Paysafe's] business."

40.    *Second*, a majority of FTAC's shareholders needed to approve the Merger. Without majority shareholder approval, the Merger would not be consummated.

41.    *Third*, Defendants needed to ensure that enough shareholders retained their shares and did not exercise their right of redemption. Specifically, in connection with the Merger, FTAC shareholders were given the option of redeeming their FTAC shares for a pro rata share of FTAC's trust account (approximately $10.00 per share plus interest) in lieu of receiving Paysafe shares. If such redemptions caused the total amount of available cash to fall below a certain pre-determined level or prevented Paysafe from meeting the listing conditions imposed by the NYSE, the Merger would fail. Because of this redemption right and the potential consequences for the Merger, Defendants were incentivized to inflate FTAC's stock price so that it remained above $10.00 per share.

42.    If the Merger was approved, FTAC's public shareholders (excluding Cannae) would own approximately 20.4% of the equity of Paysafe following completion of the Merger. According to FTAC's Schedule 14A, the remaining equity in the post-Merger company would be held by: (i) the PIPE Investors (excluding Cannae) (22.9%); (ii) PGHL (45%); (iii) Cannae (excluding amounts included in Trasimene Capital FT, LP II) (7%); and (iv) Trasimene Capital FT, LP II (including Cannae's interest in Trasimene Capital FT, LP II) (4%).

43.    In a December 7, 2020 press release announcing the Merger, which FTAC attached as an exhibit to the December 7 Form 8-K, FTAC touted Paysafe as a "[l]eading integrated payments platform processing nearly $100 billion of payment volume" with "[s]ignificant growth opportunities" and a "[l]ong history as the global market leader in iGaming payments." In the same press release, Defendant McHugh, Paysafe's CEO, stated: "This transaction will allow us to

accelerate our growth opportunities across the business, particularly in fast growth sectors such as iGaming where we are the payments partner of choice."

### C.    Background on Paysafe

44.    Paysafe traces its origins back to a UK-based eCommerce gateway called Netbanx, which was created in 1996. Following a number of rebrands, the company changed its name to Paysafe and incorporated under the laws of the Isle of Man as Paysafe Group plc in November 2015. Paysafe's stock traded on the London Stock Exchange from December 23, 2015 to December 21, 2017, when Blackstone and CVC purchased the company in a £3 billion go-private transaction.

45.    At the time of the Merger announcement, Paysafe operated a "two sided" payment processing network—i.e., one that offers payment processing services to both consumers and merchants. Paysafe described itself as a company that enables "businesses and consumers around the world to connect and transact seamlessly through payment processing, digital wallet, and online cash solutions."

46.    Digital wallets and other online payment processing services allow consumers and merchants to transact online without having to disclose their credit card numbers or bank account information. These services also enable online transactions using cash, prepaid cards, and various currencies, including alternate payment methods like cryptocurrencies. One of Paysafe's primary competitors in the online payment processing space is Square. However, unlike Square, which prohibits its customers from using its payment services for "betting, including lottery tickets, sports related gambling, casino gaming chips, off-track betting, and wagers at races," Paysafe's financial technologies were often used to facilitate monetary transactions within the video game and online gambling industries.

13

47.     At the time of the Merger and throughout the Class Period, Paysafe had three main operating segments: Integrated Processing Solutions, Digital Wallet, and eCash Solutions.

48.     The Integrated Processing Solutions segment provided services to small- and medium-sized businesses and eCommerce sellers that enabled them to accept various forms of payments both in person and online.

49.     The Digital Wallet segment allowed consumers and merchants to "upload, store, withdraw and pay funds" using traditional payment methods, like a credit card, or alternative payment methods, like cryptocurrency. The Digital Wallet segment included the branded digital wallets Neteller (used primarily outside of the U.S.) and Skrill (used in the U.S.).

50.     The eCash Solutions segment provided a platform for consumers and merchants to pay for transactions with cash, even when the user is online, using a mobile device, or in an app or video game. Within the eCash Solutions segment, Paysafe offered the "paysafecard" and "Paysafecash" payment methods, which allowed consumers to make online purchases using a prepaid card or cash, respectively.

### 1.     Paysafe's Revenue Generation

51.     At the time of the Merger and throughout the Class Period, each of Paysafe's three segments generated revenue through "per transaction fees," including fixed fees and/or fees calculated as a percentage of the dollar volume of the transaction. For example, within the Digital Wallet segment, Paysafe earned revenues by charging merchants a fee each time a payment was processed on their platforms and by charging customers a fee each time they deposited, withdrew, or transferred funds. Similarly, Paysafe's Integrated Processing segment earned revenues by charging merchants a fee to process credit card and debit card transactions, while the eCash

Solutions segment charged merchants or customers a fee every time a voucher, i.e., an electronic

barcode generated to facilitate payment at a physical location, was redeemed.[2]

52.    In each of 2019 and 2020, Paysafe generated $1.4 billion in revenue across all three

segments, primarily from "per-transaction fees."

53.    During the Class Period, Paysafe derived a significant portion of its revenue from

iGaming (which encompasses a broad selection of online betting related to sports, esports, fantasy

sports, poker, and other casino games), primarily through its Digital Wallet and e-Cash segments.

For example, in 2020, approximately 36% of Paysafe's revenue was generated through

transactions in the iGaming sector.

54.    Like its other revenue sources, Paysafe's iGaming revenues were generated

primarily through "per transaction fees." With respect to Digital Wallet, Paysafe generated

iGaming revenues each time a gaming merchant (i.e., the operator) processed a transaction on

Paysafe's platform, and each time a gaming customer deposited or withdrew funds. Similarly,

Paysafe earned per transaction fees each time eCash was used to transact on an iGaming website.

Importantly, the size of these per transaction fees depended upon both the number and dollar value

of the transactions. Thus, a decrease in either the number of customer transactions or the dollar

value of those transactions would lead to less fees and therefore lower revenues for Paysafe.

## 2.    Paysafe's Presence in the German iGaming Market

55.    In the run-up to the Merger, Defendants touted Paysafe as a "global leader in

iGaming" and a "global leader with over 1,000 operators" outside of the U.S. and Canada. One of

Paysafe's largest and most important European markets was Germany. In a tweet from December

---

[2]    In order to complete an eCash transaction, a customer receives a voucher in the form of a barcode generated during the online checkout from the online merchant. The customer must then scan the barcode at a physical location equipped to process such payments, such as a convenience store, and pay for the transaction with cash at the physical location.

12, 2021, Defendant Dawood referred to Germany as "the largest legal gambling market in Europe." As set forth in FTAC's Schedule 14A filed on February 26, 2021, Germany was Paysafe's second largest overall geographic market, accounting for over 10% of Paysafe's "Revenue from external customers" in the three fiscal quarters preceding the announcement of the Merger:

The information below summarizes revenue by geographic area for the year ended December 31, 2019 and 2018:

| | Year ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| UK | $ 63,424 | $ 53,506 |
| United States of America | 641,585 | 461,519 |
| Germany | 115,093 | 105,528 |
| All other countries | 589,312 | 509,459 |
| Revenue from external customers | $ 1,409,414 | $ 1,130,012 |

The information below summarizes revenue by geographic area for the nine-months ended September 30, 2020 and 2019:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| UK | $ 40,396 | $ 47,737 |
| United States of America | 472,799 | 487,173 |
| Germany | 106,800 | 83,461 |
| All other countries[(1)] | 432,736 | 427,774 |
| Revenue from external customers | $ 1,052,732 | $ 1,046,146 |

56.    Europe, and specifically Germany, continued to represent a significant market for Paysafe throughout the Class Period. In 2020, for example, 39% of Paysafe's revenue was generated in Europe. During this same time period, according to the European Gaming & Betting Association, Germany was the third largest European gambling market (behind the United Kingdom and Italy). Thus, as Defendants subsequently acknowledged, the German iGaming market was "an extremely large market" for Paysafe during the Class Period.

### 3.    Prior to the Merger, Germany Announced Material Changes to Its Online Gambling Regulations

57.    Germany's "Interstate Treaty on Gambling" grants the power to regulate gambling to each of the 16 German federal states. The First Interstate Treaty on Gambling, which was

enacted in 2008, permitted the German states, or companies run by these states, to offer certain in-person gambling services, but prohibited online gambling, such as online sports betting, online poker, and online casinos.

58.     In March 2019, after growing pressure to reform the gambling regulations, the German states signed the Third Interstate Treaty on Gambling. The purpose of this treaty was to create uniform, albeit temporary, regulations across the country while lawmakers worked to overhaul the gambling laws by 2021. In connection with the Third Interstate Treaty on Gambling, which went into effect on January 1, 2020, Germany legalized online sports gambling. It also implemented certain "player-protection requirements," including a monthly €1,000 stake limit—i.e., a limit on the total amount of money an individual could wager each month at each online operator. There was no limit on deposits, meaning that individual bettors could deposit as much money as they wanted across all of their accounts. The Third Interstate Treaty on Gambling maintained the prohibition against online poker and online casinos.

59.     After the Third Interstate Treaty on Gambling went into effect, German lawmakers continued to debate and solicit comments on the long-term direction of Germany's gambling regulations. Months before the Merger was announced, in March of 2020, the heads of the 16 German states announced that they had agreed on a new proposed treaty to replace the Third Interstate Treaty on Gambling. If ratified, the proposed treaty, known as the Fourth Interstate Treaty on Gambling, would take effect on July 1, 2021.

60.     The proposed Fourth Interstate Treaty on Gambling amended the sports gambling regulations. Most notably, the proposed treaty eschewed the €1,000 monthly stake limit in favor of a more restrictive *cross-operator* monthly *deposit* limit of €1,000 for sports betting. It also applied the same cross-operator deposit limit to online poker and online casinos. Accordingly, if

the Fourth Interstate Treaty on Gambling was ratified, each gambler in Germany, regardless of their income, would only be permitted to deposit a total of €1,000 per month across all gambling platforms.

61.     In October 2020, in preparation for the likely ratification of the Fourth Interstate Treaty on Gambling, Germany adopted what was colloquially referred to as a transitional regime.

62.     While the transitional regime was in place, Germany permitted online gambling operators to offer sports betting, virtual slots, and online poker without a formal license. During this period, it also applied different monthly limits to these forms of online gambling. For example, Germany continued to apply a €1,000 per month *stake* limit to sports betting, but it applied a cross-operator €1,000 per month *deposit* limit to other forms of online gambling. In other words, during this transitional period, while bettors could deposit any amount in their accounts with online sports betting operators and wager up to €1,000 per month through each operator, bettors could only deposit a total of €1,000 per month across all of their online poker and casino accounts.

63.     The Fourth Interstate Treaty on Gambling was ratified on April 21, 2021.

64.     On July 1, 2021, when the Fourth Interstate Treaty on Gambling took full effect, the cross-operator deposit limit applied across the board—i.e., all online gamblers were subject to a €1,000 per month deposit limit across all of their sports betting and online casino accounts.

### 4. Defendants Were Aware of the Forthcoming Amendments to the German Gambling Regulations Throughout the Class Period

65.     Throughout the Class Period, Defendants repeatedly assured investors that Paysafe was tracking both the changes in online gambling regulations applicable to its key markets and the impact that these changes could have on its business.

66.     For example, in a conference call held on December 7, 2020 to announce the Merger (the transcript of which was filed on Form 425 with the SEC), McHugh boasted about

Paysafe's expertise in monitoring regulatory changes, specifically in the German iGaming market, stating:

> I'll move on now from our key products to where and how we win, especially in iGaming. . . . In Europe and the rest of the world, we're a global leader with over 1,000 operators. We've continued to grow there, and we have great stories of being your global partner, but also able to react locally when regulation changes, be it in the U.K. or Germany, as examples, where we're able to react very, very quickly and support our operators.

67.     Defendant McHugh further touted Paysafe's "very deep and broad risk and regulatory management," noting the importance of "understand[ing] payment regulation[s]" in every market and boasting that Paysafe had done so "very, very successfully in every market we've entered."

68.     During the same conference call, Defendant Foley likewise touted FTAC's "unrivalled regulatory risk and technical expertise" as a reason why investors should trust its decision to pursue a merger with Paysafe.

69.     In addition, Paysafe's Initial Form F-4, filed with the SEC on December 21, 2020 and signed by McHugh and Dawood ("Initial Form F-4"), similarly stated:

> Given the importance of the online gambling sector to our business, we expend significant time and resources to ensure that we have an in-depth understanding of the regulatory environment in the main territories in which our gambling industry merchants operate and customers reside, monitoring closely the developing regulatory regimes in those territories and adapting our business acceptance policies where necessary. Currently, we monitor legal and regulatory developments in all of our material markets closely and generally seek to keep abreast of legal and regulatory developments affecting the gambling industry as a whole. We adapt our regulatory policies and, therefore, the scope of our ongoing monitoring on the basis that an individual market's materiality to us may change.

70.     The Initial Form F-4 continued: "We also engage external counsel to conduct an assessment of our top 20 online gambling revenue producing countries to assist in our assessments of risk." These same statements were repeated in multiple SEC filings in the run-up to the Merger.

71.     The Initial Form F-4 also represented that Defendants devoted significant resources to monitoring regulatory compliance, stating: "In order to successfully serve our markets, we run highly sophisticated . . . regulatory compliance operations with global capabilities."

72.     During a March 9, 2021 Analyst Day Presentation, McHugh again highlighted Paysafe's deep understanding of the regulations and related risks associated with each of its iGaming markets, stating:

> To be really good at international iGaming, you have to not only have card processing and be able to process a very high level. . . . you have to understand risk and regulation payments across hundreds of markets, and risk and regulation across gambling in hundreds of markets. They need a partner that understands that, thinks like they do and can support them globally. That's been the formula of our success internationally.

73.     Confirming that Defendants were aware of the forthcoming amendments, Paysafe's Class Period SEC filings expressly acknowledged that German regulators had agreed to amendments to the operative gambling regulations in March 2020, noting that this new legislation would impose "certain parameters" on online gambling. This statement also appeared in the Joint Proxy Statement and Prospectus filed by both Paysafe and FTAC.

**5.      Germany's Revised Gambling Regulations Were Reasonably Likely to Have a Material Adverse Impact on Paysafe's Revenues**

74.     As discussed above, Paysafe earned fees, and thus generated revenue, based on both the number of payment transactions executed by its customers and the size of those transactions. *See supra* Section IV(C).

75.     The monthly cross-operator deposit limit imposed by the Fourth Interstate Treaty on Gambling significantly limited the amount of money that German gamblers could deposit each month. Thus, it was reasonably likely to negatively impact both types of fees that Paysafe relied upon to generate revenue—per transaction fees calculated as a percentage of the transaction dollar value and fixed per transaction fees—in an "extremely large market" for the Company.

76.    In addition, as Defendants admitted at the end of the Class Period, Paysafe's iGaming customer base was skewed towards "higher-end betters"—i.e., gamblers who consistently wager large amounts of money—meaning the Company was particularly vulnerable to a €1,000 cross-operator deposit limit.

77.    Moreover, other participants in the iGaming industry publicly acknowledged the potential negative effect that these regulatory changes would have on the financial condition of companies in the German iGaming space.

78.    For example, interested members of the public expressed concern about the impact of the amended regulations on the German iGaming industry. Some comments submitted to the European Commission regarding the proposed changes to the German regulations "questioned the rationale behind the €1,000 monthly [deposit] limit that is to be applied across all products," while others noted that "***this drastic drop in the betting limit will have an effect [on] companies***."

79.    Several companies operating in the online gambling industry also publicly acknowledged that the changing regulations would impact their business, including by warning their investors about likely decreases in revenues. For example, in late 2019, addressing the potential for forthcoming regulatory changes, Bet365 disclosed that it was shutting down its German-facing casinos amid regulatory uncertainty. Then, on November 15, 2020, Flutter Entertainment plc ("Flutter"), a betting group based in Ireland that operated in Germany, announced that it expected the changes in Germany's iGaming regulations to cause a €56 million decrease in revenues, on an annualized basis.

80.    These disclosures from other companies regarding the impact of the amended German gambling regulations continued into the Class Period. For example, LeoVegas, a Swedish company that offers gaming and sports betting services in Germany, cited the changes, which were

partially implemented during the transitional regime, as a reason for its 12.5% decrease in German net gaming revenues for its second quarter ended June 30, 2021. Later, the company disclosed that as a result of the new regulations, it saw an 83% decrease in German net gaming revenues for its third quarter of 2021.

81.     Given these facts, it was reasonably likely that the enactment of the Fourth Interstate Treaty on Gambling would have a material adverse effect on Paysafe's iGaming revenues. Indeed, McHugh and Dawood admitted at the end of the Class Period that, all along, Defendants had "anticipated" that the Fourth Interstate Treaty would negatively impact Paysafe's revenues.

**D.     Defendants Failed to Disclose Known Changes in German iGaming Regulations That Were Reasonably Likely to Have an Adverse Impact on Paysafe's Business**

82.     From the beginning of the Class Period when the Merger was announced, Defendants engaged in a fraudulent scheme to inflate FTAC's and Paysafe's stock price, and to ensure that the conditions set forth above in ¶¶ 39-41 were satisfied so that the Merger would be consummated. This scheme included making, furnishing, and or/disseminating false information to the market and concealing (in violation of their disclosure obligations) the material, negative impact that known changes in the German regulatory market were reasonably likely to have on the Company's financial condition.

83.     Specifically, between December 7, 2020 and March 25, 2021, Defendants made, furnished, and/or disseminated a series of false and misleadingly incomplete statements to the market. These statements included: (i) the Initial Form F-4; (ii) the First Amended Form F-4; (iii) the Second Amended Form F-4; and (iv) the February 26, 2021 Proxy Statement for Special Meeting of Stockholders of FTAC, which FTAC filed with the SEC on Schedule 14A ("February 26, 2021 Proxy Statement"), and the February 26, 2021 Prospectus for up to 146,703,345 Common

22

Shares, 48,901,115 Warrants and 48,901,115 Common Shares Issuable Upon Exercise of Warrants

of Paysafe, which Paysafe filed with the SEC on Form 424(b)(3) ("February 26, 2021 Prospectus"

together with the February 26, 2021 Proxy Statement, the "Joint Proxy Statement and

Prospectus").

84.    Additionally, as discussed above, on December 7, 2020, Paysafe and FTAC each

filed with the SEC a Form 425 attaching the transcript from a joint Paysafe and FTAC conference

call. This Form 425 stated, among other things:

> **Important Information About the Proposed Business Combination and Where
> to Find It**
>
> In connection with the proposed business combination, a registration statement on
> Form F-4 (the "Form F-4") is expected to be filed by Paysafe Limited, an exempted
> limited company incorporated under the laws of Bermuda ("Paysafe") with the U.S.
> Securities and Exchange Commission ("SEC") that will include preliminary and
> definitive proxy statements to be distributed to holders of FTAC's common stock
> in connection with FTAC's solicitation for proxies for the vote by FTAC's
> stockholders in connection with the proposed business combination and other
> matters as described in the Form F-4, as well as a prospectus of Paysafe relating to
> the offer of the securities to be issued in connection with the completion of the
> business combination. ***FTAC, PGHL AND PAYSAFE URGE INVESTORS,
> STOCKHOLDERS AND OTHER INTERESTED PERSONS TO READ, WHEN
> AVAILABLE, THE FORM F-4, INCLUDING THE PROXY
> STATEMENT/PROSPECTUS INCORPORATED BY REFERENCE
> THEREIN, as well as other documents filed with the SEC in connection with the
> proposed business combination, as these materials will contain important
> information about PGHL, FTAC, and the proposed business combination***.

85.    Thus, Defendants explicitly directed FTAC investors and shareholders to Paysafe's

forthcoming filings concerning the Merger, including its Forms F-4 and "other documents filed

with the SEC in connection with the proposed business combination," acknowledging that these

documents "will contain important information about PGHL, FTAC, and the proposed business

combination," and thereby disseminating these filings by Paysafe to FTAC investors and

shareholders.

86.    Notably, the header on this Form 425, the other four Forms 425 that FTAC filed on December 7, 2020 regarding the Merger, and all of the pre-Merger Forms 425 filed by FTAC, identified the "Subject Company" as "Foley Trasimene Acquisition Corp. II." Similarly, the header on the four Forms 425 that Paysafe filed on December 7, 2020, and all of the other pre-Merger Forms 425 filed by Paysafe, also identified the "Subject Company" as "Foley Trasimene Acquisition Corp. II."

87.    Notwithstanding Defendants' knowledge of the forthcoming amendments to the German online gambling regulations and the fact that certain of these amendments, namely the cross-operator deposit limit, were reasonably likely to have an adverse impact on Paysafe's revenues, Defendants omitted any reference to the new deposit limit and its reasonably likely impact on the Company's business in an effort to ensure that the Merger was consummated.

88.    For example, two weeks after announcing the proposed Merger, Paysafe filed the Initial Form F-4 on December 21, 2020. McHugh and Dawood signed the Initial Form F-4.

89.    The Initial Form F-4 was filed by Paysafe to register shares in connection with the Merger. The Initial F-4 stated:

> In connection with the business combination described in this registration statement and the proxy statement/prospectus included herein[,] a series of transactions will result in outstanding publicly traded shares of Class A Common Stock and public warrants of Foley Trasimene Acquisition Corp. II, a Delaware corporation ('FTAC'), becoming securities of the Registrant registered hereunder.

90.    The Initial Form F-4 also specifically referenced the amendments to the German regulations multiple times in its Risk Disclosures, confirming that Defendants were aware of the coming changes. For instance, the Initial Form F-4 stated:

> For example, in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. ***In March 2020, German***

*regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters*.

91.     The Initial Form F-4 did not disclose what the referenced "parameters" were, nor did it disclose that one of those parameters—the cross-operator monthly deposit limit—was reasonably likely to have an adverse impact on the revenues Paysafe generated from its all-important German iGaming market, particularly given the Company's reliance on high-value gamblers. Instead, the Initial Form F-4 misleadingly touted the German regulation's legalization of online casino and poker gambling without discussing the negative impact it would have on online sports gambling.

92.     The Initial Form F-4 similarly stated, in a section titled "Regulatory Change: Trends and Outlook": "Although the general trend in gambling regulation over the last ten years has been to seek to restrict the activities of online-based operators, *in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition*. For example, the regimes in Italy and France have both moved away from state-run monopoly-based markets to controlled regulation (*and Germany has moved from prohibition to controlled regulation*)."

93.     Yet again, despite specifically referencing the imminent changes to the German iGaming regulatory landscape, the Initial Form F-4 did not disclose any information concerning the specific aspects of the regulations that were likely to negatively impact Paysafe's revenues. Instead, the Initial Form F-4 misleadingly suggested that Germany's "move[] from prohibition to controlled regulation" could be a positive development for Paysafe, stating: "Changes in the regulation of online gambling in the markets described above and elsewhere *may impact us both positively (where the markets are liberalized or become regulated)* and negatively (where markets are restricted or become prohibited)."

94.     In the months leading up to the FTAC shareholder vote, which was scheduled for March 25, 2021, Defendants' message did not change. Indeed, though the German transitional regime was implemented months earlier, Paysafe repeated these same statements in the First Amended Form F-4 and Second Amended Form F-4. The statements were again repeated in the Joint Proxy Statement and Prospectus, which was filed with the SEC by both Paysafe and FTAC. In each instance, Defendants specifically referenced the forthcoming changes to the German regulations and characterized them as a net positive for the Company, while failing to disclose— in violation of their disclosure obligations—that the cross-operator monthly deposit limit was reasonably likely to have a material negative impact on Paysafe's revenues.

95.     Notably, the Joint Proxy Statement and Prospectus disclosed that FTAC decided ***not*** to obtain a third-party fairness opinion in connection with the Merger. Rather than having a third party analyze the fairness of the Merger, which could have raised issues given the undisclosed risks facing Paysafe, FTAC's officers and directors, including Foley, personally analyzed the fairness of the transaction and concluded that it was in the best interests of FTAC and its shareholders. In addition, as reflected in the Joint Proxy Statement and Prospectus, the FTAC Board, including Foley, Massey, and Coy, recommended that FTAC shareholders vote in favor of the Merger:

> After careful consideration, the FTAC Board has determined that the Business Combination Proposal is fair to and in the best interests of FTAC and its stockholders and recommends voting "FOR" the Business Combination Proposal.

### E.    FTAC Shareholders Approve the Merger

96.     FTAC shareholders approved the Merger during a special meeting held on March 25, 2021. More specifically, 109,389,165 FTAC shares—or nearly 60% of the total outstanding FTAC shares—voted in favor of the Merger. In addition, just 98,846 FTAC shares were redeemed at a price of $10.00 per share.

97.    On March 30, 2021, FTAC filed a Form 8-K announcing the consummation of the Merger, and FTAC and Paysafe issued a joint press release promoting the success of the Merger and the Company's future prospects. On March 31, 2021, Paysafe shares began trading on the NYSE under the ticker PSFE.

**F.    Following the Merger, Paysafe, McHugh, Dawood, and Foley Continued to Conceal from Investors the Likely Adverse Impact of the Fourth Interstate Treaty on Gambling**

98.    After the Merger, Defendants Paysafe, McHugh, Dawood, and Foley continued to mislead investors regarding the likely impact of the German regulatory changes on Paysafe's revenues. For example, Paysafe's Form 20-F for fiscal year 2020, which it filed with the SEC on April 1, 2021 (the "2020 Form 20-F"), contained nothing more than a generic risk disclosure that regulations in the iGaming industry "may be unclear and may also change, sometimes dramatically, and such laws and regulations are constantly evolving and are often subject to conflicting interpretations." In addition, mirroring Defendants' prior false and misleading statements, the 2020 Form 20-F expressly referenced the amendments to Germany's gambling regulations, but continued to portray the developments as a positive for Paysafe while failing to disclose the adverse impact that they were likely to have on Paysafe's revenues. Specifically, the Form 20-F stated:

> The EU, by contrast, has generally moved towards controlled regulation of online-based gambling operators, rather than absolute prohibition. For example, in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters.

99.    The 2020 Form 20-F also once again misleadingly portrayed the impact of the new German regulations as a positive development for the Company. As Paysafe explained, "[c]hanges

in the regulation of online gambling in the markets described above and elsewhere ***may impact us***

***both positively (where the markets are liberalized or become regulated)*** and negatively (where

markets are restricted or become prohibited)." The Form 20-F further stated:

> Although the general trend in gambling regulation over the last ten years has been
> to seek to restrict the activities of online-based operators, ***in the EU this has
> generally resulted in a move towards controlled regulation, rather than absolute
> prohibition***. For example, the regimes in Italy and France have both moved away
> from state-run monopoly-based markets to controlled regulation (***and Germany
> has moved from prohibition to controlled regulation***).

100.    Like Defendants' other representations, the 2020 Form 20-F failed to disclose that

the changes to Germany's online gambling regulations were reasonably likely to adversely impact

Paysafe's revenues and financial condition.

101.    In June 2021, after the Fourth Interstate Treaty on Gambling was ratified, Paysafe

published a blog post specifically discussing the implications of the new German regulations. This

blog post again described the Fourth Interstate Treaty in a positive light, stating that it "puts online

gambling in Germany on a legally uniform basis for the first time." In addition, the post specifically

referenced the monthly deposit limit, stating that the new regulations "include a deposit limit of

EUR 1,000 per player per month and a blacklist for players who are at risk of gambling addiction.

The deposit limit should also apply across platforms and be checked by the authorities." However,

it misleadingly failed to disclose the reasonably likely negative impact of this deposit limit on the

Company's revenues, particularly given Paysafe's high-roller customer base.

102.    During the Deutsche Bank Technology Conference on September 10, 2021,

Defendant McHugh continued to mislead investors about the likely impact of the new German

regulations. Specifically, in response to a question regarding the eCash segment's performance,

McHugh stated: "Yes. We did do incredibly well. We will see a little bit of a partial slowdown as

year-on-year comps kind of normalize. ***There are a few tax laws in Germany that are creating a***

*bit of pullback in online sports betting in Germany, we think, for the next kind of 5, 6 months. So we just got to work through those pieces.*" Notably, while McHugh expressly referenced one issue that was negatively impacting online sports betting volumes in Germany—i.e., new tax laws—he misleadingly omitted the other issue that was reasonably likely to—and, in fact, already was, adversely impacting the Company's revenue—i.e., the €1,000 monthly cross-operator deposit limit.

## V.     THE TRUTH EMERGES

### A.     Defendants Announce Lower Earnings Guidance Attributable to Softness in the European Gaming Market

103.     On August 16, 2021, Plaintiffs and other investors began to learn the truth about the likely impact of the amended German regulations on Paysafe's revenues, which was previously concealed by Defendants' misrepresentations and omissions. On that day, the Company issued a press release announcing its financial results for the second quarter of 2021, which ended on June 30, 2021, just prior to the July 1, 2021 effective date of the Fourth Interstate Treaty on Gambling. Paysafe reported positive earnings for the quarter, including a 41% year-over-year increase in total payment volume, an 8% year-over-year increase in EBITDA, and $6.6 million in net income (compared to a net loss of $15.9 million in the second quarter of 2020).

104.     Despite these positive second quarter results, Defendants surprised investors by announcing that they expected the Company to generate just $360 million to $375 million in revenues during the third quarter of 2021 (its first quarter following the effective date of the Fourth Interstate Treaty)—well below the market consensus estimate of $389 million. Nevertheless, Defendants blamed the lowered guidance on "[s]easonally quieter summer gaming activity in Europe impacting eCash and Digital Wallets" and "a return to normalized post-COVID seasonality with quieter summer gaming activity in the European markets," without disclosing that the Fourth

Interstate Treaty's cross-operator deposit limit was reasonably likely to have a negative impact on Paysafe's revenues. Defendants also suggested that the reduction in third-quarter guidance was the product of mere transitory issues, assuring investors that the Company would "return to double-digit growth in the fourth quarter" and "reaffirming" the Company's full-year revenue target of $1.53 billion to $1.55 billion.

105.    In response to Defendants' disclosures, the price of Paysafe common stock declined $1.58 per share, or more than 15%, from a close of $10.20 per share on August 13, 2021, to close at $8.62 per share on August 16, 2021. Paysafe common stock traded on unusually high volume on August 16, 2021.

106.    Analysts and market commentators reacted negatively. For example, on August 16, 2021, Compass Point Research & Trading, LLC reported that "[third quarter 2021] guidance needed to impress and in our opinion, in this instance it did not." Also on August 16, 2021, Wolfe Research lowered its price target from $17 to $14, reporting: "While results were sound, the company did not raise its 2021 guidance and delivered a 3Q21 guide that came in below the Street. The 3Q guide implies a material acceleration in 4Q21, which we believe some investors are questioning, driving much of the underperformance today."

**B.    Defendants Belatedly Reveal that the Fourth Interstate Treaty on Gambling Is Adversely Affecting Paysafe's Revenues**

107.    On November 11, 2021, the Company announced its financial results for the third quarter of 2021 and finally admitted that the amended German gambling regulations were materially impacting Paysafe's revenues. Defendants disclosed third quarter revenues of $353.6 million—$6 million below the low end of the revenue guidance Defendants provided to investors on August 16, 2021—as well as disappointing fourth quarter revenue guidance of just $355 million

to $365 million. Defendants also revised Paysafe's full year revenue guidance downward to a range of $1.47 billion to $1.48 billion:

| ($ in millions) | Q4 2021 | Full Year 2021 - prior | Full Year 2021 - updated |
|---|---|---|---|
| Revenue | $355 – $365 | $1,530 – $1,550 | $1,470 – $1,480 |
| Gross Profit (excluding depreciation and amortization) | $205 – $215 | $930 – $970 | $870 – $880 |
| Adjusted EBITDA | $90– $100 | $480 – $495 | $425 – $435 |

108.    During the Company's earnings conference call on November 11, 2021, Defendants attributed Paysafe's poor third quarter results and disappointing fourth quarter guidance to "continued market softness, particularly due to the regulatory environment in Europe." In particular, McHugh stated that "in Germany, the adoption of new regulations had a more meaningful impact than we anticipated with several operators reducing activity or leaving the market."

109.    Surprised by Defendants' disclosures, analysts focused their questions on the impact of the German regulatory changes on Paysafe's revenues. For example, Daniel Rock Perlin of RBC Capital Markets asked:

> You called out regulatory issues, in particular, in a couple of countries. But they sounded like they're pretty onerous. And I have to admit, I'm not expert on the regulatory environment there. So can you just help us understand how stringent some of these are that would cause these operators to actually leave, which it sounds like in the market?

110.    In response, McHugh expressly admitted that the German deposit limit was negatively impacting Paysafe's revenues, stating: "There is a cap on how much a single person can bet. So regardless of what the – it's not on a single operator, it's across all platforms. ***So when***

*you – when we cater to higher-end betters, that cap has a pretty high impact.*" He further admitted that Defendants "had anticipated" a negative impact from these regulations, but claimed that those impacts have "been sharper and bigger than we expected." McHugh also acknowledged the material impact that the amendments to the German gambling regulations were having on the Company, referring to these changes as "a big adjustment" and describing the German gaming market as "*an extremely large market for us*."

111.    On this news, the price of Paysafe common stock plummeted $3.03 per share, or more than 41%, from a close of $7.27 per share on November 10, 2021, to a close of $4.24 per share on November 11, 2021. Paysafe common stock traded on unusually high volume on November 11, 2021.

112.    Analysts and market commentators reacted negatively. For example, on November 11, 2021, Cowen reported, "[s]hares of [Paysafe] are trading off 40% intra-day as the company lowered its 2021 outlook while providing a disappointing 2022 outlook, principally reflecting weaker trends across its Digital Wallet business," "the segment . . . is being impacted by . . . regulatory . . . factors," and "the regulatory environment in Europe is causing softness namely in Germany (caps on how much a single person can bet. . .) . . . ."

## VI.    POST CLASS PERIOD EVENTS AND DISCLOSURES

113.    After the markets closed on November 11, 2021, Defendant Dawood echoed McHugh's earlier statements on Twitter, confirming that Paysafe had, in fact, been "*anticipat[ing]*" that changes in the German gambling laws were going to have a negative impact on Paysafe's revenues, yet failed to disclose this information to investors.

114.    On March 2, 2022, Paysafe disclosed in its Form 6-K that the eCash and Digital Wallet segments were impacted by "unfavorable market headwinds related to gambling regulations in Europe."

115.    During Paysafe's March 2, 2022 earnings call, Defendant McHugh further explained the extent of the impact of the German regulations:

> [I]n the third quarter, we talked about the impacts of European iGaming regulation, which was sizable. And the 2 big features were, one, obviously, Germany, they put limits on sports betting, on gambling limits as well as taxes on games. ***And that had some pretty big impacts and some bigger impacts than expected with the operators.*** And then two, Holland had a surprise decree that really impacted the ability for e-money institutions to operate in the space, and that was really – we continue to feel that was a misplaced, so basically a mistake that we hope can be reversed. ***To give you a sense, the combine impact of those 2 in the fourth quarter earnings, that was a $15 million year on year impact in the quarter alone. So it is sizable in the fourth quarter***. Now we have all these impacts baked into our guidance. What we see first is ***we expect to start to lap the German impacts in the third quarter, right? We'll start to baseline.*** That's when we started to feel the impacts. And in Holland, we expect some sort of partial or full reversal of this regulation in the second half. We're working with regulators with the industry on that piece. . . . But the 2 big ones, Germany and Holland, we have baked into our numbers. One will baseline, one will reverse. And the rest of the year, we're not seeing any major impacts in the short to medium term.

116.    On March 28, 2022, Paysafe filed its annual Form 20-F for the fiscal year ending December 31, 2021. The 2021 Form 20-F contained, for the first time, a reference to the potential adverse impact of Germany's cross-operator monthly deposit limit on Paysafe's financial condition, stating: "[I]n Germany in 2021, the new German Interstate Treaty on Gambling allows for online gambling in Germany, ***but has set forth certain restrictive measures that could adversely impact the Company***. ***The new German regulations have put in place a mandatory deposit limit of 1,000 euros per month across all providers for online gambling.***"

117.    Paysafe's earnings presentations in 2022 continued to demonstrate that the changes in the German gambling regulations had a long-term impact on Paysafe's revenues. For example, Paysafe's first quarter 2022 Earnings Presentation, dated May 11, 2022, indicated that its Digital Commerce segment (a new combination of the eCash and Digital Wallet segments), was continuing to suffer adverse impacts from headwinds related to "regulations in Europe (e.g.,

Germany, Netherlands)." In that quarter, the Company's Digital Commerce segment experienced an 11% decrease in revenues compared to the same quarter in the previous fiscal year.

118. Paysafe's August 10, 2022 Earnings Presentation for the second quarter of 2022 demonstrated that the regulatory changes were still impacting Paysafe's business. The Company noted that its Digital Commerce segment experienced an approximately 13% decline in revenue compared to the same quarter the previous fiscal year. Paysafe attributed the subpar performance in part to "gambling regulations in Europe."

## VII. DEFENDANTS VIOLATED ITEM 303 OF REGULATION S-K, ITEM 5 OF FORM 20-F, AND ITEM 14(g)(1) OF FORM F-4

119. Pursuant to Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), an issuer must "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to cause a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." An issuing company must include disclosures pursuant to Item 303 in registration statements filed in connection with public stock offerings, proxy statements, and periodic reports filed pursuant to Sections 13 and 15 of the Exchange Act.

120. In May 1989, the SEC issued an interpretive release discussing Item 303 (the "1989 Interpretive Release"). The 1989 Interpretative Release stated, in part:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

121. The 1989 Interpretive Release also provided the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

122.    On April 7, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 ("2003 Rule"). The 2003 Rule emphasizes that Management Discussion and Analysis ("MD&A") disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions." The 2003 Rule further states that the MD&A affords "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show *and do not show*, as well as *important trends and risks* that have shaped the past *or are reasonably likely to shape the future*."

123.    Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods." Specifically, Item 5(D), entitled "Trend information," provides:

The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. *The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues*, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

35

124.    Item 14(g)(1) of Form F-4 requires the registrant to "furnish . . . information" responsive to Item 5 of Form 20-F.

125.    The information required to be disclosed pursuant to Item 5 of Form 20-F is the same as that required by Item 303. Indeed, as the SEC stated in its Release No. 33-10751, Commission Guidance on Management's Discussion and Analysis of Financial Condition and Results of Operation: "The disclosure requirements for Item 5 of Form 20-F (Operating and Financial Review and Prospects) are substantively comparable to the MD&A requirements under Item 303 of Regulation S-K."

126.    Here, for the reasons discussed above in ¶¶ 51-118, Germany's enactment of the Fourth Interstate Treaty on Gambling that included a cross-operator monthly deposit limit constituted an event, known to Defendants, that was reasonably likely to have a material impact on Paysafe's revenues and results of operations.

127.    Accordingly, Defendants were obligated to disclose that the €1,000 cross-operator monthly deposit limit was reasonably likely to have a material adverse impact on Paysafe's future revenues and results of operations in the Company's February 26, 2021 Proxy Statement, February 26, 2021 Prospectus, March 30, 2021 Form 8-A (the "March 2021 Form 8-A"), and May 19, 2021 Form F-1 Registration Statement. This disclosure was required by Item 303 and was necessary to make Defendants' statements about, among other things, the forthcoming changes to German gaming regulations, not misleading. Their failure to make this required disclosure therefore constituted a violation of Item 303 and rendered Defendants' statements in these filings, which are set forth in ¶¶ 149-150, 152, 156-157 below, materially false and misleading. *See infra* Section VIII.

128.    Similarly, Defendants were obligated pursuant to Item 5 of Form 20-F to disclose that the €1,000 cross-operator monthly deposit limit was reasonably likely to have a material adverse impact on Paysafe's future revenues and results of operations in Paysafe's 2020 Form 20-F. This disclosure was required by Item 5 and was necessary to make Defendants' statements about, among other things, the forthcoming changes to German gaming regulations, not misleading. Their failure to make this required disclosure therefore constituted a violation of Item 5 of Form 20-F and rendered Defendants' statements in this filing, which are set forth in ¶ 154 below, materially false and misleading. *See infra* Section VIII.

129.    Finally, Defendants were obligated pursuant to Item 14(g)(1) of Form F-4 to disclose that the €1,000 cross-operator monthly deposit limit was reasonably likely to have a material adverse impact on Paysafe's future revenues and results of operations in Paysafe's December 21, 2020 Initial Form F-4; February 1, 2021 First Amended Form F-4; and February 25, 2021 Second Amended Form F-4. This disclosure was required by Item 14(g)(1) and was necessary to make Defendants' statements about, among other things, the forthcoming changes to German gaming regulations, not misleading. Their failure to make this required disclosure therefore constituted a violation of Item 14(g)(1) of Form F-4 and rendered Defendants' statements in these filings, which are set forth in ¶¶ 139-40, 142-43, 145-46 below, materially false and misleading. *See infra* Section VIII.

## VIII.  <u>DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS</u>

### A.    **December 7, 2020 Form 8-K**

130.    On December 7, 2020, FTAC filed a Form 8-K announcing the Merger. In discussing the Merger, Defendants made, furnished, and/or disseminated materially false and

misleading statements and omissions regarding the Merger's ability to deliver value to FTAC shareholders. For example, Defendant Foley stated:

> ***Paysafe delivers a unique value proposition in large and high-growth markets, such as gaming and e-commerce, enabling the company to generate strong organic revenue growth and margin expansion***. With a proven stratgy and an experienced management team and our newly formed partnership, ***we believe Paysafe has significant long-term growth potential***.

131.    FTAC also described Paysafe as a "[l]eading integrated payments platform processing nearly \$100 billion of payment volume" with "***[s]ignificant growth opportunities***" and a "[l]ong history as the global market leader in iGaming payments."

132.    The bolded statements in ¶¶ 130-31 above were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on the Company's future revenues. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly about Paysafe's presence in the iGaming market—specifically, its ability to deliver strong revenue growth from gaming and its "unrivalled regulatory risk and technical expertise"—and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the shifting regulatory landscape in the iGaming space, including the forthcoming amendments to the German gambling regulations and the likely impact of these amendments on the Company's revenues.

### B.    December 7, 2020 Form 425

133.    In a transcript from the Company's December 7, 2020 analyst conference call, which both Paysafe and FTAC filed with the SEC on Forms 425 later that same day, Defendant Foley touted Paysafe as "an attractive high growth payments company, with meaningful scale,

*positioned in the highest growth vertical markets*" and claimed that Paysafe had "*unrivalled*

*regulatory risk and technical expertise*."

134.    During that same call, Defendant McHugh similarly boasted about the Company's

expertise in monitoring regulatory changes, specifically in the German iGaming market, stating:

> I'll move on now rom our key products to where and how we win, especially in iGaming. . . . **In Europe and the rest of the world, we're a global leader with over 1,000 operators. We've continued to grow there, and we have great stories of being your global partner, but also able to react locally when regulation changes, be it in the U.K. or Germany, as examples, where we're able to react very, very quickly and support our operators.**

135.    This Form 425 also stated, among other things:

> Important Information About the Proposed Business Combination and Where to Find It

> In connection with the proposed business combination, a registration statement on Form F-4 (the "Form F-4") is expected to be filed by Paysafe Limited, an exempted limited company incorporated under the laws of Bermuda ("Paysafe") with the U.S. Securities and Exchange Commission ("SEC") that will include preliminary and definitive proxy statements to be distributed to holders of FTAC's common stock in connection with FTAC's solicitation for proxies for the vote by FTAC's stockholders in connection with the proposed business combination and other matters as described in the Form F-4, as well as a prospectus of Paysafe relating to the offer of the securities to be issued in connection with the completion of the business combination. FTAC, PGHL AND PAYSAFE URGE INVESTORS, STOCKHOLDERS AND OTHER INTERESTED PERSONS TO READ, WHEN AVAILABLE, THE FORM F-4, INCLUDING THE PROXY STATEMENT/PROSPECTUS INCORPORATED BY REFERENCE THEREIN, as well as other documents filed with the SEC in connection with the proposed business combination, as these materials will contain important information about PGHL, FTAC, and the proposed business combination.

136.    Thus, Defendants explicitly directed FTAC shareholders and investors to Paysafe's

forthcoming filings concerning the Merger, including its Forms F-4 and "other documents filed

with the SEC in connection with the proposed business combination," acknowledging that these

documents "will contain important information about PGHL, FTAC, and the proposed business

combination," thereby disseminating these filings by Paysafe to FTAC shareholders and investors.

137.    Notably, the header on this Form 425, and each of the other Forms 425 that FTAC and Paysafe filed prior to the Merger, identified the "Subject Company" as "Foley Trasimene Acquisition Corp. II."

138.    The bolded statements in ¶¶ 133-34 above were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on the Company's future revenues. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly about Paysafe's presence in the iGaming market—specifically, its ability to deliver strong revenue growth from gaming and its "unrivalled regulatory risk and technical expertise"—and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the shifting regulatory landscape in the iGaming space, including the forthcoming amendments to the German gambling regulations and the likely impact of these amendments on the Company's revenues.

**C.    December 21, 2020 Form F-4**

139.    The Initial Form F-4, which Paysafe filed with the SEC on December 21, 2020 and was signed by McHugh and Dawood, disclosed the following with respect to the "Risks Related to Paysafe's Business and Industry" and, more specifically, "Regulatory, Legal and Tax Risks":

> Regulations in the gaming and sports betting and foreign exchange trading sectors vary significantly among different countries and localities. . . .
>
> The EU, by contrast, has generally moved towards controlled regulation of online-based gambling operators, rather than absolute prohibition. **For example, in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. In March 2020, German regulators subsequently agreed to additional legislation that will**

**legalize online forms of certain gambling, such as casino and poker, within certain parameters.**

140.    The Initial Form F-4 further stated, regarding "Regulatory Change: Trends and Outlook":

> Although the general trend in gambling regulation over the last ten years has been to seek to restrict the activities of online-based operators, **in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition**. For example, the regimes in Italy and France have both moved away from state-run monopoly-based markets to controlled regulation (**and Germany has moved from prohibition to controlled regulation**). . . . Changes in the regulation of online gambling in the markets described above and elsewhere **may impact us both positively (where the markets are liberalized or become regulated)** and negatively (where markets are restricted or become prohibited).

141.    The bolded statements in ¶¶ 139-40 above were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's future revenues and results of operations. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly about changes in gambling regulations—specifically, the changes in the German online gambling regulations, including the legalization of "online forms of certain gambling, such as casino and poker, within certain parameters," and the potential impact of changes in gambling regulations on the Company—and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the forthcoming amendments to the German gambling regulations and the likely impact of these amendments on Paysafe's revenues. Further, Defendants violated Item 14(g)(1) of Form F-4 by failing to disclose in the Initial Form F-4 that the €1,000 cross-operator deposit limit was reasonably likely to have an impact on Paysafe's revenues and by discussing forthcoming changes in the German gambling regulations without disclosing that the

€1,000 cross-operator deposit limit was reasonably likely to have an impact on Paysafe's revenues. *See supra* Section VII. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

### D.    February 1, 2021 First Amended Form F-4

142.    The First Amended Form F-4, which Paysafe filed with the SEC on February 1, 2021 and was signed by McHugh and Dawood, disclosed the following with respect to "Risks Related to Paysafe's Business and Industry" and, more specifically, "Regulatory, Legal and Tax Risks":

> Regulations in the gaming and sports betting and foreign exchange trading sectors vary significantly among different countries and localities. . . .
>
> The EU, by contrast, has generally moved towards controlled regulation of online-based gambling operators, rather than absolute prohibition. **For example, in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters.**

143.    The same First Amended Form F-4 also disclosed the following regarding "Regulatory Change: Trends and Outlook":

> Although the generl trend in gambling regulation over the last ten years has been to seek to restrict the activities of online-based operators, **in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition**. For example, the regimes in Italy and France have both moved away from state-run monopoly-based markets to controlled regulation (**and Germany has moved from prohibition to controlled regulation**). . . . Changes in the regulation of online gambling in the markets described above and elsewhere **may impact us both positively (where the markets are liberalized or become regulated)** and negatively (where markets are restricted or become prohibited).

144.    The bolded statements in ¶¶ 142-43 above were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because

Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's future revenues and results of operations. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly about changes in gambling regulations—specifically, the changes in the German online gambling regulations, including the legalization of "online forms of certain gambling, such as casino and poker, within certain parameters," and the potential impact of changes in gambling regulations on the Company—and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the forthcoming amendments to the German gambling regulations and the likely impact of these amendments on Paysafe's revenues. Further, Defendants violated Item 14(g)(1) of Form F-4 by failing to disclose in the First Amended Form F-4 that the €1,000 cross-operator deposit limit was reasonably likely to have an impact on Paysafe's revenues and by discussing forthcoming changes in the German gambling regulations without disclosing that the €1,000 cross-operator deposit limit was reasonably likely to have an impact on Paysafe's revenues. *See supra* Section VII. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

**E.    February 25, 2021 Second Amended Form F-4**

145.    The Second Amended Form F-4, which Paysafe filed with the SEC on February 25, 2021 and was signed by McHugh and Dawood, disclosed the following with respect to "Risks Related to Paysafe's Business and Industry" and, more specifically, "Regulatory, Legal and Tax Risks":

> Regulations in the gaming and sports betting and foreign exchange trading sectors vary significantly among different countries and localities. . . .
>
> The EU, by contrast, has generally moved towards controlled regulation of online-based gambling operators, rather than absolute prohibition. **For example, in**

**March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters.**

146.    The same Second Amended Form F-4 also disclosed the following regarding

"Regulatory Change: Trends and Outlook":

> Although the general trend in gambling regulation over the last ten years has been to seek to restrict the activities of online-based operators, **in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition**. For example, the regimes in Italy and France have both moved away from state-run monopoly-based markets to controlled regulation (**and Germany has moved from prohibition to controlled regulation**). . . . Changes in the regulation of online gambling in the markets described above and elsewhere **may impact us both positively (where the markets are liberalized or become regulated)** and negatively (where markets are restricted or become prohibited).

147.    The bolded statements in ¶¶ 145-46 above were materially false and misleading

when made and/or omitted material facts necessary to make the statements not misleading because

Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be

enacted as part of the amendments to the German online gambling regulations was reasonably

likely to have a material adverse effect on Paysafe's future revenues and results of operations. *See*

*supra* ¶¶ 51-118. In addition, by electing to speak publicly about changes in gambling

regulations—specifically, the changes in the German online gambling regulations, including the

legalization of "online forms of certain gambling, such as casino and poker, within certain

parameters," and the potential impact of changes in gambling regulations on the Company—and

thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully

disclose all material facts regarding the forthcoming amendments to the German gambling

regulations and the likely impact of these amendments on Paysafe's revenues. Further, Defendants

violated Item 14(g)(1) of Form F-4 by failing to disclose in the Second Amended Form F-4 that

the €1,000 cross-operator deposit limit was reasonably likely to have an impact on Paysafe's revenues and by discussing forthcoming changes in the German gambling regulations without disclosing that the €1,000 cross-operator deposit limit was reasonably likely to have an impact on Paysafe's revenues. *See supra* Section VII. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

### F.    February 26, 2021 Joint Proxy Statement and Prospectus

148.    On February 26, 2021, Defendants filed the Joint Proxy Statement and Prospectus with the SEC. FTAC filed the Joint Proxy Statement and Prospectus, signed by Foley on behalf of FTAC, on Schedule 14A. Paysafe filed the Joint Proxy Statement and Prospectus as a Rule 424(b)(3) prospectus.

149.    In the Joint Proxy Statement and Prospectus, Defendants disclosed the following with respect to the "Risks Related to Paysafe's Business and Industry" and, more specifically, "Regulatory, Legal and Tax Risks":

> Regulations in the gaming and sports betting and foreign exchange trading sectors vary significantly among different countries and localities. . . .
>
> The EU, by contrast, has generally moved towards controlled regulation of online-based gambling operators, rather than absolute prohibition. **For example, in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters.**

150.    Defendants also expressly referenced the forthcoming changes in Germany's gambling regulations under a heading titled "Regulatory Change: Trends and Outlook," stating:

> Although the general trend in gambling regulation over the last ten years has been to seek to restrict the activities of online-based operators, **in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition**. For example, the regimes in Italy and France have both

moved away from state-run monopoly-based markets to controlled regulation (**and Germany has moved from prohibition to controlled regulation**). . . . Changes in the regulation of online gambling in the markets described above and elsewhere **may impact us both positively (where the markets are liberalized or become regulated)** and negatively (where markets are restricted or become prohibited).

151.    The bolded statements in ¶¶ 149-50 above were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's future revenues and results of operations. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly about changes in gambling regulations—specifically, the changes in the German online gambling regulations, including the legalization of "online forms of certain gambling, such as casino and poker, within certain parameters," and the potential impact of changes in gambling regulations on the Company—and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the forthcoming amendments to the German gambling regulations and the likely impact of these amendments on Paysafe's revenues. Further, Defendants violated Item 303 by failing to disclose in the Joint Proxy Statement and Prospectus that the €1,000 cross-operator deposit limit was reasonably likely to have a material impact on Paysafe's revenues and by discussing forthcoming changes in the German gambling regulations without disclosing that the €1,000 cross-operator deposit limit was reasonably likely to have a material impact on Paysafe's revenues. *See supra* Section VII. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

### G.    March 30, 2021 Form 8-A

152.    The March 2021 Form 8-A, which Paysafe filed with the SEC on March 30, 2021 and was signed by McHugh, described "[t]he securities to be registered" as "the common shares

and warrants of Paysafe Limited" and further stated that "[t]he description of the common shares and warrants contained in the [Joint Proxy Statement and Prospectus] forming a part of the Registration Statement on Form F-4, as originally filed with the Securities and Exchange Commission on December 21, 2020, as amended from time to time," which the Form 8-A "incorporated herein by reference." Accordingly, the Form 8-A incorporated by reference the Initial Form F-4, First Amended Form F-4, Second Amended Form F-4, and the Joint Proxy Statement and Prospectus.

153.    As set forth in ¶¶ 139-51 above, the Initial Form F-4, First Amended Form F-4, Second Amended Form F-4, and the Joint Proxy Statement and Prospectus incorporated by referenced into the Form 8-A were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's future revenues and results of operations. *See supra* ¶¶ 51-118. Further, Defendants violated Item 14(g)(1) of Form F-4 and Item 303 by failing to disclose in the Initial Form F-4, First Amended Form F-4, Second Amended Form F-4, and the Joint Proxy Statement and Prospectus that the €1,000 cross-operator deposit limit was reasonably likely to have an impact on Paysafe's revenues and by discussing forthcoming changes in the German gambling regulations without disclosing that the €1,000 cross-operator deposit limit was reasonably likely to have an impact on Paysafe's revenues. *See supra* Section VII. As a result of the foregoing, the statements incorporated by reference into the Form 8-A were materially false and misleading, rending the Form 8-A materially false and misleading at all relevant times.

H.    **April 1, 2021 Form 20-F**

154.    On April 1, 2021, Paysafe filed its 2020 Form 20-F with the SEC. The 2020 Form

20-F was signed by Defendant McHugh and disclosed the following with respect to "Risks Related

to Paysafe's Business and Industry" and, more specifically, "Regulatory, Legal and Tax Risks":

> The EU, by contrast, has generally moved towards controlled regulation of online-based gambling operators, rather than absolute prohibition. **For example, in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters.**

155.    The bolded statements in ¶ 154 above were materially false and misleading when

made and/or omitted material facts necessary to make the statements not misleading because

Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be

enacted as part of the amendments to the German online gambling regulations was reasonably

likely to have a material adverse effect on Paysafe's future revenues and results of operations. *See*

*supra* ¶¶ 51-118. In addition, by electing to speak publicly about the changes in the German online

gambling regulations, including the legalization of "online forms of certain gambling, such as

casino and poker, within certain parameters," and thereby putting these subjects into play,

Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the

forthcoming amendments to the German gambling regulations and the likely impact of these

amendments on Paysafe's revenues. Further, Defendants violated Item 5 of Form 20-F by failing

to disclose in the 2020 Form 20-F that one of those "parameters"—the €1,000 cross-operator

deposit limit—was reasonably likely to have a material impact on Paysafe's revenues and by

discussing forthcoming changes in the German gambling regulations without disclosing that the

€1,000 cross-operator deposit limit was reasonably likely to have a material impact on Paysafe's

revenues. *See supra* Section VII. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

### I.    May 19, 2021 Form F-1

156.    On May 19, 2021, Paysafe filed a Form F-1 Registration Statement with the SEC, which was deemed effective by the SEC on May 28, 2021. The Form F-1 was signed by Defendants Foley, McHugh and Dawood. In the Form F-1, Defendants disclosed the following with respect to the "Risks Related to Paysafe's Business and Industry" and, more specifically, "Regulatory, Legal and Tax Risks":

> Regulations in the gaming and sports betting and foreign exchange trading sectors vary significantly among different countries and localities. . . .
>
> The EU, by contrast, has generally moved towards controlled regulation of online-based gambling operators, rather than absolute prohibition. **For example, in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters.**

157.    Defendants also expressly referenced the forthcoming changes in Germany's regulations under a heading titled "Regulatory Change: Trends and Outlook," stating:

> Although the general trend in gambling regulation over the last ten years has been to seek to restrict the activities of online-based operators, **in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition.** For example, the regimes in Italy and France have both moved away from state-run monopoly-based markets to controlled regulation (**and Germany has moved from prohibition to controlled regulation**). . . . Changes in the regulation of online gambling in the markets described above and elsewhere **may impact us both positively (where the markets are liberalized or become regulated**) and negatively (where markets are restricted or become prohibited).

158.    On May 28, 2021, Paysafe filed with the SEC a Final Prospectus as part of its May 19, 2021 Form F-1 Registration Statement in which it repeated the materially false and misleading statements bolded above in ¶¶ 156-57.

159.    The bolded statements in ¶¶ 156-57 above were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's future revenues and results of operations. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly about changes in gambling regulations—specifically, the changes in the German online gambling regulations, including the legalization of "online forms of certain gambling, such as casino and poker, within certain parameters," and the potential impact of changes in gambling regulations on the Company—and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the forthcoming amendments to the German gambling regulations and the likely impact of these amendments on Paysafe's revenues. Further, Defendants violated Item 303 by failing to disclose that the €1,000 cross-operator deposit limit was reasonably likely to have a material impact on Paysafe's revenues and by discussing forthcoming changes in the German gambling regulations without disclosing that the €1,000 cross-operator deposit limit was reasonably likely to have a material impact on Paysafe's revenues. *See supra* Section VII. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

**J.    June 2021 Paysafe Blog Post**

160.    In June 2021, Paysafe published a blog post entitled, "Enter a new iGaming era with my paysafecard[.]"

161.    In the blog post, Paysafe stated:

The new Inter-State Treaty on iGaming, which the German federal states signed up to in the summer of 2020, has been announced to come into force in Germany from 1 July 2021. This puts online gambling in Germany on a legally uniform basis for the whole country for the first time. In future, every provider will be able to apply for a German iGaming licence [sic] if they operate a website with the .de extension and meet the new requirements. The latter include a deposit limit of EUR 1,000 per player per month and a blacklist for players who are at risk of gambling addiction. The deposit limit should also apply across platforms and be checked by the authorities.

162.    The statements in ¶ 161 above were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's future revenues and results of operations. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly about the "new Inter-State Treaty on iGaming" and specifically referencing the "deposit limit of EUR 1,000 . . . across platforms" and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the amendments to the German gambling regulations and the likely impact of these amendments on Paysafe's revenues. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

**K.    August 16, 2021 Form 6-K**

163.    On August 16, 2021, Paysafe filed a Form 6-K with the SEC reporting the Company's financial results for the second quarter of 2021. The Form 6-K was signed by Defendant Dawood. This Form 6-K expressly incorporated by reference the "Risk Factors" enumerated in the Company's April 1, 2021 Form 20-F, including the Company's statements regarding the amendments to the German online gambling regulations set forth in ¶ 154 above.

164.    As set forth in ¶ 155 above, these statements were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's revenues and results of operations. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly about the changes in the German online gambling regulations, including the legalization of "online forms of certain gambling, such as casino and poker, within certain parameters," and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the enacted amendments to the German gambling regulations and the likely impact of these amendments on Paysafe's revenues. Further, Defendants violated Item 5 of Form 20-F by failing to disclose in the 2020 Form 20-F that one of those "parameters"—the €1,000 cross-operator deposit limit—was reasonably likely to have a material impact on Paysafe's revenues and by discussing changes in the German gambling regulations without disclosing that the €1,000 cross-operator deposit limit was reasonably likely to have a material impact on Paysafe's revenues. *See supra* Section VII. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

**L.    September 10, 2021 Deutsche Bank Technology Conference**

165.    During the Deutsche Bank Technology Conference on September 10, 2021, Deutsche research analyst Bryan Connell Keane asked Defendant McHugh:

> eCash has been a really strong part of the story. I think volumes were up something like 60% in the first quarter and then up 40% in the second. I know you guys guided to a further—a little bit further of a deceleration there. But how should we be thinking about that segment on a normalized basis going forward?

166.    Defendant McHugh responded:

Yes. We did do incredibly well. We will see a little bit of a partial slowdown as year-on-year comps kind of normalize. ***There are a few tax laws in Germany that are creating a bit of pullback in online sports betting in Germany, we think, for the next kind of 5, 6 months.*** So we just got to work through those pieces.

167.    The bolded statements in ¶ 166 above were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading because Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's revenues and results of operations and misleadingly suggested that the "pullback" in the German sports betting market was temporary. *See supra* ¶¶ 51-118. In addition, by electing to speak publicly regarding "pullback in online sports betting in Germany" and thereby putting this subject into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the cause for the "pullback," including the amendments to the German gambling regulations. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

## IX.    ADDITIONAL ALLEGATIONS OF SCIENTER

168.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or control over the materially false and misleading statements and omissions alleged above. Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section VIII above were materially false and misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. Defendants' scienter is evidenced by the facts set forth above and the additional allegations set forth below, among others.

A.    **iGaming-Related Transactions in Germany were a Core Operation of Paysafe**

169.    Throughout the Class Period, Paysafe maintained that iGaming was a core operation for its business. In its February 26, 2021 Schedule 14A, Paysafe acknowledged that it has "established a strong position in iGaming and Gaming, which we have identified as ***our key verticals***." Paysafe explained that "there is significant market potential for growth and expansion in these areas" and indicated that the Company was "committed to focusing on opportunities for organic and inorganic growth in iGaming and Gaming."

170.    In 2019, high-risk industry verticals, including iGaming, made up 45% of Paysafe's revenue. In 2020, these verticals made up 74% of Paysafe revenues.

171.    With respect to iGaming specifically, of Paysafe's $1.4 billion in total revenues for the year ended December 31, 2019, $455.1 million was from iGaming. For the year ended December 31, 2020, $503.3 million out of Paysafe's $1.4 billion in total revenue was derived from the iGaming vertical. For the year ended December 31, 2021, iGaming revenue comprised $536 million of Paysafe's $1.5 billion in total revenue.

172.    Germany in particular was a major geographic region for Paysafe. For the years ended December 31, 2019, December 31, 2020, and December 31, 2021, revenues from Germany totaled $115 million, $146 million, and $127 million, respectively.

173.    Further, Paysafe routinely spoke about the European Gambling market in its SEC filings and earnings calls, demonstrating the importance of the region and the attendant revenue source to the Company. During its March 9, 2021 Analyst Day Presentation, Paysafe's COO Daniel Chazonoff stated: "[O]f course, in Europe, we've been in that market for such a long period of time. Neteller and Skrill are pretty much household names when it comes to online gambling."

174.    During the same presentation, Defendant McHugh stated: "[W]e see ourselves as the de facto leader in the iGaming space. That's sports betting, online casino and poker, lottery, fantasy, and eSports. We have a leadership position internationally in Europe . . . ."

175.    In its 2020 Form 20-F, Paysafe identified the "principal markets" for its "payment solutions in . . . on-line gambling" as North America and Europe."

176.    The importance of the iGaming business and the German market to Paysafe's overall revenues raises a strong inference that Defendants knew, or were deliberately reckless in not knowing, that their statements with respect to the impact of the new German gambling regulations were false or misleading and/or omitted material facts.

**B.      Defendants Publicly Discussed and Touted Their Monitoring of Regulatory Changes**

177.    As discussed above, during the Class Period, Defendants frequently and publicly discussed that one of Paysafe's strengths was its ability to monitor and adapt to changing regulations in high-risk verticals, like iGaming.

178.    Defendant McHugh stated during the merger announcement on December 7, 2020: "I'll move on now from our key products to where and how we win, especially in iGaming. . . . We've continued to grow there, and we have great stories of being your global partner, but also able to react locally when regulation changes, be it in the U.K. or Germany, as examples, where we're able to react very, very quickly and support our operators."

179.    Paysafe's SEC filings also emphasized its ability to track and adapt to regulatory developments, including in its (i) Initial Form F-4, (ii) First Amended Form F-4, (iii) Second Amended Form F-4, and (iv) April 1, 2021 2020 Form 20-F, wherein Paysafe repeatedly stated: "Given the importance of the online gambling sector to our business, we expend significant time and resources to ensure that we have an in-depth understanding of the regulatory environment in

the main territories in which our gambling industry merchants operate and customers reside, monitoring closely the developing regulatory regimes in those territories and adapting our business acceptance policies where necessary."

**C.    Defendants' Class Period Disclosures Repeatedly Referenced European Gambling Markets and, More Specifically, Changes to Germany's Gambling Regulations**

180.    Defendants' disclosures during the Class Period further support scienter as these statements confirm that Defendants were aware of the forthcoming amendments to the German online gambling regulations, but concealed from investors the reasonably likely adverse impact that the new regulations would have on Paysafe's future revenues and results of operations.

181.    For example, Defendants disclosed in the December 21, 2020 Form F-4, that "in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies" and that "in March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters."

182.    This disclosure was repeated in Paysafe's First Amended Form F-4, Paysafe's Second Amended Form F-4, Defendants' Joint Proxy Statement and Prospectus, and in Paysafe's 2020 Form 20-F, and was incorporated into Paysafe's August 16, 2021 Form 6-K.

**D.    Defendants Admitted that Paysafe Had "Anticipated" a Negative Impact From the Cross-Operator Deposit Limit**

183.    During the November 11, 2021 earnings call, Defendant McHugh admitted in response to an analyst question regarding the "regulatory issues" that Defendants "had anticipated" an impact from the "wave of European regulation coming through," including the "cap on how much a single person can bet" in Germany. McHugh went on to confess that ***"when [Paysafe] cater[s] to higher-end betters, that cap has a pretty high impact."***

184.    Later on November 11, 2021, Defendant Dawood admitted in a tweet in response to an inquiry regarding the German regulations that the negative impact of the amended German online gambling regulations "was anticipated," demonstrating that Defendants were made aware and internally recognized that these regulatory changes would negatively impact their business.

185.    Dawood added that "even Flutter talked about it," referencing Flutter's disclosure that it would reduce its revenue expectations by €56 million in anticipation of the negative impact of the German gambling regulations. *See supra* ¶ 79.

### E.    Defendant Foley Had Financial Motives to Commit Fraud

186.    Defendant Foley was incentivized to ensure that the Merger was consummated given his significant financial interest in the Merger.

187.    According to the Joint Proxy Statement and Prospectus, Trasimene Capital FT, LP II owned 36,600,836 shares[3] of FTAC Class B common stock, which it purchased for an aggregate price of $25,000. These Class B common shares, which would convert into Class A common shares if FTAC consummated a merger within 24 months of the IPO, had a market value of $638,159,546, "based upon the closing price of $17.40 per share on the NYSE on February 17, 2021, the record date for the Special Meeting." If FTAC did not complete an initial business combination within 24 months from the IPO, the Class B common shares would be rendered worthless.

188.    In addition, in connection with FTAC's IPO, Trasimene Capital FT, LP II purchased 20,893,780 FTAC warrants for $31,340,669. As of February 17, 2021, the warrants had a market value of $99,663,331. If FTAC did not complete an initial business combination within 24 months from the IPO, the warrants would expire worthless.

---

[3]    Defendant Foley actually bought the equivalent of 36,675,836 Class B shares prior to FTAC's IPO but gave away 75,000 shares to three other FTAC directors not named as defendants herein.

189.    According to a Form 3 filed with the SEC on August 18, 2020, the "sole general partner" of Trasimene Capital FT, LP II was Trasimene Capital FT, LLC II, and the "sole member" of Trasimene Capital FT, LLC II was Defendant Foley.

190.    Thus, if FTAC failed to complete an initial business combination, Defendant Foley's significant financial interests in the Company—which were valued at approximately $738 million as of February 17, 2021—would be rendered worthless. As a result, Defendant Foley had a strong financial motive to inflate FTAC's share price and to ensure that the Merger was consummated.

**F.    FTAC's Management Conducted Significant Due Diligence Examinations of Paysafe Prior to the Merger**

191.    The Proxy Statement FTAC filed on February 26, 2021 described in detail the comprehensive due diligence efforts that Defendants Foley, Massey, and Coy performed on Paysafe in the months leading up to the Merger. For example, on September 21, 2020, FTAC was granted access to a virtual data room containing non-public information relating to Paysafe's business "in order to facilitate FTAC's due diligence review. . . ." Afterwards, "from September 21, 2020 to December 7, 2020, FTAC and its advisors continued their broader due diligence review of PGHL's business, including holding numerous diligence calls among FTAC management, PGHL management and their respective advisors."

192.    On October 28, 2020, FTAC executed a non-disclosure agreement with PGHL in order to facilitate the exchange of confidential information. From November 2020 through the announcement of the Merger, "FTAC engaged in business, financial and legal due diligence review of PGHL, and representatives of each party and certain of their respective advisors (acting at the direction of their respective party) held numerous calls in furtherance of that review."

193.    Further, the Joint Proxy sated: "***FTAC's management and advisors*** conducted ***significant due diligence examinations of Paysafe***, including: conducting commercial due diligence, ***conducting financial, tax and legal due diligence***, conducting ***discussions with Paysafe's management*** and FTAC's financial, tax and legal advisors concerning such due diligence examination of Paysafe."

194.    In fact, Defendants Foley, Massey, and Coy stated that the reason they eschewed a third-party valuation or fairness opinion in connection with the Merger was because they had personally performed the necessary analyses and made the necessary fairness determinations in connection with the Merger. Indeed, the Joint Proxy Statement and Prospectus stated: "The officers and directors of FTAC, including Mr. Foley, have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and backgrounds . . . enabled them to perform the necessary analyses and make determinations regarding the [Merger]."

195.    The "significant due diligence" performed, and touted, by Defendants Foley, Massey, and Coy, combined with purposefully declining a third-party fairness opinion, supports an inference that they were aware forthcoming German regulations would materially impact Paysafe's revenues and by failing to disclose this specific risk they deprived investors of making fully informed investment decisions.

## X.    LOSS CAUSATION

196.    During the Class Period, as detailed in this Complaint, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. Defendants' false and misleading statements and fraudulent scheme artificially inflated the prices of FTAC and Paysafe common stock and operated as a fraud and deceit on the Class. The false and misleading statements and omissions set forth above were widely disseminated to the

securities markets, investment analysts, and the investing public. The true facts became known to the market and/or the risks concealed by Defendants' false and misleading statements and omissions materialized through disclosures on August 16, 2021 and November 11, 2021.

197.    When the true facts became known and/or the materialization of the risks concealed by Defendants occurred, the price of Paysafe common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiffs and the Class.

198.    On August 16, 2021, Paysafe issued a press release disclosing the Company's earnings for the second quarter of 2021 and providing earnings guidance for the third quarter. In this press release, Defendants revealed that notwithstanding Paysafe's positive second quarter earnings, the Company expected to generate just $360 million to $375 million in revenues during the third quarter of 2021—well below the market consensus estimate of $389 million. That same day, Paysafe also held an earnings call to discuss the Company's results. In the slide deck presented during the earnings call, Defendants attributed the lowered third quarter guidance to "[s]easonally quieter summer gaming activity in Europe impacting eCash and Digital Wallets." Dawood also stated that the Company expected "a return to normalized post-COVID seasonality with quieter summer gaming activity in the European markets." In response to the Company's partial disclosure regarding challenges tied to the "softness" of the European gambling market, Paysafe's stock price fell $1.58, or more than 16%, from a close of $10.20 per share on August 13, 2021, to a close of $8.62 per share on August 16, 2021, on high trading volume.

199.    Market analysts and commentators identified the revised third quarter guidance and corresponding pressure on the fourth quarter as driving the decline in the Company's stock price. For example, on August 16, 2021, Compass Point Research & Trading, LLC reported that "[third

quarter 2021] guidance needed to impress and in our opinion, in this instance it did not." Also on August 16, 2021, Wolfe Research lowered its price target from $17 to $14, reporting: "While results were sound, the company did not raise its 2021 guidance and delivered a 3Q21 guide that came in below the Street. The 3Q guide implies a material acceleration in 4Q21, which we believe some investors are questioning, driving much of the underperformance today."

200.    The relevant truth was fully revealed and/or the risks concealed by Defendants' misrepresentations and omissions further materialized on November 11, 2021. On this day, Defendants disclosed third quarter 2021 revenues of $353.6 million—$6 million below the low end of the revenue guidance Defendants provided to investors on August 16, 2021—as well as disappointing fourth quarter revenue guidance of just $355 million to $365 million. Defendants also revised Paysafe's full year revenue guidance downward to a range of $1.47 billion to $1.48 billion.

201.    During the Company's earnings call that same day, Defendants attributed Paysafe's poor third quarter results and disappointing fourth quarter guidance to "[g]ambling regulations" and "continued market softness, particularly due to the regulatory environment." In particular, McHugh stated that "in Germany, the adoption of new regulations had a more meaningful impact than we anticipated with several operators reducing activity or leaving the market."

202.    In response to this news, Paysafe's stock price fell $3.03, or more than 41%, from a close of $7.27 per share on November 10, 2021, to a close of $4.24 per share on November 11, 2021, on high trading volume.

203.    Market analysts and commentators identified Paysafe's revised earnings outlook based on the impact of Germany's gambling regulations as driving the decline in the Company's share price. For example, on November 11, 2021, Cowen reported that "[s]hares of [Paysafe] are

trading off 40% intra-day as the company lowered its 2021 outlook while providing a disappointing 2022 outlook, principally reflecting weaker trends across its Digital Wallet business," noting that "the segment . . . is being impacted by . . . regulatory . . . factor[s]," and "the regulatory environment in Europe is causing softness namely in Germany (caps on how much a single person can bet . . .) . . . ."

204.   It was entirely foreseeable to Defendants that concealing from the public the likely impact of Germany's amended gambling regulations on Paysafe's revenues would artificially inflate the price of FTAC and Paysafe common stock. It was also foreseeable that the disclosure of this information and/or the materialization of the risks concealed by Defendants' misrepresentations and omissions, would cause the price of Paysafe's stock to decline as the inflation caused by Defendants' earlier misrepresentations and omissions was removed from the stock price.

205.   Accordingly, the conduct of Defendants, as alleged herein, proximately caused foreseeable losses to Plaintiffs and the Class.

## XI.   APPLICATION OF THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

206.   At all relevant times, the market for FTAC and Paysafe common stock was an efficient market for the following reasons, among others:

207.   FTAC's and Paysafe's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

208.   As regulated issuers, FTAC and Paysafe filed periodic public reports with the SEC and the NYSE;

209.   FTAC and Paysafe regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press

releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

210.    FTAC and Paysafe were followed by multiple securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

211.    As a result of the foregoing, the market for FTAC's and Paysafe's common stock promptly digested current information regarding FTAC and Paysafe from all publicly available sources and reflected such information in the price of FTAC's and Paysafe's common stock. Under these circumstances, all purchasers and acquirers of FTAC's and/or Paysafe's common stock during the Class Period suffered similar injury through their purchase or acquisition of FTAC and/or Paysafe common stock at artificially inflated prices and the presumption of reliance applies.

212.    Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased or otherwise acquired FTAC and/or Paysafe common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972).

## XII.    INAPPLICABILITY OF SAFE HARBOR

213.    The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and misleading statements alleged herein.

214.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

215.    To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

216.    To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of FTAC and/or Paysafe who actually knew that such statement was false when made.

217.    Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

## XIII.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

218.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following Class: all persons or

entities that purchased or otherwise acquired FTAC common stock and/or Paysafe common stock during the period from December 7, 2020 through November 11, 2021, inclusive, and were damaged thereby.

219.    Excluded from the Class are Defendants (as defined herein) and their immediate family members, present or former officers of FTAC and Paysafe, the members of FTAC's and Paysafe's board of directors, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(2)).

220.    The members of the Class are so numerous that joinder of all members is impracticable. As of April 1, 2021, there were 723,712,382 million shares of Paysafe common stock outstanding. As of February 17, 2021, there were 146,703,345 shares of FTAC common stock outstanding. While Plaintiffs do not know the exact number of Class members, Plaintiffs believe that there are, at minimum, thousands of members of the Class who purchased FTAC and/or Paysafe common stock during the Class Period.

221.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

222.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' conduct as alleged herein;
- whether Defendants' public statements disseminated to shareholders and investors during the Class Period contained material misstatements or omitted to state material information;
- whether and to what extent the market price of FTAC's and Paysafe's common stock was artificially inflated during the Class Period due to the omissions and/or misstatements complained of herein;
- whether Defendants acted with scienter;

- whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

- whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

223.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

224.    A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the Defendants' wrongful conduct. Furthermore, there will be no difficulty in the management of this litigation as a class action.

## XIV.    <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants**

225.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

226.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder on behalf of Plaintiffs and all other members of the Class, against all Defendants.

227.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements

of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of the FTAC and Paysafe common stock; and (iii) cause Plaintiffs and members of the Class to purchase FTAC and/or Paysafe common stock at artificially inflated prices.

228.    The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

229.    As set forth above, Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased FTAC and/or Paysafe common stock during the Class Period.

230.    In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for FTAC and/or Paysafe common stock, Plaintiffs and other members of the Class purchased FTAC and/or Paysafe common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased

FTAC and/or Paysafe common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined precipitously, and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of FTAC and/or Paysafe common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

**<u>COUNT II</u>**
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

231.    Plaintiffs repeat and reallege each and every allegation set forth above as if set forth fully herein.

232.    As alleged herein, throughout the Class Period, Defendants intended to and did, among other things: (i) deceive the investing public, including Plaintiffs and other Class members; (ii) artificially inflate and maintain the prices of FTAC and Paysafe common stock; and (iii) cause Plaintiffs and members of the Class to purchase FTAC and/or Paysafe common stock at artificially inflated prices.

233.    The Defendants: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of FTAC and/or Paysafe common stock in violation of Section 10(b) of the Exchange Act, and Rule 10b-5(a) and(c) promulgated thereunder.

234.    The Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make, furnish, and/or disseminate materially false and misleading statements to investors, and to conceal adverse material information about the Company's financial well-being, operations, and prospects.

235.     As set forth above, the Defendants acted with scienter in that they: (i) participated in this scheme knowing or with deliberate recklessness that it would artificially inflate FTAC's and Paysafe's stock price; (ii) knew that the public documents and statements issued, made, furnished, and/or disseminated by FTAC and/or Paysafe were materially false and misleading; (iii) knew that such statements or documents would be issued or disseminated to the investing public; (iv) and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

236.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information, participated in the fraudulent scheme and course of conduct alleged herein.

237.     The Individual Defendants were individually and collectively responsible for making, furnishing, or disseminating the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class.

238.     In ignorance of the materially false and misleading nature of the statements and omissions made, furnished, and/or disseminated by the Defendants, and relying directly or indirectly on those statements or upon the integrity of the market price for FTAC and Paysafe common stock, Plaintiffs and other Class members purchased FTAC and/or Paysafe common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and other Class members would not have purchased at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined

precipitously, and Plaintiffs and other Class members were harmed and damaged as a direct and proximate result of their purchases of FTAC and/or Paysafe common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

## COUNT III
### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

239.    Plaintiffs repeat and reallege each and every allegation set forth above as if set forth fully herein.

240.    This count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Plaintiffs and all other members of the Class, against the Individual Defendants (Foley, Massey, Coy, McHugh, and Dawood).

241.    As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of FTAC and Paysafe common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

242.    As set forth above, the Individual Defendants were controlling persons of FTAC and/or Paysafe during the Class Period, due to their senior executive positions and their direct involvement in the FTAC's and/or Paysafe's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same. As such, the Individual Defendants had regular access to non-public information about the Company's business, operations, performance, and future prospects through

access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and Board meetings and committees thereof, as well as reports and other information provided to them in connection therewith.

243.    By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of FTAC and/or Paysafe, including the content of their public statements with respect to the Company's operations, corporate governance, and compliance with regulators.

244.    The Individual Defendants were culpable participants in the fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased FTAC and/or Paysafe common stock during the Class Period.

245.    By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons in violation of Section 20(a) of the Exchange Act.

## XV.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray for relief and judgment, as follows:

246.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

247.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

248.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

249.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

250.    Granting such other and further relief as the Court deems just and proper.

## XVI.  **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: May 16, 2024                          Respectfully submitted,

*S/ Richard A. Russo, Jr.*
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Andrew L. Zivitz
Richard A. Russo, Jr.
Margaret E. Mazzeo
Farai Vyamucharo-Shawa
Dylan J. Isenberg
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
rrusso@ktmc.com
mmazzeo@ktmc.com
fshawa@ktmc.com
disenberg@ktmc.com

*Attorneys for Lead Plaintiffs Robert J. Viani and Eric C. Price, as trustee for the Eric C. Price & Kristen B. Hennig-Price Rev. Living Trust UA 05/27/2015*