**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE PAYSAFE LIMITED f/k/a FOLEY TRASIMENE ACQUISITION CORP. II SECURITIES LITIGATION | Master File No. 1:21-cv-10611 (ER) (KHP) <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: <br> ALL ACTIONS | |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**
<u>**THE CONSOLIDATED AMENDED COMPLAINT**</u>

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ........................................................................................ 1

II.  STATEMENT OF FACTS ............................................................................................. 4

    A.   FTAC Raises $1.4 billion to Fund a Potential Merger ........................................ 4

    B.   FTAC Identifies Paysafe as a Potential Merger Partner ...................................... 5

    C.   Germany Adopts New Gambling Regulations with Monthly Deposit Limits ........................................................................................................ 6

    D.   FTAC and Paysafe Announce the Merger, Lobby Shareholders for Approval .............................................................................................................. 7

    E.   Defendants Knowingly Mislead Investors About Paysafe's Revenues .............................................................................................................. 7

    F.   FTAC Consummates the Merger, Becomes Paysafe ............................................ 8

    G.   The Truth Is Revealed .......................................................................................... 9

III. ARGUMENT ............................................................................................................... 10

    A.   The Complaint Alleges Materially False and Misleading Statements ............................................................................................................ 10

        1.   Plaintiffs Adequately Allege that Defendants Misled Investors About the German Gaming Regulations ........................................................................ 10

        2.   The Complaint Sufficiently Alleges Falsity for Each Challenged Statement ................................................................... 12

        3.   The PSLRA Safe Harbor Does Not Absolve Defendants of Liability ............................................................... 17

        4.   Defendants' Growth Statements Were Not Inactionable Opinions ............................................................... 20

        5.   Defendants' Statements Were Not Inactionable Puffery ............................................................................................ 22

        6.   The Complaint Alleges that Each of the Individual Defendants "Made" False Statements ........................................ 23

    B.   The Complaint Raises a Strong Inference of Defendants' Scienter ..................... 25

        1.   The Complaint Raises a Strong Inference of the Paysafe Defendants' Scienter ................................................... 26

2. The Complaint Raises a Strong Inference of the FTAC Defendants' Scienter.......................................................... 31

3. Plaintiffs Have Sufficiently Pled Corporate Scienter ............................... 34

C. The Complaint States a Claim for Scheme Liability ............................................. 35

D. The Complaint Adequately Pleads Loss Causation ............................................... 37

E. The Complaint Adequately Pleads Control Person Claims Under Section 20(a) ..................................................................................................... 39

IV. CONCLUSION.................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)..................................................................................................21

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005).....................................................................................14

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) .....................................................................................21

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010).....................................................................................28

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).....................................................................................................39

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................................23

*Caiola v. Citibank, N.A., New York*,
  295 F.3d 312 (2d Cir. 2002)...................................................................................................13

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010).....................................................................................30

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013)............................................................................... 17-18

*In re Complete Mgmt. Inc. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001).....................................................................................18

*In re DraftKings Inc. Sec. Litig.*,
  650 F. Supp. 3d 120 (S.D.N.Y. 2023)............................................................................... 33-34

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013).....................................................................................12

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
  2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ...........................................................................18

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).........................................................................28, 38, 39

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
 422 F. Supp. 3d 821 (S.D.N.Y. 2019)......................................................................19

*Heller v. Goldin Restructuring Fund, L.P.*,
 590 F. Supp. 2d 603 (S.D.N.Y. 2008).....................................................................26

*Ho v. Duoyuan Glob. Water, Inc.*,
 887 F. Supp. 2d 547 (S.D.N.Y. 2012)......................................................................29

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
 620 F. Supp. 3d 167 (D.N.J. 2022) .........................................................................16

*In re Initial Pub. Offering Sec. Litig.*,
 241 F. Supp. 2d 281 (S.D.N.Y. 2003)......................................................................40

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
 564 U.S. 135 (2011).............................................................................................23, 24

*In re JP Morgan Chase Sec. Litig.*,
 363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................29

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
 708 F. Supp. 2d 334 (S.D.N.Y.2010).......................................................................38

*Kusnier v. Virgin Galactic Holdings, Inc.*,
 639 F. Supp. 3d 350 (E.D.N.Y. 2022) .....................................................................14

*Lapin v. Goldman Sachs Grp., Inc.*,
 506 F. Supp. 2d 221 (S.D.N.Y. 2006).......................................................................11

*Lentell v. Merrill Lynch & Co., Inc.*,
 396 F.3d 161 (2d Cir. 2005)...........................................................................37, 38, 39

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
 797 F.3d 160 (2d Cir. 2015)...............................................................................34, 38

*Lorenzo v. SEC*,
 587 U.S. 71 (2019)...................................................................................................35

*In re Lottery.com, Inc. Sec. Litig.*,
 2024 WL 454298 (S.D.N.Y. Feb. 6, 2024)................................................................32

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
 601 U.S. 257 (2024)......................................................................................... *passim*

*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*,
 2024 WL 2890968 (2d Cir. June 10, 2024) .............................................................12

iv

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)...............................................................................................13

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
    2024 WL 3867669 (2d Cir. Aug. 19, 2024)........................................................................37

*Moshell v. Sasol Ltd.*,
    481 F. Supp. 3d 280 (S.D.N.Y. 2020).......................................................................12, 15, 20

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ..........................................................................................29

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)...............................................................................13, 29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...........................................................................................................21

*Ontario Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    432 F. Supp. 3d 131 (D. Conn. 2019).................................................................................14

*In re Oxford Health Plans Sec. Litig., Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................................................18

*Patel v. L-3 Commc'ns Holding Inc.*,
    2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)....................................................................34

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)............................................................................22, 23

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)................................................................................32

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund
    v. Arbitron Inc.*, 741 F. Supp. 2d 474 (S.D.N.Y. 2010), *as corrected*
    (Sept. 30, 2010)..................................................................................................................17

*Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*,
    2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11
    (2d Cir. 2018).....................................................................................................................15

*Puddu v. 6D Glob. Techs., Inc.*,
    2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ...............................................................24, 35

*Puddu v. 6D Glob. Techs., Inc.*,
    742 F. App'x 553, 556 (2d Cir. 2018) ...............................................................................25

v

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................................32

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)...............................................................34

*Rudani v. Ideanomics, Inc.*,
    2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020).............................................25, 27, 29

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    2024 WL 1898512 (S.D.N.Y. May 1, 2024) ..........................................25, 28, 30, 37

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013).................................................................40

*SEC v. Fiore*,
    416 F. Supp. 3d 306 (S.D.N.Y. 2019)................................................................36

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) .............................................................................37

*SEC v. SolarWinds Corp.*,
    2024 WL 3461952 (S.D.N.Y. July 18, 2024) .......................................................35

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    2024 WL 2124504 (S.D.N.Y. May 10, 2024) .......................................................12

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)............................................................................17

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012)................................................................23

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014).................................................................39

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)...........................................................30

*Teamsters Local 445, Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)............................................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................................25

*Theodore v. Purecycle Techs., Inc.*,
    2023 WL 4035880 (M.D. Fla. June 15, 2023)........................................................32

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)......................................................................................... 20-21

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022)................................................................................22

*In re Vale S.A. Sec. Litig.*,
    2020 WL 2610979 (E.D.N.Y. May 20, 2020) ..................................................................23

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)..................................................................22

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) ..................................................................25

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)...............................................................................26

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)........................................................................... 19, 22-23

*Wang v. Cloopen Grp. Holding Ltd.*,
    661 F. Supp. 3d 208 (S.D.N.Y. 2023)............................................................... 30-31

**Statutes**

15 U.S.C. § 78u-5(c) ..........................................................................................................17

## I.    PRELIMINARY STATEMENT

This case is about Defendants' efforts to deceive investors and push through a lucrative merger between FTAC and Paysafe by concealing the risks that recent regulatory changes in one of Paysafe's most important markets posed to its business.[1] Paysafe, which operated as a private company prior to the Class Period (December 7, 2020 through November 11, 2021), provides payment processing services and facilitates online transactions. On December 7, 2020, FTAC, a publicly-traded SPAC formed for the sole purpose of entering into a business combination with a financial technology company, announced that it had agreed to a merger with Paysafe. Through the Merger, Paysafe would become a publicly-traded company while skirting the traditional IPO process.

In the months leading up to the Merger, which was set for a shareholder vote on March 25, 2021, and throughout the remainder of the Class Period, Defendants misled investors by making and disseminating materially false and misleading statements about Paysafe, and concealing adverse material information about the Company. Specifically, in order to secure investor approval of the Merger, Defendants portrayed Paysafe as an established, highly-successful financial technology company poised to capitalize on the rapidly-growing iGaming market. In addition, in their public representations to investors regarding the Merger (which required the approval of FTAC shareholders), Defendants repeatedly referenced forthcoming changes to gaming regulations in Germany—Paysafe's second largest geographic market—representing that the

---

[1]    Unless otherwise noted herein: (i) all emphasis is added; (ii) all internal citations and quotation marks are omitted; (iii) all references to ¶ __ are to paragraphs in the Consolidated Amended Complaint (ECF No. 82) ("Complaint"); (iv) all capitalized terms shall have the meanings ascribed to them in the Complaint; (v) all references to "Paysafe Br." are to the Memorandum of Law in Support of Defendants' Motion to Dismiss Lead Plaintiffs' Consolidated Amended Complaint (ECF No. 96); and (vii) all references to "FTAC Br." are to the Memorandum of Law in Support of the FTAC Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF No. 99).

amendments would benefit the Company. Even after the Merger closed, Defendants continued to assure investors that Germany's amended gaming regulations, which were slated to take effect on July 1, 2021, would benefit the Company.

Privately, however, Defendants knew that the opposite was true. They knew that because Paysafe catered to high-roller clients (a fact that investors did not know), these amendments, which implemented a monthly cap on the total amount of money clients could deposit into their accounts, would negatively impact Paysafe's revenues. Indeed, Defendants belatedly admitted following the close of the Class Period that, contrary to their repeated public representations, they "had anticipated" that Germany's amended gambling laws would harm Paysafe's business.

Months after the end of the Class Period, on March 28, 2022, Defendants further confirmed the misleadingly incomplete nature of their Class Period representations by adding language to Paysafe's SEC filings that belatedly warned investors of the very facts they previously concealed—i.e., that the new German regulations contained "***certain restrictive measures that could adversely impact the Company***" including "a mandatory deposit limit of 1,000 euros per month across all providers for online gambling." But by then, the damage had been done. Over the course of two corrective disclosures, in August and November 2021, the financial impact of these amended regulations had already been laid bare to the market. Paysafe's stock price plummeted in response to these revelations, causing significant damage to Plaintiffs and the Class.

The Complaint's allegations in this regard plausibly state a claim for violations of the securities laws, and Defendants' contentions to the contrary are meritless. Indeed, Defendants attempt to escape liability by impermissibly ignoring Plaintiffs' allegations, mischaracterizing Plaintiffs' claims, and downplaying their own admissions. For example, Defendants' reliance on the Supreme Court's recent decision in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,

601 U.S. 257 (2024), disregards that: (i) Plaintiffs do not premise their Rule 10b-5(b) claims on "pure omissions"; and (ii) *Macquarie* does not, as the Second Circuit recently confirmed, address the scheme liability claims Plaintiffs assert under Rules 10b-5(a) and (c). In truth, *Macquarie* is inapplicable. Similarly, contrary to Defendants' suggestions, their statements are not entitled to the protections afforded to forward-looking statements, opinion statements, or corporate puffery, and Plaintiffs have alleged with the requisite specificity why each challenged statement was materially false or misleading.

Defendants' scienter arguments fare no better. Defendants attempt to sidestep their damning post-Class Period admissions by suggesting that the ultimate financial impact of the amended German regulations was larger than they expected. In making this argument, however, Defendants concede that they did in fact anticipate a ***negative*** impact from the amended regulations, which stands in stark contrast to their Class Period representations that the shifting regulatory framework would be a "***positive***" for the Company. Further, through the FTAC Defendants' extensive due diligence of Paysafe prior to the Merger, they had ample access to the very information that was omitted and misrepresented to investors. Defendants likewise gloss over Plaintiffs' allegations regarding the import of the German market and iGaming to Paysafe's bottom line—facts that strengthen the overall inference of their scienter raised by the Complaint. Defendants' scienter arguments also fail because certain Defendants were financially motivated to inflate the Company's stock price to ensure that the Merger was consummated. In particular, Foley stood to gain nearly ***$700 million*** if the Merger was successful.

Finally, Defendants' loss causation challenges can be swiftly rejected. Plaintiffs' allegations more than sufficiently establish, for pleading purposes, the requisite causal link

between the information revealed through the two corrective disclosures at the end of the Class Period—which was previously unknown to investors—and their alleged misrepresentations.

In sum, when Plaintiffs' allegations are credited and taken as true, the Complaint adequately alleges all elements of their claims. Plaintiffs respectfully submit that Defendants' motions to dismiss should be denied.

## II.    STATEMENT OF FACTS

### A.    FTAC Raises $1.4 billion to Fund a Potential Merger

FTAC was founded on July 15, 2020 by billionaire William Foley as a SPAC. Foley created FTAC for the sole purpose of consummating a "business combination with one or more businesses" in the financial technology or business process outsourcing industries. ¶¶ 33, 35.

On August 18, 2020, FTAC conducted an IPO, selling 130 million IPO "units" to investors at a price of $10 per unit. ¶ 34. Each unit comprised one share of FTAC Class A common stock and one-third of one redeemable FTAC warrant, with each full warrant giving its holder the right to purchase one FTAC Class A share for $11.50 upon consummation of a suitable business combination. *Id*. Just prior to the IPO, Foley purchased approximately 36 million Class B shares, which could be converted to Class A shares after a merger was consummated, for $25,000. ¶ 187. Also in August 2020, Foley, acquired approximately 20 million FTAC warrants for just over $31 million through a company in which he was the "sole general partner." ¶¶ 188-89. Through the IPO and other related offerings, FTAC raised nearly $1.4 billion in capital, which it intended to use to fund a merger. ¶ 34.

There was one catch: if FTAC *failed* to consummate a merger within 24 months of the IPO, it was required to repurchase all the shares it sold in the IPO, and all FTAC warrants would expire worthless. ¶ 35. At stake for Foley were his Class B shares and warrants, which gave him the right to acquire FTAC shares valued at close to $740 million after FTAC's IPO. ¶ 190. If FTAC failed

to execute a business combination within the allotted 24 months, Foley's securities would be rendered worthless. *Id.*

### B.    FTAC Identifies Paysafe as a Potential Merger Partner

Enter Paysafe, a private online payment processing service company that allows consumers to transact online without disclosing traditional banking information like credit card numbers. ¶¶ 44-46. Paysafe's revenues from its three main operating segments—Integrated Processing Solutions, Digital Wallet, and eCash Solutions—were principally generated through "per transaction fees." ¶¶ 47, 51. These fees were either based on a fixed rate or calculated as a percentage of the dollar amount of each transaction processed through Paysafe's platform. ¶¶ 47-49, 51. Paysafe claimed to fill a void in the market because, unlike its competitors in the payment processing space, Paysafe not only condoned "betting, including lottery tickets, sports related gambling, casino gaming chips, off-track betting, and wagers at races," it structured its business around these activities. ¶ 46.

Paysafe held itself out as a "global leader in iGaming" with more than 1,000 operators outside North America. ¶ 55. Europe, and in particular Germany, represented "an extremely large market" for the Company—trailing only the U.S. as Paysafe's most profitable country by revenue. ¶¶ 55-56. Paysafe generated $1.4 billion in revenue in 2019 and 2020, with approximately 36% of this revenue derived from iGaming—online betting encompassing both sports gambling and traditional casino games. ¶¶ 52-53. With respect to iGaming, Paysafe's per transaction fees accrued each time a merchant (i.e., casino operator) processed a transaction on Paysafe's platform and each time a customer deposited, withdrew, or used money to transact on an iGaming website. ¶ 54. Crucially, Paysafe's revenues were dependent on both the number of transactions and the dollar amounts because Paysafe earned a percentage of each transaction in fees. *Id.* Thus, while the number of transactions processed through Paysafe's systems mattered, so too did the total dollar

value of those transactions. *Id*. This fee structure was particularly beneficial to Paysafe because, unbeknownst to investors, it "***catered to higher-end betters***," known as "high-rollers." ¶ 110.

### C.    Germany Adopts New Gambling Regulations with Monthly Deposit Limits

Germany's Third Interstate Treaty on Gambling, which was enacted in January 2020, legalized sports betting countrywide. ¶ 58. And while these regulations imposed a modest "player-protection" by limiting the amount that bettors could wager through each gaming operator to €1,000 per month, it imposed no limit on the *total* amount of money a bettor could gamble—and thus deposit into his or her gaming accounts—each month. *Id*. Without a cap on total deposits or wagers, Paysafe's German high-roller customer base continued to fuel revenues for the Company in "the largest legal gambling market in Europe." *See* ¶ 55.

In March 2020, however, German lawmakers announced that they had agreed to a new set of gambling regulations known as the Fourth Interstate Treaty on Gambling ("Fourth Interstate Treaty"). ¶ 59. Although the Fourth Interstate Treaty would legalize online casino gambling, it would also crack down on online gaming generally by imposing dozens of stringent player protections and operator restrictions. ¶ 60. Chief among the announced changes, and crucial to Paysafe's business, was the imposition of a ***cross-operator*** monthly ***deposit*** limit, which capped at €1,000 the total amount of money a player could ***deposit*** into ***all*** of his or her German gaming accounts each month. *Id*.

Given Paysafe's reliance on per-transaction fees and its key high-roller customer base, Paysafe executives privately "***anticipated***" that the Fourth Interstate Treaty with its cross-operator monthly deposit limit, which was scheduled to take effect on July 1, 2021, would negatively impact the Company's all-important German revenues. ¶ 81.

6

**D.      FTAC and Paysafe Announce the Merger, Lobby Shareholders for Approval**

On December 7, 2020—after the Fourth Interstate Treaty was announced but before it became fully effective—FTAC publicly disclosed that it had entered into a merger agreement with Paysafe. ¶ 66. For the Merger to be consummated, however, Defendants needed to satisfy at least three conditions. *First*, Paysafe's fair market value had to equal at least 80% of the assets held in FTAC's trust account. ¶ 39. This meant that if Paysafe's fair market value fell below $1.17 billion, the Merger could not be consummated. *Id. Second*, a majority of FTAC's shareholders needed to approve the Merger. ¶ 40. And finally, Defendants needed to ensure that shareholders not only voted to approve the Merger, but also agreed to receive Paysafe stock in exchange for their FTAC shares. If a significant number of FTAC shareholders exercised the redemption rights granted to them pursuant to FTAC's IPO—which permitted them to redeem their FTAC shares for approximately $10 per share in lieu of receiving Paysafe shares—the Merger would fail. ¶ 41.

**E.      Defendants Knowingly Mislead Investors About Paysafe's Revenues**

Each of these conditions—coupled with the financial windfalls that would be realized through the Merger—incentivized Defendants to withhold material negative information from investors. And that is precisely what they did. In their public statements to the market, Defendants did not say a word about the "anticipated" negative impact that the Fourth Interstate Treaty would have on Paysafe's revenues in its second largest market. Instead, in announcing the Merger on December 7, 2020, Defendant Foley told investors that "***Paysafe delivers a unique value proposition in large and high-growth markets, such as gaming and e-commerce, enabling the company to generate strong organic growth and margin expansion***" and that Paysafe was "***positioned in the highest growth vertical markets***." ¶¶ 130, 133. These statements stand in conflict with the hit Paysafe knew was coming with respect to its German revenues.

7

As part of the Merger announcement, Defendants also "urge[d] investors, stockholders and other interested persons to read, when available, [Paysafe's] Form F-4 . . . as well as other documents filed with the SEC in connection with the proposed business combination." ¶ 84. In Paysafe's Initial Form F-4, filed on December 21, 2020, Defendants affirmatively referenced Germany's gambling regulations but falsely represented to the market that "[c]hanges in the regulation of online gambling in [Germany] . . . may impact us . . . *positively*." ¶ 93. This and other similar representations, which Defendants repeated in several jointly-filed SEC filings, were misleading given Defendants' awareness that the forthcoming Fourth Interstate Treaty, with its cross-operator limit, was reasonably likely to have a material negative impact on Paysafe. ¶ 94.

### F.    FTAC Consummates the Merger, Becomes Paysafe

On the heels of their false and misleading statements and omissions about Paysafe and the purported positive impact of the Fourth Interstate Treaty on Paysafe's business, Defendants secured shareholder approval for the Merger on March 25, 2021. ¶ 96. On March 31, 2021, FTAC shares converted into Paysafe shares and began trading on the NYSE under the PSFE ticker. ¶ 97. As noted above, through the Merger, Foley's investment of just over $31 million in FTAC securities was transformed into Paysafe shares worth over $730 million. ¶¶ 187-89.

After the Merger, Paysafe continued to issue false and misleading statements and omit material information about the anticipated impact of Germany's Fourth Interstate Treaty on Paysafe's revenues. ¶¶ 98-99. Notably, unlike Paysafe, several of its competitors disclosed to the market that the Fourth Interstate Treaty was likely to have a material negative impact on their businesses. For example, Flutter, an Irish gaming company that also operated in Germany, disclosed that the Fourth Interstate Treaty was likely to cause its annual revenues to decline by €56 million. ¶ 79. Yet Defendants remained silent about the known, anticipated impact on Paysafe's revenues.

G.      **The Truth Is Revealed**

After the Fourth Interstate Treaty took effect on July 1, 2021, the truth about Defendants' fraud was slowly revealed to the market. ¶ 103. On August 16, 2021, Paysafe issued a press release announcing its financial results for the second quarter of 2021, which ended on June 30, 2021—the day before the cross-operator deposit limit took effect. *Id*. Paysafe reported positive earnings for the second quarter, but it shocked investors by announcing that it was lowering its expected revenues for the third quarter to $360 million to $375 million, well below the market consensus of $389 million. ¶ 104. Yet Paysafe continued to mislead investors, blaming its lowered guidance on transitory "seasonal[]" betting patterns and again failing to disclose the expected impact of the Fourth Interstate Treaty. *Id*. In fact, the Company "reaffirm[ed]" its full-year revenue target. *Id*. Based on this partial disclosure, Paysafe's stock price declined by more than 15%, from a close of $10.20 per share on August 13, 2021, to close at $8.62 per share on August 16, 2021. ¶ 105.

Thereafter, on November 11, 2021, the full truth about the impact of the Fourth Interstate Treaty on the Company was finally revealed to the market when Paysafe announced its financial results for third quarter of 2021. ¶¶ 107-10. Defendants disclosed revenues of $353.6 million for the third quarter, missing even the low end of the Company's previously revised guidance, lowered its fourth quarter guidance, and revised Paysafe's full year guidance range downward by $60 to $70 million. ¶ 107.

During the Company's third quarter earnings conference call, Paysafe's former CEO Philip McHugh admitted that "in Germany, the adoption of new regulations had a more meaningful impact than we anticipated with several operators reducing activity or leaving the market." ¶ 108. In response to an analyst question regarding the regulatory issues in Germany, McHugh pointed to the "cap on how much a single person can bet," explaining, "when we cater to higher-end betters, that cap has a pretty high impact." ¶ 110. On this news, the price of Paysafe common stock

9

plummeted by $3.03 per share, or **_more than 41%_**, from a close of $7.27 on November 10, 2021, to a close of $4.24 per share on November 11, 2021. ¶ 111. Analysts tied the decline directly to "the regulatory environment in Europe . . . namely in Germany (caps on how much a single person can bet . . . )." ¶ 112.

Importantly, Paysafe's then-CFO, Ismail Dawood, took to Twitter after the disappointing earnings report and **_admitted_** that the Company had been "anticipat[ing]" that the changes in the German gambling laws would have a negative impact on the Company. ¶ 113. Further, **_after_** the truth was disclosed to investors, Paysafe belatedly revised its SEC filings to include language disclosing that the Fourth Interstate Treaty and, in particular, the cross-operator monthly deposit limit, was likely to have a continuing "adverse[] impact" on the Company's business. ¶ 116.

## III.   ARGUMENT

### A.   The Complaint Alleges Materially False and Misleading Statements

Throughout the Class Period, Defendants repeatedly and specifically referenced the forthcoming amendments to the German gaming regulations, misleadingly painting these amendments as a positive development and assuring investors about Paysafe's long-term growth potential. Contrary to these statements, Defendants knew internally—but failed to disclose to investors—that due to its reliance on high-roller clients who deposit and wager large amounts of money, the Company's business and revenues were likely to be disproportionately impacted by the €1,000 cross-operator monthly deposit limit enacted through those amendments.

Each of Defendants' statements is false or misleading for the reasons set forth below.

### 1.   Plaintiffs Adequately Allege that Defendants Misled Investors About the German Gaming Regulations

Plaintiffs have not, as Defendants contend, alleged a "pure omission" claim under Rule 10b-5(b). Paysafe Br. at 11 (citing *Macquarie*, 601 U.S. at 264). As the Supreme Court made clear

10

in *Macquarie*, "[a] pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." 601 U.S. at 263. The Supreme Court contrasted pure omissions with actionable "[h]alf-truths"—affirmative statements that misleadingly "omit[] critical qualifying information." *Id.* Importantly, *Macquarie* only addresses "pure omission" claims under Rule 10b-5(b); it expressly does not address claims alleging "half-truths." *Id.* at 266 n.2.

Here, Plaintiffs repeatedly allege that Defendants' failure to disclose information required by Item 303 of Regulation S-K (as well as Item 5 of Form 20-F and Item 14(g)(1) of Form F-1) ***rendered their affirmative statements to investors misleading***. *See, e.g.*, ¶ 127 ("disclosure was required by Item 303 ***and*** was necessary to make Defendants' statements about, among other things, the forthcoming changes to German gaming regulations, not misleading"); ¶ 128 (same for Item 5 of Form 20-F); ¶ 129 (same for Item 14(g)(1) of Form F-4); *see also Lapin v. Goldman Sachs Grp., Inc.,* 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("once a party chooses to discuss material issues . . . one has a duty to be both accurate and complete").[2] Plaintiffs contend that Defendants' affirmative statements concerning, *inter alia*, the forthcoming changes in the German gambling regulations, constituted misleading half-truths because they failed to disclose the material, "anticipated" negative impact that those regulations were reasonably likely to have on Paysafe's business. *See, e.g.,* ¶ 81.

---

[2]    Defendants' "Appendix A: Table of Challenged Statements," underscores their apparent misapprehension of the distinction between a "pure omission" and a "half-truth" as it relates to Plaintiffs' claims. Indeed, Defendants set forth in this table each ***affirmative misstatement*** that Plaintiffs allege was materially false or misleading but then nonetheless characterize each as an "Inactionable pure omission." *See generally* Appendix A: Table of Challenged Statements (ECF No. 96-1) ("Defendants' Appendix A").

11

Thus, Plaintiffs have alleged a quintessential Section 10(b) violation based on half-truths that courts—**including the Supreme Court in Macquarie**—have long held actionable. *See Macquarie*, 601 U.S. at 266 ("private parties remain free to bring claims based on Item 303 violations that create misleading half-truths"); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 512-13 (S.D.N.Y. 2013) (violation of Item 303 where company was aware of, but failed to disclose, a "material negative impact on . . . revenues.).[3] Defendants' reliance on *Macquarie* is therefore sorely misplaced. *See Macquarie*, 601 U.S. at 266 n.2; *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2024 WL 2124504, at \*1 (S.D.N.Y. May 10, 2024); Paysafe Br. at 11-12; FTAC Br. at 6.[4]

### 2.    The Complaint Sufficiently Alleges Falsity for Each Challenged Statement

Plaintiffs adequately identify each of Defendants' statements that they allege is false or misleading and detail the facts supporting falsity. *See, e.g.*, ¶¶ 130-32; ¶¶ 139-41; ¶¶ 142-44. In light of these well-pled allegations, Defendants' falsity arguments should be rejected.[5]

*First*, as discussed above, many of Defendants' misstatements are actionable "half-truths," which "create[d] a materially misleading impression by omitting certain information." *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 292 (S.D.N.Y. 2020) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016)). Indeed, Defendants told investors that "German regulators . . .

---

[3]    *Maso* is inapposite as the plaintiffs there, unlike here, asserted pure omissions. *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, 2024 WL 2890968, at \*4 (2d Cir. June 10, 2024) (cited at Paysafe Br. at 11-12).

[4]    The Paysafe Defendants' claim that Plaintiffs failed to raise a "plausible inference" that they "knew of the alleged 'trends or uncertainties'" (Paysafe Br. at 12), fails for the reasons set forth in Section III.B below. Indeed, Paysafe's own SEC filings confirm their awareness of the Fourth Interstate Treaty, and Defendants themselves admitted that they "anticipated" it would have a negative impact on Paysafe's business. *See e.g.*, ¶¶ 108, 110.

[5]    For *every* alleged misstatement, Defendants identify "fails to allege falsity" as among the "Reasons Why Inactionable" in Defendants' Appendix A. For the reasons discussed in this Section, however, all of the challenged statements are actionably false or misleading.

agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters" and then highlighted "Germany['s] . . . move[] from prohibition to controlled regulation" as a "*positive[]*" for the Company, while omitting that the Fourth Interstate Treaty was reasonably likely to have a negative impact on Paysafe's business. *See e.g.*, ¶¶ 139-40; ¶¶ 148-50.

Contrary to Defendants' claim that disclosure of the reasonably likely impact of Germany's amended regulations was not required (Paysafe Br. at 12), once Defendants chose to make affirmative statements about the regulations, going so far as touting them as a positive, they had a "duty to be both accurate and complete." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) ("the lack of an independent duty is not . . . a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues"). This duty required Defendants to disclose to investors that Paysafe's "higher-end better" customer base rendered the Company particularly susceptible to the €1,000 monthly deposit cap. By omitting the reasonably likely material negative impact of the regulations on Paysafe's revenues, Defendants' statements misled investors in violation of Section 10(b). *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 34 (S.D.N.Y. 2019) (actionable half-truth where defendants made "general disclosure of a phenomenon's existence[] without describing . . . the potential impact on an important source of revenue"); *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth").[6]

---

[6]    Defendants' statements regarding Paysafe's presence in "high-growth markets," and "highest growth vertical markets," as well as its "unique value proposition," "long-term growth potential," and "growth opportunities" are likewise misleading half-truths as these statements gave investors the impression that Paysafe was poised for growth in the iGaming space when, in actuality, Defendants anticipated that the forthcoming amendments to the German gambling

*Second*, Defendants' claim that Plaintiffs provide only "a generalized explanation" of falsity (Paysafe Br. at 13) ignores the Complaint's specific allegations detailing the reasons why each challenged statement is false or misleading. For example, Plaintiffs allege with particularity that many of Defendants' statements were false or misleading because "Defendants failed to disclose that the new cross-operator monthly deposit limit of €1,000 set to be enacted as part of the amendments to the German online gambling regulations was reasonably likely to have a material adverse effect on Paysafe's future revenues and results of operations." *See, e.g.*, ¶ 141.[7] Such allegations satisfy PSLRA's pleading standard. *See Kusnier v. Virgin Galactic Holdings, Inc.,* 639 F. Supp. 3d 350, 368 (E.D.N.Y. 2022) (falsity sufficiently alleged where "plaintiffs have identified specific statements (and added emphasis where challenged assertions are embedded in longer passages) and followed each by a list of reasons why those statements are allegedly misleading"); *Ontario Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 153 (D. Conn. 2019) ("a complaint meets the particularity requirement when it specifically identifies the date, publication, and speaker of each of the alleged misstatements or omissions and contains facts supporting the existence and materiality of these problems and highlights in some way the particular aspects of the statements alleged to be misleading") (alterations omitted).[8] The

---

regulations would negatively impact the Company's revenues. *See* ¶¶ 130-38; *cf.* FTAC Br. at 9-10.

[7]    Moreover, Plaintiffs set forth in detail in Sections IV-VI of the Complaint all of the facts supporting the falsity of Defendants' representations and then incorporate by reference these paragraphs in detailing the reasons why each of Defendants' statements were materially false or misleading. *See, e.g.*, ¶¶ 138, 141, 144, 147, 151, 153, 155, 159, 162, 164, 167.

[8]    *Alcatel* is inapposite because here, unlike there, Plaintiffs not only make clear what portions of each statement are false also specify the reasons supporting their alleged falsity. *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (cited at Paysafe Br. at 13); *see, e.g.*, ¶ 138 ("by electing to speak publicly about Paysafe's . . . 'unrivalled regulatory risk and technical expertise' . . . Defendants had a duty to . . . disclose all material facts regarding the shifting regulatory landscape in the iGaming space, including the forthcoming amendments to the German gambling regulations and the likely impact of these amendments . . . .").

fact that the majority of Defendants' misrepresentations were false or misleading for the same reasons does not undermine the sufficiency or particularity of Plaintiffs' allegations—particularly here, where Defendants repeated their misrepresentations throughout the Class Period.

*Third*, Defendants argue that even if they expected the cross-operator deposit limit to have a negative impact on Paysafe's revenues, their statements to the contrary would still not be materially false or misleading. Paysafe Br. at 13. But this argument rests upon a mischaracterization of Plaintiffs' claims.[9] Plaintiffs do not contend, as Defendants suggest, that the amendments to the German regulations merely represented a "***potential*** headwind in one geographic market in one segment of its business." Paysafe Br. at 13. Instead, Plaintiffs allege that Defendants knew, but concealed from investors, that the amendments to the gaming regulations in Germany—Paysafe's second largest geographic market—were reasonably likely to have a material adverse effect on the Company's overall revenues. *See* ¶¶ 82-102. Indeed, Defendants confirmed after the close of the Class Period that they had ***expected*** the amended regulations to negatively impact Paysafe's business. ¶¶ 110, 113. Against this backdrop, Defendants' repeated references to the forthcoming amendments, including their representations that the amendments would be ***positive*** for the Company, were plainly materially misleading half-truths. *See Moshell*, 481 F. Supp. 3d at 292 (statements discussing cost estimates and projected schedules were

---

[9]    Defendants' reliance on *La Quinta* is misplaced because the court there dismissed the plaintiff's claims primarily on the grounds that the defendants adequately disclosed the purported risks at issue, not because the defendants withheld materially important information from investors. *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *6-7, 9 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018) ("The Court concludes that the information available. . . *sufficiently apprised Plaintiff of this risk* . . . . Even if Plaintiff had identified a duty to disclose . . . the Court would nonetheless dismiss . . . *because the risks identified by Plaintiff were adequately disclosed*. . . . Even assuming that La Quinta did have a duty to disclose the complications related to the call center transition . . . *the company did in fact disclose this information*.").

actionable half-truths where they failed to account for additional information known to defendants); *see also Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe 'a favorable picture' of a material issue 'without including the details that would have presented a complete and less favorable one.'" (quoting *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018))).

*Fourth*, Defendants' contention that the allegedly-omitted information was already "known to the market" is baseless. Paysafe Br. at 13. While investors may have been aware that Germany's new gambling regulations would go into effect on July 1, 2021 and that Germany was Paysafe's second largest market, they could not have understood the material impact that the regulations were reasonably likely to have on Paysafe's business, including because the market did not know, as Defendants did, about Paysafe's disproportionate reliance on high value bettors. As McHugh belatedly admitted, because the Company "cater[s] to higher-end betters," the cross-operator monthly deposit limit "has a pretty high impact" on Paysafe's revenues. ¶ 183. Nowhere in their brief do Defendants claim that investors knew that Paysafe's customer base was skewed toward high-rollers, which was key to understanding the likely impact of the amended regulations on Paysafe's business. *See generally* Paysafe Br.

Defendants' assertion that the Complaint references no contemporaneous projections showing a negative impact from the German regulations also fails. Paysafe Br. at 13-14. Defendants cite no authority requiring that Plaintiffs plead such "evidence" to demonstrate falsity, especially given the facts alleged here. Indeed, this argument disregards Plaintiffs' myriad allegations that the amended regulations were likely to have a material impact on the Company. Chief among these allegations is Defendants' admission that they "had anticipated" a negative impact from the amendments. *See* ¶¶ 110, 113. Plaintiffs also detail public concerns about the

16

potential impact of the new law (¶ 78) and disclosures made by other companies in the gambling space predicting a negative impact from the amended regulations (¶¶ 77-80). In fact, Dawood himself acknowledged at the end of the Class Period that "even Flutter talked about it," referencing Flutter's decision, *months prior to the effective date of the regulations*, to disclose an expected €56 million revenue shortfall as result of Germany's new regulatory regime. ¶ 185.[10]

### 3.    The PSLRA Safe Harbor Does Not Absolve Defendants of Liability

The PSLRA's safe harbor protects forward-looking statements if (i) they are identified as forward-looking and accompanied by meaningful cautionary language; (ii) they are immaterial; or (iii) the plaintiff cannot prove they were made with actual knowledge of their falsity. 15 U.S.C. § 78u-5(c); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765-66 (2d Cir. 2010). Defendants contend that all of the alleged misstatements were forward-looking and thus are insulated from liability under the PSLRA safe harbor. Paysafe Br.at 14-16, FTAC Br. at 9. This argument falls short.[11]

*First*, before applying the safe-harbor, courts must find that the statements at issue are, in fact, forward-looking. Statements that misrepresent present facts are not forward-looking and therefore not protected under the safe-harbor. *See Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 485 (S.D.N.Y. 2010), *as corrected* (Sept. 30, 2010) ("positive descriptions of [a company's] ongoing performance . . . were statements of specific, present-day fact[s], not optimistic predictions of the future"); *see also City of Austin*

---

[10]    Dawood's reference to Flutter further demonstrates the misleading nature of Defendants' statements. Indeed, two similarly-situated companies chose to "talk[] about" the same forthcoming regulatory changes—one (Flutter) disclosed a reasonably likely negative impact and the other (Paysafe) misleadingly portrayed the same regulatory regime as a positive. *Id.*

[11]    For *every* alleged misstatement, other than Paysafe's statement in a June 2021 Blog Post referencing the monthly deposit limit (*see* ¶ 161), Defendants identify "PSLRA safe harbor" as among the "Reasons Why Inactionable" in Defendants' Appendix A. For the reasons discussed in this Section, however, none of Defendants' statements are entitled to protection under the safe harbor.

*Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) ("it is well-settled that cautionary language cannot protect against the omission of present fact").

Here, when Defendants touted the changes to the German regulatory regime as a "positive" for Paysafe, the Fourth Interstate Treaty (and its €1,000 cross-operator monthly deposit limit) had already been enacted, and the risk it posed to Paysafe's business already existed. ¶ 75.[12] Similarly, at the time of Defendants' statements regarding the "pullback in online sports betting in Germany" on September 10, 2021—more than two-thirds of the way through the third quarter, and just two months before Defendants' fraud was fully revealed—Paysafe had already experienced a negative impact on its revenues from the monthly deposit cap, but concealed this information from investors. *See* ¶ 107 (disclosing third quarter revenues $6 million below the low end of revised guidance). Defendants' "failure to disclose [these] historical and existing material facts about . . . [the Company's] problems and the impact of those problems" renders these statements not forward-looking. *In re Oxford Health Plans Sec. Litig., Inc.*, 187 F.R.D. 133, 141-42 (S.D.N.Y. 1999) (safe-harbor does not apply to misrepresentations about then-existing problems facing defendants). As a result, the safe-harbor does not apply to these statements. *Id.*

Defendants' statements about Paysafe's continued growth also "invite[d] the conclusion that the company w[ould] expand with ease" and as such "communicate[d] present facts" that are not protected by the PSLRA. *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *9 (S.D.N.Y. Jan. 20, 2015). In light of Defendants' statements, investors would reasonably

---

[12]    Defendants' argument that their statements about the Gambling Regulations were forward-looking because they "address events that have not yet occurred" is without merit. Paysafe Br. at 15. As alleged, the Fourth Interstate Treaty was announced in March 2020, well before Defendants' Class Period misrepresentations regarding the German regulatory landscape. *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (the safe-harbor "doctrine[] appl[ies] to forward-looking statements only, and not to material omissions or misstatements of historical fact") (emphasis omitted).

18

conclude that Defendants' assurances of growth were based on Defendants' knowledge about both the forthcoming regulations and the specifics of the Company's business, including the makeup of its customer base.

*Second*, even if Defendants' statements are deemed forward-looking, they were not accompanied by meaningful cautionary language. To be meaningful, "defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Vivendi*, 838 F.3d at 247. "[K]itchen-sink disclaimer[s], listing garden-variety business concerns that could affect any company's financial well-being" do not constitute meaningful cautionary language. *Id*. (emphasis omitted).

Here, Paysafe's purported cautionary language was hopelessly boilerplate and failed to warn investors about the unique factors that led to investors' losses. Paysafe Br. at 7-9, 15-16. That Paysafe "may be adversely affected by other economic, business and/or competitive factors" and "there are risks inherent in doing business internationally on both a domestic (i.e., in-country) and cross-border basis, including but not limited to . . . risks related to government regulation" constitute generalized statements that apply to every company with international operations and thus are not meaningful. They did not even mention, let alone meaningfully caution investors about, the ***specific*** risks to Paysafe's revenues posed by the ***already-enacted*** Fourth Interstate Treaty and the Company's ***then-existing*** high-roller customer base.

Paysafe's other purported cautionary statements fare no better because they too did not speak to the potential impact of the deposit limit imposed by German regulations. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 847 (S.D.N.Y. 2019) (cautionary statements not "meaningful" where they did not relate to "specific risks" associated with company's underinvestment issues). While Defendants point to "COVID-

19

19," "tax developments," and "seasonality and volatility" as the cause for the Company's significant decline in revenue (Paysafe Br. at 7-8), these arguments ignore Defendants' ultimate admission that Paysafe's revenue shortfall stemmed at least in part from "anticipated" issues related to Germany's new gambling regulations. ¶ 108 (McHugh on a November 11, 2021 conference call), ¶ 113 (Dawood Tweet on November 11, 2021), ¶ 114 (Paysafe's Form 6-K filed on March 2, 2022), ¶ 115 (McHugh on a March 2, 2022 conference call). Plaintiffs' well-pled allegations, taken as true, demonstrate that Paysafe's revenue miss was attributable to the amended German regulations, and therefore Paysafe's unrelated cautionary language is not "meaningful."

*Third*, Defendants cannot seek shelter under the safe harbor because they had actual knowledge of the falsity of their statements. Paysafe Br. at 14. Statements made with actual knowledge of their falsity are not afforded immunity under the safe-harbor provision. *Moshell*, 481 F. Supp. 3d at 292 (evidence of scienter renders purported forward-looking statement actionable). Here, Plaintiffs adequately allege that, contrary to their public statements, Defendants knew that the Fourth Interstate Treaty was reasonably likely to have a material negative impact on Paysafe's revenues. *See infra* Section III.B.

### 4. Defendants' Growth Statements Were Not Inactionable Opinions

Defendants next argue that three of the alleged misstatements are inactionable statements of opinion. Paysafe Br. at 16-17; FTAC Br. at 8-9; ¶¶ 130, 131, 134. They are wrong.[13]

Opinions are actionable under Section 10(b) if: (i) the speaker did not honestly hold the stated beliefs; (ii) the statement contains embedded facts that were false or misleading; or (iii) the speaker omitted material facts that rendered the statements misleadingly incomplete. *See Tongue*

---

[13]    For the four statements alleged at ¶¶ 130-31, 133-34, Defendants identify "inactionable opinion statements" as among the "Reasons Why Inactionable" in Defendants' Appendix A. For the reasons discussed in this Section, however, none of these statements is an inactionable opinion.

*v. Sanofi,* 816 F.3d 199, 210 (2d Cir. 2016) (adopting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015) for § 10(b) claims). Where statements of opinions are delivered without critical context, they are not insulated from liability under Section 10(b). *See Omnicare*, 575 U.S. at 190-91; *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) ("when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow").

The Complaint plausibly alleges that Defendants' omission of material facts rendered their statements misleadingly incomplete. In particular, Defendants' statements omitted the anticipated risks posed by the already-enacted monthly €1,000 cross-operator deposit limit applicable to Paysafe's second largest market. *See* ¶¶ 61-62, 75-76; *see also Abramson*, 965 F.3d at 175 ("when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow"). Thus, these statements are actionable. *See id*. at 177 ("when omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable").

Likewise, Defendants could not have sincerely held their opinions in light of their subsequent admissions that they expected the Fourth Interstate Treaty to negatively impact the Company's business in its second-largest market. For this additional reason, these statements are not immune from liability. *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 212 (E.D. Pa. 2021) (statements not inactionable opinions where plaintiffs "present numerous facts on the ground that directly contradicted the statements— facts they contend were known to the speakers and could not be reconciled with the assurances offered to investors").

21

### 5.      Defendants' Statements Were Not Inactionable Puffery

Defendants next argue that certain of their statements about Paysafe's growth were immaterial corporate puffery. Paysafe Br. at 17-18, FTAC Br. at 8. Importantly, Defendants concede that this argument is inapplicable to their statements about Germany's gaming regulations, including Defendants' representations to investors that the new laws would impact the Company "positively." Instead, Defendants aim their puffery argument only at their assurances about Paysafe's "significant growth opportunities." *See* Paysafe Br. at 17-18 (citing ¶¶ 130, 131, 134).[14]

Defendants' argument that these statements constitute "classic corporate puffery" (FTAC Br. at 8) fails because it ignores the context in which the comments were made. *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("Whether a representation is 'mere puffery' depends, in part, on the context in which it is made."); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 222 (S.D.N.Y. 2022) ("where the context makes it such that a reasonable investor could rely on them as reflective of the true state of affairs at the Company, courts in this district routinely hold that such statements will not be found to be inactionable puffery"). Here, Defendants' statements about Paysafe's growth were made in connection with the Merger announcement and were intended to shore up investor support for the Merger. ¶¶ 5, 43, 82. These statements, moreover, were belied by Defendants' knowledge of the "anticipated" negative impact of "regulatory issues" in Europe. ¶ 183.[15] As such, the "tableau painted by [Defendants'] public

---

[14]     For the four statements alleged at ¶¶ 130-31, 133-34, Defendants identify "puffery and corporate optimism" as among the "Reasons Why Inactionable" in Defendants' Appendix A. For the reasons discussed in this Section, however, none of these statements constitutes inactionable puffery or corporate optimism.

[15]     Because Defendants' public promises of growth stood in stark contrast to the internal knowledge of the looming negative impact of the amended German regulations, their reliance on *Villare* is misplaced. *See Villare v. Abiomed, Inc.,* 2021 WL 4311749, at *15 (S.D.N.Y. Sept. 21, 2021) (statements puffery where plaintiffs fail to "demonstrate any . . . baseline by which to verify the challenged statements").

statements" about growth "did not match the tenor of the discussions inside the company" about the expected adverse impact of the German regulations. *Vivendi*, 838 F.3d at 235.

Moreover, where, as here, a company pushes messaging "in an effort to reassure the investing public about matters particularly important to the company," those statements are not puffery. *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020) (collecting cases). In the run-up to the shareholder vote on the Merger, Defendants repeatedly emphasized Paysafe's "presence in high-growth markets," and "highest growth vertical markets," as well as its "unique value proposition," "long-term growth-potential," and "growth opportunities," in an attempt to assure investors that any regulatory issues affecting these markets would not be an impediment to Paysafe's growth. *See* ¶¶ 130-31, 133; *see In re BHP Billiton Ltd. Sec. Litig.,* 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (noting that a topic is "obviously a major concern to . . . investors" where it is acknowledged as such in "[defendants'] own disclosures"). Accordingly, Defendants' statements were not "too general to cause a reasonable investor to rely upon them." *Petrobras*, 116 F. Supp. 3d at 381.

### 6.    The Complaint Alleges that Each of the Individual Defendants "Made" False Statements

Paysafe, McHugh, Dawood, Foley, Massey, and Coy are each individually liable as makers of false and misleading statements under Section 10(b) of the Exchange Act. *See* ¶¶ 26-32. Foley, McHugh, and Dawood either delivered the false and misleading statements themselves or were signatories to disclosures containing these misrepresentations. *See Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011) ("One 'makes' a statement by stating it."); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) ("courts consistently hold that *signatories* of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b)").

While Defendants argue that Plaintiffs' claims against Massey and Coy, respectively the CEO and CFO of FTAC, must be dismissed because neither was "responsible" for any of the challenged misstatements, this claim is unfounded. FTAC Br. at 6-7. Under *Janus*, the maker of a statement is the person "with ultimate authority over a statement." *Janus*, 564 U.S. at 143 n.6 (2011). Prior to the Merger, FTAC was not a sprawling operation with thousands of employees. Instead, as a SPAC, FTAC did not maintain any operations and was formed for the sole purpose of raising capital in order to enter into a "business combination with one or more businesses." ¶ 33. Drawing all reasonable inferences in Plaintiffs' favor, the Complaint plausibly alleges that, through their roles as the senior-most executives of FTAC with intimate involvement in the Merger,[16] Massey, and Coy[17] both possessed "ultimate authority over the statement[s], including [their] content and whether and how to communicate [them]" such that they are liable as makers of FTAC's statements. *Janus*, 564 U.S. at 142; *see also Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *8 (S.D.N.Y. Mar. 30, 2021) (plaintiffs established plausible inference that defendant was maker of statement where defendants "reviewed SEC filings, provided instructions on what to include and not include, and participated in conference calls concerning the preparation of 6D's 10-Ks and 10-Qs").

---

[16]     Massey's, Coy's, and Foley's involvement in the Merger is evidenced by, *inter alia*, their roles in conducting "significant due diligence examinations of Paysafe," including, commercial, financial, tax, and legal due diligence, as well as their access to a virtual data room containing non-public information relating to Paysafe's business, and their participation in numerous diligence calls and discussions with Paysafe's management. ¶¶ 191-93. As such, Defendants' cited authority actually supports the proposition that where, as here, "authority is implicit from surrounding circumstances alleged in the complaint," an officer can be held liable as a maker. FTAC Br. at 7 (citing *Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 362 (S.D.N.Y. 2022)).

[17]     Defendants' focus on the fact that Coy was not a director of FTAC is misplaced. FTAC Br. at 5 n.1, 7 n.3. As Chief Financial Officer, Coy's "ultimate authority" over FTAC's financials is sufficient to render him a "maker" under *Janus*.

24

**B.      The Complaint Raises a Strong Inference of Defendants' Scienter**

A complaint can establish a strong inference of scienter "by alleging facts to show either (1) that the defendant had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 556 (2d Cir. 2018). The scienter inquiry is holistic in nature, meaning that it requires a court to consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). This inference need not be "irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324. Rather, the inference of scienter is strong so long as it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.

Courts in this Circuit have held that a strong inference of scienter exists where a complaint alleges that the defendants "benefitted in a concrete and personal way from the purported fraud" *or* that they "knew facts or had access to information suggesting that their public statements were not accurate." *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at *6 (S.D.N.Y. Sept. 25, 2020) (quoting *ECA v. JP Morgan Chase Co.*, 553 F3d 187, 199 (2d Cir. 2009)); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *6-11 (S.D.N.Y. May 1, 2024) (scienter alleged where defendants' bonus pay was buttressed by allegations of actual knowledge and defendants' numerous representations that they were monitoring subject of fraud).[18]

---

[18]      Allegations of motive are not necessary to plead scienter. *See Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *14 (S.D.N.Y. Mar. 28, 2017) (Ramos, J.) ("While the Court agrees that Plaintiff has not alleged motive, the Court finds that taking the facts as a whole, Plaintiff has adequately alleged facts creating an inference of scienter[] . . . [b]ecause . . . Plaintiff has sufficiently alleged that Defendant knew or should have known that the statements were false or misleading when made.").

Here, Plaintiffs' allegations give rise to a strong inference of scienter that Defendants: (i) had a motive to commit fraud; and/or (ii) knew facts or had access to information suggesting that their public statements were not accurate. Defendants' arguments to the contrary (Paysafe Br. at 18-23, FTAC Br. at 10-16) are meritless and should be rejected for the reasons discussed below.

### 1.    The Complaint Raises a Strong Inference of the Paysafe Defendants' Scienter

The Paysafe Defendants' scienter arguments cannot be credited for one simple reason: they have ***admitted*** that they were aware of facts that contradicted their Class Period public statements. ¶¶ 140-41. Through their post-Class Period statements, the Paysafe Defendants acknowledged that they anticipated that the amendments to the German Regulations would have a negative impact on the Company's revenues. Specifically, on November 11, 2021, Defendant McHugh confessed that the Company had always expected a negative impact from the amended German Regulations, acknowledging that Defendants "***had anticipated***" an impact from the "wave of European regulation coming through," including the "***cap on how much a single person can bet***" in Germany. ¶¶ 110, 183. That same day, Defendant Dawood echoed McHugh's admissions in a Tweet, confirming that the Paysafe Defendants had been "anticipat[ing]" that changes in the German regulations were going to have a negative impact on Paysafe's revenues. ¶¶ 113, 184. But instead of disclosing this information to investors, the Paysafe Defendants falsely characterized the German amendments as a ***positive*** development for the Company.

These "allegations alone are enough to satisfy the pleading requirement for scienter." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008) (defendants' knowledge of facts that contradicted their public statements alone satisfied scienter); *see also In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) (plaintiffs may "rel[y] on post-class period [statements] to confirm what a defendant should have known during the class

26

period," as holding otherwise would "reward [Defendants] for their successful concealment") (first alteration in original).

Despite claiming that Plaintiffs have "cherry pick[ed] statements," the Paysafe Defendants nonetheless *admit* that they did, in fact, anticipate a negative impact on Paysafe's revenues from the amended German regulations. Paysafe Br. at 21. They contend, however, that their scienter is somehow negated by the fact that the ultimate impact of the regulations was "sharper and bigger than [they] expected." Paysafe Br. at 21. This argument is meritless. Regardless of the ultimate impact, the Paysafe Defendants publicly characterized the German regulations as a ***positive*** for the Company at the same time they privately anticipated that the regulations would ***negatively*** impact the Company. Given their admissions, there can be no credible dispute that the Paysafe Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Rudani*, 2020 WL 5770356, at \*6. That alone should end the scienter inquiry.

But there is more. The Paysafe Defendants spoke repeatedly and specifically about the amendments to the German gaming regulations during the Class Period. *See, e.g.*, ¶¶ 139-40 (December 21, 2020 Form F-4 stating that "in March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters" and that the EU has "generally . . . move[d] towards controlled regulation, rather than absolute prohibition" and "Germany has moved from prohibition to controlled regulation")[19]; ¶ 154 ("In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters."). The Paysafe Defendants' repeated public statements on this topic

---

[19]    These statements were repeated in the February 1, 2021 First Amended Form F-4 (¶¶ 142-43), the February 26, 2021 Joint Proxy Statement and Prospectus (¶¶ 148-49),the May 19, 2021 Form F1 (¶¶ 156-57), and incorporated by reference into the March 30, 2021 Form 8-A (¶ 152).

strengthen the inference of their scienter. *See, e.g.*, *Dentsply Sirona*, 2024 WL 1898512, at \*8 ("Courts have found that '[t]he specificity of [the defendants'] statements . . . is strong circumstantial evidence that [they] were receiving some form of specific information on [these topics].'") (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (alterations in original)); *see also In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 268 (S.D.N.Y. 2010) ("it strains credulity that [CFO] could remain ignorant of the company's lowered underwriting standards" where CFO publicly touted company's conservative standards and "CEO and other senior managers were aware of them"); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 199 (S.D.N.Y. 2010) (defendant's "reassurances to investors throughout the Class Period regarding the key issues in this case . . . and his responsibilities as [the Company's] chief financial and accounting officer, further evidence his scienter").

The Paysafe Defendants' scienter is further supported by Plaintiffs' allegations concerning the importance of iGaming, including online gambling, to Paysafe's revenues, as well as the central role of the German market to the Company's overall success. For 2019, 2020, and 2021, Paysafe reported iGaming revenues of $455.1, $503.3, and $536 million, respectively, accounting for approximately 33%, 36%, and 36% of the Company's total revenues, respectively. ¶ 171. Further, the Company's 2021 proxy statement emphasized iGaming and Gaming as the Company's "key verticals." ¶ 169. Defendant McHugh specifically referenced the Company's role as a leader in the iGaming industry during an Analyst Day Presentation on March 9, 2021, explaining: "[W]e see ourselves as the de facto leader in the iGaming space. That's sports betting, online casino and poker, lottery, fantasy, and eSports. We have a leadership position internationally in Europe . . . ."

28

¶ 174. At the same time, the Company's German revenues were $115 million, $146 million, and $127 million, for the years 2019, 2020, and 2021, respectively. ¶ 172.

Given that the iGaming and German markets were significant revenue drivers for the Company, there is a strong inference that Defendants knew or had access to facts concerning these core operations, including the anticipated negative impact from the looming amendments to the German regulations. *See, e.g.*, *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) ("[k]nowledge . . . can be imputed to key officers who should have known of facts relating to the core operations of their company"); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005) (information at the core of a company's business "may be properly ascribable to senior officers"); *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (CEO and CFO "had reason to focus on" metric that "was key to measuring [the Company's] financial performance and was a subject about which investors and analysts often inquired"); *Rudani,* 2020 WL 5770356, at *7 (where undisclosed information is readily accessible and "easily determinable," and the business line is sufficiently "critical" to company such that defendants "had a duty to monitor" it, individual defendants' high positions and roles support inference of scienter).[20]

Defendants' repeated assurances that they were carefully monitoring the regulatory environment with respect to the Company's iGaming business also strengthens the inference of scienter. On December 7, 2020, the first day of the Class Period, Defendant McHugh explained to investors during the Merger announcement that the Company was able to "react very, very quickly" when "regulations change[], be it in the U.K. or Germany, as examples[.]" ¶ 178.

---

[20]    Defendants' argument (Paysafe Br. at 21) that the lack of confidential witnesses undercuts scienter is "[un]availing" as there is "no authority requiring confidential witnesses allegations" to show scienter. *Lexmark*, 367 F. Supp. 3d at 38.

Paysafe's Class Period SEC filings continued to emphasize Defendants' ability to track and adapt

to regulatory developments throughout the Class Period. For example, in Paysafe's Initial Form

F-4, First Amended Form F-4, Second Amended Form F-4, and April 1, 2021 Form 20-F,

Defendants repeatedly highlighted not only the significance of the online gambling industry to the

Company's overall operations, but also touted their ability to monitor and understand changes

impacting this industry:

> Given the importance of the online gambling sector to our business, we expend significant time and resources to ensure that we have an in-depth understanding of the regulatory environment in the main territories in which our gambling industry merchants operate and customers reside, monitoring closely the developing regulatory regimes in those territories and adapting our business acceptance policies where necessary.

¶ 179.

Defendants' statements touting their careful monitoring and "in-depth understanding" of

the shifting regulatory landscape and their professed expertise in reacting to changes in regulations

give rise to an inference that they knew that the amended German gaming regulations were likely

to have a material negative impact on Paysafe's business. *See, e.g.*, *Stadium Cap. LLC v. Co-*

*Diagnostics, Inc.*, 2024 WL 456745, at *6 (S.D.N.Y. Feb. 5, 2024) (defendants' statements that

"we keep a close eye" on orders and "we are . . . able to monitor the daily influx of demand"

supported inference of scienter); *see also Dentsply Sirona*, 2024 WL 1898512, at *8 ("If, on the

other hand, [defendants] didn't monitor these topics but made definitive statements as if they did,

they still might have been reckless."); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d

506, 516 (S.D.N.Y. 2010) (scienter adequately alleged where defendants "told the investing public

that they monitored the value of their portfolio"); *Wang v. Cloopen Grp. Holding Ltd.*, 661 F.

Supp. 3d 208, 236 (S.D.N.Y. 2023) ("constantly monitoring . . . subjects, as [defendant's] own

30

Registration Statement made clear, constitutes strong circumstantial support for an inference" that defendants were reckless about not knowing contrary facts).

When viewed holistically, as the law requires, Plaintiffs' allegations are sufficient to create a strong inference of the Paysafe Defendants' scienter.

### 2. The Complaint Raises a Strong Inference of the FTAC Defendants' Scienter

The Complaint also gives rise to a strong inference of the FTAC Defendants' scienter.[21]

*First*, Defendant Foley was highly motivated to ensure that the Merger was consummated. One of the requirements for completion of the Merger was that Paysafe's fair market value had to equal at least 80% of the assets held in FTAC's trust account, which stood at $1.467 billion as of December 31, 2020. ¶ 39. In addition, if the Company's share price dropped below $10.00 per share, FTAC shareholders would likely opt to redeem their shares, which would deplete the available cash in Paysafe's trust account and potentially render Paysafe ineligible for listing on the NYSE. ¶ 41. Thus, the FTAC Defendants were motivated to inflate the Company's share price in order to ensure that the Merger was consummated by maintaining Paysafe's fair market value above the required $1.17 billion threshold, discouraging shareholders from exercising their redemption rights, and encouraging shareholders to vote in favor of the Merger. ¶¶ 35, 39, 41. If these conditions were not satisfied and the Merger fell through, Defendant Foley's investment, which would balloon to $738 million following the Merger, would be rendered worthless. ¶ 187. While the FTAC Defendants claim that Foley had a stronger motive to ensure Paysafe's long-term

---

[21]    Plaintiffs do not, as the FTAC Defendants claim (FTAC Br. at 16) allege scienter through group pleading. Indeed, the Complaint paragraphs that the FTAC Defendants cite in making this argument are introductory paragraphs followed by specific, detailed allegations and Defendants conspicuously ignore the paragraphs that expressly reference Defendants Foley, Massey, and Coy and set forth facts evidencing each Defendant's scienter. *See* ¶¶ 186-95.

31

success, the amount of money he stood to lose if the Merger was not consummated—nearly $740 million—far outweighs any hypothetical future gain. FTAC Br. at 13.[22]

*Second*, the Complaint raises a strong inference that the FTAC Defendants also knew or had access to information that would have put them on notice of the falsity of the challenged statements. "[S]cienter may be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007). These warning signs, like the scienter analysis generally, must be considered holistically. *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) ("multiple allegations of red flags, considered in the aggregate, support [scienter]"). Here, through their pre-Merger due diligence, the FTAC Defendants knew or had access to information regarding Paysafe's "business" and "financial" condition.[23]

---

[22]  In *In re Lottery.com, Inc. Securities Litigation*, the court cited the plaintiffs' "fail[ure] to identify actionable statements or omissions from the pre-merger period" in deeming the plaintiffs' scienter allegations inadequate, noting that "[i]f the alleged motive to commit fraud arose out of [d]efendants' desire to ensure that the de-SPAC transaction happened, that motive dissipated once the de-SPAC transaction was complete." 2024 WL 454298, at *32 (S.D.N.Y. Feb. 6, 2024) (cited at FTAC Br. at 11-12). Here, for the reasons set forth above, Plaintiffs have adequately alleged actionable statements and omissions prior to the Merger. *See supra* Section III.A. Thus, the motive to ensure that the Merger was consummated, combined with Plaintiffs' other allegations, gives rise to the requisite strong inference of scienter.

[23]  The inference of Foley's scienter is further bolstered by the fact that he signed the February 26, 2021 Joint Proxy Statement and Prospectus and May 19, 2021 Form F-1. *See, e.g., Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *9 (M.D. Fla. June 15, 2023) ("Plaintiffs' allegation . . . that [defendant] signed both proxy statements helps them move the needle: [defendant's] repeated signing shows an ongoing involvement with the SPAC merger over a period of several months, making it more likely—along with the types of information Plaintiffs allege he had access to—that he did not sufficiently pay attention to or care to investigate integral aspects of [the pre-merger private company], even over the course of the several pivotal months in which the parties were consummating the merger.") (emphasis omitted).

Specifically, in the lead up to the Merger, the FTAC Defendants performed comprehensive due diligence on Paysafe and its operations. ¶ 191. Among other things, the FTAC Defendants had access to a virtual data room containing non-public information relating to Paysafe's business "in order to facilitate FTAC's due diligence review. . . ." *Id*. Thereafter, "from September 21, 2020 to December 7, 2020, FTAC and its advisors continued their broader due diligence review of PGHL's business, including holding numerous diligence calls among FTAC management, PGHL management and their respective advisors." *Id*.

Moreover, rather than enlist the services of a third-party evaluation or fairness opinion in connection with the Merger, FTAC's Board elected to have FTAC's officers and directors value Paysafe's business themselves. ¶ 95. In eschewing a third-party valuation or opinion, the FTAC Defendants explained in the Joint Proxy Statement and Prospectus that "[t]he officers and directors of FTAC, including Mr. Foley, have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and backgrounds . . . enabled them to perform the necessary analyses and make determinations regarding the [Merger]." ¶ 194. This evaluation necessarily entailed a review of information relevant to Paysafe's future business prospects and its largest markets, including Paysafe's iGaming sector, its prospects in the German market, and its disproportionate reliance on "higher-end betters." Indeed, without analyzing these factors, the FTAC Defendants could not have formed an opinion concerning the purported fairness of the transaction. In light of this extensive due diligence, Plaintiffs' allegations regarding the FTAC Defendants' scienter is not, as Defendants suggest, "founded on nothing more than" their "corporate position[s]." FTAC Br. at 14.[24]

---

[24]   *In re DraftKings Inc. Securities Litigation* is inapposite. 650 F. Supp. 3d 120, 178 (S.D.N.Y. 2023) (cited at FTAC Br. at 15). There, the court determined that the due diligence performed by the SPAC officers did not raise an inference of scienter because it would not have

### 3.    Plaintiffs Have Sufficiently Pled Corporate Scienter

The foregoing facts are also sufficient to plead a strong inference of Paysafe's scienter. "[T]he most straightforward way to [plead corporate scienter] . . . will be to plead it for an individual defendant." *Teamsters Local 445, Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Courts routinely attribute the scienter of both control persons or more junior executives to corporate defendants where they were involved in the underlying fraud. *See, e.g., Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015) (imputing corporate scienter from knowledge of managing director involved in underlying scheme); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 281 n.10 (S.D.N.Y. 2012) (imputing knowledge of Goldman's Mortgage Department head to Goldman). However, "it is [also] possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Dynex*, 531 F.3d at 195.

Here, each of the Individual Defendants, control persons of FTAC prior to the merger and/or Paysafe once the Merger was completed, were sufficiently senior for their knowledge to be imputed to the Company. Moreover, the Individual Defendants' (i) roles as officers and/or directors, (ii) day-to-day management of the Company, (iii) responsibility for the review of the relevant information regarding Paysafe's operations, and (iv) participation in the drafting, making, and/or dissemination of the false or misleading statements alleged are sufficient to impute their scienter to Paysafe. *See Patel v. L-3 Commc'ns Holding Inc.*, 2016 WL 1629325, at *14 (S.D.N.Y. Apr. 21, 2016) (recognizing that "[a]lthough . . . these managers were all below the corporate level,

---

revealed "ostensible black-market operations." *Id.* Here, by contrast, the facts that Plaintiffs allege the FTAC Defendants had access to through their due diligence are basic facts about one of Paysafe's core business—i.e., the forthcoming amendments to the German gaming regulations and the material impact on Paysafe due to its heavy reliance on high-end betters. *See* ¶ 195.

34

there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter" and imputing scienter of officer of one business segment to corporation).

### C.    The Complaint States a Claim for Scheme Liability

In addition to alleging liability under Rule 10b-5(b) for their false and misleading statements, the Complaint also adequately alleges that Defendants violated Rule 10b-5(a) and (c) by engaging in a scheme to inflate FTAC's share price and ensure that the Merger was consummated.

Scheme liability arises when defendants engage in deceptive conduct in conjunction with deceptive statements. *See Lorenzo v. SEC*, 587 U.S. 71, 78-82 (2019). To state a claim for scheme liability under subsections (a) and (c) of Rule 10b-5, a complaint must allege "that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) [with] scienter." *SEC v. SolarWinds Corp.*, 2024 WL 3461952, at *24 (S.D.N.Y. July 18, 2024). In alleging a scheme liability claim, plaintiffs can show "the existence of a 'manipulative or deceptive act' by pointing to alleged misrepresentations or omissions." *Puddu*, 2021 WL 1198566, at *11. Here, the Complaint alleges that Defendants engaged in multiple deceptive acts in furtherance of their scheme to inflate FTAC's share price and ensure that the Merger was consummated.

*First*, Defendants disseminated false and misleading statements to the market, which the Second Circuit has endorsed as giving rise to scheme liability. *Id.* at *10 ("dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5"). As part of a scheme to condition the market for the purposes of driving up Paysafe's pre-Merger share price, Defendants directed investors to Paysafe's SEC filings containing the false assurances that forthcoming German gambling regulations would "positively" impact Paysafe's revenues. Specifically, under the heading "Important Information About the

35

Proposed Business Combination and Where to Find It," FTAC's December 7, 2021 Form 425 "urge[d] investors, stockholders and other interested persons to read . . . [Paysafe's] Form F-4, including the Proxy Statement/Prospectus incorporated therein, as well as other documents filed with the SEC in connection with the proposed business combination." ¶ 135. By directing shareholders to false and misleading statements about Paysafe in order to consummate the Merger and drive up FTAC's share price, Foley, Massey, and Coy are liable under Rule 10b5-(a) and (c) for dissemination.

In challenging Plaintiffs' scheme claim, Defendants assert that the Complaint fails to allege acts separate and apart from the misleading statements. *See* Paysafe Br. at 24-25, FTAC Br. at 3. However, Defendants ignore that by separately ***disseminating*** these false and misleading statements to the public, they engaged in a fraudulent scheme that is actionable conduct under Rule 10b5-(a) and (c). *See, e.g.*, *SEC v. Fiore*, 416 F. Supp. 3d 306, 320 (S.D.N.Y. 2019) ("the Supreme Court . . . h[e]ld[] that dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, and that even a disseminator who did not 'make' the misstatements as defined by *Janus* can thus be held liable as a primary violator") (citing *Lorenzo*, 587 U.S. at 78) (collecting cases).

*Second*, even if the Court were to conclude that Defendants did not make, furnish, and/or disseminate false statements to investors, the Complaint adequately alleges that Defendants violated Rule 10b-5(a) and (c) by ***omitting*** material information regarding the reasonably likely impact of the known changes in German gambling regulations, which was required to be disclosed pursuant to, *inter alia*, Item 303 of Regulation S-K. *See, e.g.*, ¶¶ 82, 87, 234.

Defendants are wrong to contend that pure omissions cannot give rise to liability under Rule 10b-5(a) and (c) in light of *Macquarie*, 601 U.S. 257. *See* FTAC Br. at 3. The Supreme Court

36

expressly stated in *Macquarie* that it "d[id] not opine on . . . whether Rules 10b-5(a) and 10b-5(c) support liability for pure omissions." 601 U.S. at 266 n.2. Moreover, the Second Circuit subsequently "vacate[d] the district court's judgment dismissing Moab's claims . . . under Rules 10b-5(a) and 10b-5(c)" premised on omissions, thereby recognizing the viability of these claims. *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2024 WL 3867669, at *2 (2d Cir. Aug. 19, 2024).

*Third*, the Complaint alleges that Defendants engaged in other acts in furtherance of their scheme, including the FTAC Defendants' decision to eschew a third-party fairness opinion and instead rely on their "substantial experience in evaluating the operating and financial merits of companies from a wide range of industries." ¶¶ 194-95. This decision, made at the same time Defendants were concealing from investors the anticipated negative impact of the Fourth Interstate Treaty, which directly impacted the value of Paysafe's business, constitutes "something extra that makes a violation a scheme." *SEC v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022).

### D.    The Complaint Adequately Pleads Loss Causation

Defendants contend that the Complaint fails to allege loss causation because the alleged disclosures (i) did not reveal undisclosed facts in regard to Defendants' misrepresentations and omissions; and (ii) were based on facts that were already known to the public. Paysafe Br. at 23-24. Each of these arguments fails.

In pleading loss causation, "[p]laintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Dentsply Sirona*, 2024 WL 1898512, at *12; *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (to establish loss causation, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security"). "A risk allegedly concealed

37

by defendants which materialized and arguably caused the decline in shareholder value suffices." *Freudenberg*, 712 F. Supp. 2d at 202. Thus, "for pleading purposes, loss causation exists 'if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.'" *Id.* (quoting *Lentell*, 396 F.3d at 173).

Here, as discussed above, Plaintiffs contend that Defendants' fraud concealed from investors a material risk to Paysafe's revenues—i.e., that Paysafe's revenues were reasonably likely to decline due to recent changes to the German gambling regulations. When Paysafe shocked investors on August 16, 2021 by lowering its earnings guidance for the third quarter—the ***first*** quarter after the new German regulations took effect—that previously-concealed risk began to materialize. Yet Defendants prevented the full truth from being revealed to investors by attributing the guidance reduction to "[s]easonally quieter summer gaming activity in Europe impacting eCash and Digital Wallets." ¶ 198. As a result, it was not until November 11, 2021 that the full truth was disclosed to investors. On this date, Defendants not only announced worse-than-expected third quarter earnings and disappointing fourth quarter guidance, they also expressly attributed these negative developments to the amended German regulations, specifically referencing the disproportionate impact of the cross-operator deposit limit due to the Company's reliance on "higher-end betters." ¶¶ 107-10.[25] Accordingly, the risk that materialized and caused investors' losses—reductions in revenues attributable to Germany's amended gambling regulations—is not only "within the zone of risk" that was concealed from investors, it is the exact same risk. *Lentell*,

---

[25]    The fact that Defendants also cited other causes contributing to the miss is beside the point, as Plaintiffs are not required "to rule out other contributing factors or alternative causal explanations." *Wells Fargo*, 797 F.3d at 189; *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 342 (S.D.N.Y.2010) ("Neither *Dura* nor *Lentell* . . . imposes on plaintiffs the heavy burden of pleading facts sufficient to exclude other non-fraud explanations.") (emphasis omitted). Plaintiffs need only allege enough facts to support the inference that they "would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell*, 396 F.3d at 175.

396 F.3d at 173; *see also Freudenberg*, 712 F. Supp. 2d at 202 ("the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss'").

Defendants' assertion that both corrective disclosures were based on already public information, Paysafe Br. at 24, is equally meritless. As discussed in detail above, neither Paysafe's reliance on "higher-end betters" nor the fact that Defendants anticipated an adverse impact from the amended German regulations was disclosed to the public during the Class Period. Instead, Defendants repeatedly (and falsely) assured the market that the German regulations would have a *positive* impact on the Company. Finally, Defendants' argument is eviscerated by the fact that Paysafe's stock price declined precipitously following each corrective disclosure. *Freudenberg*, 712 F. Supp. 2d at 203 ("The market's reaction to the disclosures evidences Defendants' concealment of much of the Company's investment risk.").

**E.      The Complaint Adequately Pleads Control Person Claims Under Section 20(a)**

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). The Paysafe Defendants do not dispute their control of Paysafe, but instead claim a failure to allege a primary violation and culpable participation. *See* Paysafe Br. at 25. For the reasons discussed above, Plaintiffs have adequately alleged both a primary violation with respect to Paysafe and the Paysafe Defendants' scienter, which is sufficient to allege culpable participation. *See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) ("recklessness is the appropriate minimum standard of culpability that plaintiffs must plead under § 20(a)"). The Paysafe Defendants are therefore liable under Section 20(a).

The FTAC Defendants similarly claim that Plaintiffs fail to plead a primary violation and their culpable participation, but also assert that the FTAC Defendants were not control persons of Paysafe. FTAC Br. at 16-17. Because, as discussed above, Plaintiffs have adequately alleged both a primary violation with respect to FTAC and the FTAC Defendants' scienter, these first two arguments fail. *See supra* Sections III.A-B.

The FTAC Defendants' control person argument also fails. "Generally, signing a financial statement filed by the company is enough to establish control over those who wrote the statement, as well as the content of the statement." *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 482 (S.D.N.Y. 2013). Prior to the Merger, Defendant Foley served as Chairman of the FTAC Board, Defendant Massey served as FTAC's CEO, and Defendant Coy served as FTAC's CFO. ¶¶ 26-28. Thus, Foley's role as a signatory to the public disclosures that either made or disseminated false or misleading statements, and Foley's, Massey's and Coy's oversight roles through their positions as directors and/or officers of FTAC evidence their day-to-day involvement in the operation of FTAC prior to the Merger, which is sufficient to plead control. ¶¶ 26-28, 32. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 n.85 (S.D.N.Y. 2003) ("by virtue of their positions (*e.g.,* CEO, CFO) and Plaintiffs' specific allegations, these Individual Defendants very likely exercised actual control over the Issuers").

## IV. CONCLUSION

Plaintiffs respectfully submit that Defendants' motions to dismiss should be denied. Should the Court grant the motions in full or in part, Plaintiffs request leave to amend.

Dated: September 13, 2024                 Respectfully submitted,

                                          *S/ Richard A. Russo, Jr.*
                                          **KESSLER TOPAZ**
                                          **MELTZER & CHECK, LLP**
                                          Andrew L. Zivitz

Richard A. Russo, Jr.
Margaret E. Mazzeo
Farai Vyamucharo-Shawa
Dylan J. Isenberg
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
rrusso@ktmc.com
mmazzeo@ktmc.com
fshawa@ktmc.com
disenberg@ktmc.com

***Attorneys for Lead Plaintiffs Robert J. Viani and Eric C. Price, as trustee for the Eric C. Price & Kristen B. Hennig-Price Rev. Living Trust UA 05/27/2015***