UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PAYSAFE *f/k/a* FOLEY
TRASIMENE ACQUISITION CORP.
II SECURITIES LITIGATION,

**OPINION & ORDER**

21-cv-10611 (ER)

RAMOS, D.J.:

 Robert J. Viani and Eric C. Price (collectively, "Plaintiffs") bring this putative class action against Paysafe Limited ("Paysafe") f/k/a Foley Trasimene Acquisition Corporation II ("FTAC"), Philip McHugh, Ismail Dawood, William P. Foley, II, Richard N. Massey, and Bryan D. Coy (collectively, "Defendants"), alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act. The Consolidated Amended Complaint ("CAC") alleges that Defendants made materially false or misleading statements and deceived investors in order to artificially inflate FTAC and Paysafe stock prices in violation of Section 10(b), and that McHugh, Dawood, Foley, Massey, and Coy (the "Individual Defendants") were controlling persons of FTAC and Paysafe and are culpable participants in the alleged fraud against investors in violation of Section 20(a). Before the Court are two separate motions filed by Foley, Massey, and Coy (the "FTAC Defendants"), and Paysafe, McHugh, and Dawood (the "Paysafe Defendants")[1], respectively, to dismiss the CAC, Docs. 95, 98. For the reasons set forth below, the motions are GRANTED.

---

[1] While the Court labels Foley a FTAC Defendant, from April of 2021, until March of 2022, he was the chairman of Paysafe's board of directors. ¶ 26.

## I.    BACKGROUND

### A.  Factual Background

The following facts are based on the allegations in the CAC, which the Court accepts as true for purposes of the instant motions.  *See*, *e.g.*, *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Plaintiffs Viani and Price are shareholders that allege they purchased FTAC or Paysafe common stock and were injured as a result of Defendants' actions. [2]  ¶¶ 23, 24.

FTAC was a publicly traded special purpose acquisition company ("SPAC") that was formed for the sole purpose of entering into a "business combination with a company in the financial technology industry."  ¶¶ 4, 23, 33, 35.  Paysafe is a financial technology company that provides payment processing services and facilitates online transactions. ¶ 1.  Prior to merging with FTAC, Paysafe was a subsidiary of Paysafe Group Holding Limited ("PGHL"), a privately held company controlled by private equity firms Blackstone Group and CVC Capital Partners.  ¶¶ 1, 36, 44-46.  On March 25, 2021, FTAC and Paysafe merged, becoming Paysafe Limited, a publicly held company.[3]  ¶¶ 36, 38, 97.

Foley was the chairman of the FTAC board of directors ("FTAC Board") from December 7, 2020 until April 2021, and served as the chairman of the Paysafe board of directors through November 11, 2021.  ¶ 26.  Foley signed the Joint Proxy Statement and Prospectus filed on February 26, 2021 and Paysafe's Form F-1 filed on May 19, 2021.  ¶¶ 26, 148, 156.  Massey was the chief executive officer of FTAC and a FTAC board member from July 2020 until March 30, 2021.  ¶ 27.  Coy was the chief financial officer of FTAC from July 2020 until March 30, 2021.  ¶ 28.

[2] Unless otherwise noted, citations to "¶ __" refer to the CAC.

[3] For ease of reference, unless otherwise noted, the Court refers to Paysafe Limited and its predecessor, PGHL's former subsidiary, as "Paysafe."

McHugh was the chief executive officer of Paysafe from June 2019 through November 11, 2021.  ¶ 29.  Dawood was the chief financial officer of Paysafe from September 2020 through late 2022.  ¶ 30.

According to the CAC, Germany was Paysafe's second largest overall geographic market, "accounting for over 10% of Paysafe's 'Revenue from external customers' in the three fiscal quarters preceding the announcement of the Merger."  ¶ 55.  Throughout the Class Period, Europe, and specifically Germany, continued to represent a significant market for Paysafe.  ¶ 56.  In 2020, for example, 39% of Paysafe's revenue was generated in Europe.  *Id.*  Plaintiffs allege that "during this same time period, Germany was the third largest European gambling market."  *Id.*

Plaintiffs contend that from December 7, 2020 through November 11, 2021 (the "Class Period"), Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  ¶ 196, 197.  Specifically, prior to and after the merger, Defendants failed to inform the investing public of the likely material negative impact of changing regulations in Europe.  ¶¶ 8, 12.  Plaintiffs allege that despite Defendants' prior knowledge, it wasn't until disclosures that Defendants made on August 16, and November 11, 2021, that the market discovered the truth.  ¶ 196.  Once discovered, the price of Paysafe's common stock "declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiffs[.]"  ¶ 197.

*1. FTAC*

Foley founded FTAC on July 15, 2020.  ¶ 33.  FTAC, as a SPAC, does not maintain any operations like a traditional company.  *Id.*  Shortly before FTAC conducted an initial public offering ("IPO"), Trasimene Capital FT, LP II ("Trasimene") purchased approximately 36 million Class B shares for $25,000, which could be converted to Class A shares after a merger was consummated.  ¶ 187.  However, if FTAC did not complete a merger within 24-months, the Class B common shares would be rendered worthless.  *Id.*

According to a Form-3 filed with the Securities and Exchange Commission ("SEC") on August 18, 2020, the "sole general partner" of Trasimene was Trasimene Capital FT, LLC II, whose "sole member" was Foley. ¶ 189.

On August 18, 2020, three months after its formation, FTAC conducted an IPO, selling 130 million IPO "units" to investors at a price of $10 per unit. ¶ 34. Each unit consisted of one share of FTAC Class A common stock and one-third of one redeemable FTAC warrant, with each full warrant giving its holder the right to purchase one FTAC Class A share for $11.50 upon consummation of a suitable business combination. *Id*. Shortly after the IPO, FTAC sold over 20 million additional warrants in two private placements, and it sold over 16 million units through a partial exercise of an over-allotment option by the underwriters of the IPO. *Id*. Trasimene acquired approximately 20 million FTAC warrants for just over $31 million. ¶ 188. Through the IPO and other related offerings, FTAC raised nearly $1.4 billion in capital, which it intended to use to fund a merger. ¶¶ 34, 35. However, according to the terms of FTAC's certificate of incorporation, FTAC was required to consummate a merger within 24 months of the IPO or it would be required to redeem its public shares and promptly liquidate and dissolve, and all warrants issued in the IPO and sold in the post-IPO private placements would expire worthless. ¶ 35. Therefore, if FTAC failed to consummate a merger, Foley's significant financial interests—valued at approximately $738 million[4] in potential Class A common shares and FTAC warrants—would be rendered worthless. ¶¶ 187–90.

### 2. *Paysafe*

Paysafe is a financial technology company that was formerly a direct subsidiary of PGHL, a privately held company controlled by private equity firms Blackstone Group and CVC Capital Partners. ¶ 36. Paysafe provides payment processing services and

---

[4] Of the approximately $738 million that would have been "rendered worthless," according to Plaintiffs, approximately $31 million would have been from pre-merger investments, *i.e.*, $25,000 in Class B common stock and $31,340,669 in FTAC warrants. ¶¶ 187–89.

facilitates online transactions through the use of digital wallets and online cash transactions. ¶¶ 1, 44–46. Paysafe's payment services are often used for video games and online gambling transactions. ¶¶ 1, 46. Prior to its merger with FTAC and the start of the Class Period, Paysafe operated as a private company. ¶ 4.

At the start of the Class Period, Paysafe had three main operating segments: (1) Integrated Processing, which processed payments for merchants; (2) Digital Wallet,[5] which enabled consumers to make digital payments using a variety of currencies for purposes like e-commerce purchases, transactions within video games, and online gambling; and (3) e-Cash Solutions, which allowed consumers to use cash for digital payments through the purchase of prepaid digital vouchers. ¶ 2. Each segment generated revenue through "per-transaction fees." ¶¶ 3, 47, 51. With respect to iGaming, *i.e.*, online gambling related to sports, poker, and other casino games, Paysafe's per transaction fees accrued each time a merchant (*e.g.*, casino operator) processed a transaction on Paysafe's platform and each time a customer deposited, withdrew, or used money on an iGaming website. ¶ 54. These fees were based on either a fixed rate or calculated as a percentage of the dollar amount of each transaction processed through Paysafe's platform. ¶¶ 3, 47–49, 51. The size of these per transaction fees depended upon both the number and dollar value of the transactions. ¶ 54. Accordingly, a decrease in either the number of customer transactions or the dollar value of those transactions would lead to less fees, and thus lower revenues. *Id.* In each of 2019 and 2020, Paysafe generated $1.4 billion in revenue across all three segments, primarily from per-transaction fees. ¶ 52. During the Class Period, Paysafe derived a significant portion of its revenue from iGaming. ¶ 53. For example, in 2020, approximately 36% of Paysafe's revenue was generated through transactions in the iGaming sector. *Id.*

---

[5] The Digital Wallet segment included the branded digital wallets Neteller and Skrill. ¶ 49.

According to the CAC, Paysafe maintained that iGaming was a core operation of its business.  ¶ 169.  For example, in its February 26, 2021 Schedule 14a filed with the SEC, Paysafe acknowledged that is had "established a strong position in iGaming and Gaming, which [they] identified as [their] key verticals.  *Id*.  Further, they stated, "there is a significant market potential for growth and expansion in these areas," and that Paysafe was "committed to focusing on opportunities for organic and inorganic growth in iGaming and Gaming.  *Id*.  For the three years from January 1, 2019, through December 31, 2021, Paysafe's revenue from iGaming verticals were:  $455.1 million of their $1.4 billion in total revenue; $503.3 million of their $1.4 billion in total revenue; and $536 million of their $1.5 billion in total revenue, respectively, accounting for approximately 33%, 36%, and 36% of the Paysafe's total revenues (including non-iGaming revenue), respectively.  ¶ 171.

The CAC also alleges that Europe, and particularly, Germany, was a major geographic region for Paysafe.  ¶ 172.  For example, for the three years from January 1, 2019, through December 31, 2021, revenues from Germany totaled $115 million, $146 million, and $127 million, respectively.  *Id*.  Additionally, During its March 9, 2021 Analyst Day Presentation, Paysafe's chief operating officer, Danie Chazanoff stated "of course, in Europe, we've been in the market for such a long period of time.  Neteller and Skrill [, branded digital wallets,] are pretty much household names when it comes to online gambling."  ¶ 173.  In the same presentation, McHugh stated that "we see ourselves as the de facto leader in the iGaming space.  That's sports betting, online casino and poker, lottery, fantasy, and eSports.  We have a leadership position internationally in Europe[.]"  ¶ 174.  Further, in its 2020 Form 20-F, Paysafe identified "North America and Europe" as the "principal markets" for its "payment solutions in . . . on-line gambling."  ¶ 175.

### 3. *Germany's Interstate Treaty on Gambling*

Germany's Interstate Treaty on Gambling, which was originally enacted in 2008, granted its 16 federal states the power to offer and regulate certain in-person gambling services while universally prohibiting online gambling.  ¶ 57.  On January, 1, 2020, the Third Interstate Treaty on Gambling went into effect, legalizing online sports gambling but still prohibiting online poker and casinos.  ¶ 58.  Additionally, it implemented certain "player-protection requirements" including a monthly €1,000 stake limit—*i.e.*, a limit on the total amount of money an individual could wager each month at each online operator. *Id.*  However, there was no limit on deposits, meaning that individual bettors were not limited in how much they could deposit across all of their accounts.  *Id.*

In March 2020, however, German lawmakers announced their agreement to the Fourth Interstate Treaty on Gambling (the "Fourth Treaty").  ¶ 59.  Although the Fourth Treaty would legalize online casino gambling, it would also do away with the €1,000 monthly stake limit in favor of a monthly deposit limit of €1,000 for sports betting, in addition to applying a cross-operator deposit limit to online poker and casinos.  ¶ 60. Accordingly, if ratified, it would subject gamblers in Germany to a deposit limit of €1,000 per month across all gambling platforms.  *Id.*

In October 2020, in preparation for the anticipated ratification of the Fourth Treaty, Germany adopted what was colloquially referred to as a transitional regime.  ¶ 61. Relevant here, the transitional regime—like the anticipated Fourth Treaty—applied a cross-operator deposit limit of €1,000 per month to certain forms of online gambling, like sports betting.  ¶¶ 61, 62.  On April 21, 2021, the Fourth Treaty was ratified and on July 1, 2021, it took full effect, subjecting all online gamblers to a €1,000 per month deposit limit across all of their sports betting and online casino accounts.  ¶¶ 63, 64.

### 4. *The Merger*

On December 7, 2020—approximately nine months after Germany announced the Fourth Treaty, but seven months before its full implementation— FTAC announced a

proposed merger with Paysafe.  ¶¶ 36, 43, 59.  FTAC proposed to acquire Paysafe through a combination of cash and stock consideration.  ¶ 37.  If consummated, the merger would result in each outstanding share of FTAC common stock being converted into the right to receive one share of Paysafe common stock, which would trade on the New York Stock Exchange (the "NYSE") following the merger.  ¶ 38.  Therefore, as a result of the merger, private FTAC shares would effectively be transformed into an equivalent number of publicly traded Paysafe shares, with Paysafe becoming a publicly traded company, without the requirements of a traditional IPO.  *Id.*

However, before merging, at least three conditions needed to be met:  (1) Paysafe's fair market value had to remain at or above 80% of the assets held in FTAC's trust account, which stood at $1.467 billion as of December 31, 2020*, i.e.*, FTAC's fair market value could not fall below $1.17 billion; (2) the merger had to be approved by a majority of FTAC's shareholders; and (3) Defendants needed to ensure that a significant number of FTAC shareholders did not exercise the redemption rights granted to them pursuant to FTAC's IPO, which permitted them to redeem their FTAC shares for approximately $10 per share in lieu of receiving Paysafe shares.  ¶¶ 39, 40, 41.  If such redemptions caused the total amount of available cash to fall below a certain pre-determined level or prevented Paysafe from meeting the listing conditions imposed by the NYSE, the merger would fail.  ¶ 41.  The CAC alleges that because of this redemption right, and the potential consequences for the merger, Defendants were incentivized to inflate FTAC's stock price so that it remained above $10.00 per share.  *Id*.  On March 25, 2021, FTAC shareholders approved the merger, and on March 31, 2021, Paysafe shares began trading on the NYSE.  ¶ 96, 97.  By this time, the "transitional regime" was already in place in Germany, in anticipation of the ratification of The Fourth Treaty, and its limits on online gambling.  ¶¶ 61, 80, 94.

5.  *Substantive Allegations*

According to the CAC, before and after the merger, Defendants withheld material negative information from investors in order to gain approval of the merger.  ¶¶ 130–167.  Specifically, Defendants failed to sufficiently inform investors about the anticipated negative impact of the Fourth Treaty on Paysafe's revenues in Germany.  *Id*.  Instead, Defendants are alleged to have made statements that conflict with their contemporaneous knowledge regarding the potential impact of the German regulations.  ¶¶ 8–17.

a.  *Pre-Merger Statements*

i.  *Revenue Growth ("Growth Statements")*

The CAC alleges that Defendants made or disseminated materially false and misleading statements or omissions to FTAC shareholders concerning Paysafe's potential for revenue growth and position as a leader in the market, including:

On December 7, 2020, FTAC filed a Form 8-K attaching a press release announcing the merger.  ¶ 130.  In discussing the merger, Foley states:

> **"Paysafe delivers a unique value proposition in large and high-growth markets, such as gaming and e-commerce, enabling the company to generate strong organic revenue growth and margin expansion.**  With a proven stratgy [sic] and an experienced management team and our newly formed partnership, **we believe Paysafe has significant long-term growth potential."**

*Id*.  FTAC went on to describe Paysafe as a "[l]eading integrated payments platform processing nearly $100 billion of payment volume" with **"[s]ignificant growth opportunities"** and a "[l]ong history as the global market leader in iGaming payments." ¶ 131.  In the same press release, McHugh stated: "**This transaction will allow us to accelerate our growth opportunities across the business, particularly in fast growth sectors such as iGaming where we are the payments partner of choice**." ¶ 43.

Additionally, in a transcript from an analyst conference call held on the same day—which both Paysafe and FTAC filed with the SEC on Forms 425 later that same day—Foley described Paysafe as "an attractive high growth payments company, with meaningful scale, **positioned in the highest growth vertical markets**" and claimed that

Paysafe had "**unrivalled regulatory risk and technical expertise**."[6]  ¶ 133.  In the call, McHugh stated:

> I'll move on now from our key products to where and how we win, especially in iGaming. . . .  **In Europe and the rest of the world, we're a global leader with over 1,000 operators.  We've continued to grow there, and we have great stories of being your global partner, but also able to react locally when regulation changes, be it in the U.K. or Germany, as examples, where we're able to react very, very quickly and support our operators**.

¶ 134.

The CAC alleges that the bolded statements above were materially false and misleading because Defendants did not disclose that the impending Fourth Treaty's new cross-operator monthly deposit limit was reasonably likely to have a material adverse impact on Paysafe's future revenues.  ¶¶ 8, 51-118, 132, 138.  Further, it alleges that by "electing to speak publicly about Paysafe's presence in the iGaming market—specifically, its ability to deliver strong revenue growth from gaming and its 'unrivalled regulatory risk and technical expertise'—and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the shifting regulatory landscape in the iGaming space, including the forthcoming amendments to the German gambling regulations and the likely impact of these amendments on the Company's revenues."  ¶ 132.

Defendants assert that the challenged statements were forward-looking statements that were accompanied by meaningful cautionary language.  For example, under the "Forward-Looking Statements" section of FTAC's merger announcement, they warned of risks associated with, *inter alia*, "changes in applicable laws or regulations" and stated

---

[6] According to the CAC, the December 7, 2020 Form 425 "explicitly directed FTAC shareholders and investors to Paysafe's forthcoming filings concerning the [m]erger, including its Forms F-4 and 'other documents filed with the SEC in connection with the proposed business combination,' acknowledging that these documents 'will contain important information about PGHL, FTAC, and the proposed business combination,' thereby disseminating these filings by Paysafe to FTAC shareholders and investors.  ¶¶ 135, 136.

that Paysafe "may be adversely affected by other economic, business, and/or competitive factors." Doc. 96 at 15. Other examples of the cautionary language include:

> • Paysafe is "subject to extensive regulation and oversight in a variety of areas, all of which are subject to change and uncertain interpretation."

> • Paysafe focuses on "specialized and high-risk industry verticals, including iGaming" which are "extensively regulated, and their regulation is evolving and subject to frequent change and uncertain interpretation. As a result of regulatory action, we have had to exit a market altogether, limit services we provide, or otherwise modify our business in ways that have adversely impacted profitability."

> • Paysafe is "subject to a wide variety of laws, regulations, licensing schemes and industry standards in the countries and localities in which [it] operate[s] … Such laws, regulations, and standards are subject to changes and evolving interpretations and application… and it can be difficult to predict how they may be applied to our business and the way we conduct our operations."

> • "There are risks inherent in doing business internationally on both a domestic (*i.e.*, in country) and cross-border basis, including, but not limited to … risks related to government regulation or required compliance with local laws; local licensing and reporting obligations; … potentially adverse tax developments and consequences … and other laws and regulations."

> • "Regulations in the gaming and sports betting and foreign exchange trading sectors vary significantly among different countries and localities. In many cases, they may be unclear and may also change, sometimes dramatically, and such laws and regulations are constantly evolving and are often subject to conflicting interpretations."

> • "[L]ocal laws in place in EU member states are sometimes incompatible with EU laws, regulations and directives, which introduces additional uncertainty around licensing and ongoing compliance obligations into the regulatory framework;" and

> • "Changes in the regulation of online gambling in the markets where we operate may materially and adversely affect our results of operations and financial condition."

*Id.* at 15, 16.

ii. *European Gambling Regulations ("Statements About The German Regulations")*

The CAC also alleges that Defendants made materially false and misleading statements or omissions to FTAC shareholders through statements and disclosures regarding the current state of European, and specifically, German, regulations related to Paysafe both leading up to and following the consummation of the merger. ¶¶ 139–151, 154–159. The challenged statements include:

In the Initial Form F-4—which Paysafe filed with the SEC on December 21, 2020, and was signed by McHugh and Dawood—Defendants disclosed the following with regard to "Risks Related to Paysafe's Business and Industry" and, more specifically, "Regulatory, Legal and Tax Risks":

> Regulations in the gaming and sports betting and foreign exchange trading sectors vary significantly among different countries and localities. . . .

> The EU … has generally moved towards controlled regulation of online-based gambling operators, rather than absolute prohibition. **For example, in March 2019, German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling, which provides new, temporary regulations for sports betting companies in the country effective January 1, 2020 until permanent regulations can be established by June 2021. In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters.**

¶ 139. Regarding "Regulatory Change: Trends and Outlook," the Initial Form F-4 further stated:

> Although the general trend in gambling regulation over the last ten years has been to seek to restrict the activities of online-based operators, **in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition**. For example, the regimes in Italy and France have both moved away from state-run monopoly-based markets to controlled regulation (**and Germany has moved from prohibition to controlled regulation**). . . . Changes in the regulation of online gambling in the markets described above and elsewhere **may impact us both positively (where the markets are liberalized or become regulated)** and negatively (where markets are restricted or become prohibited).

¶ 140.  Like the statements in the December 7, 2020 Form 8-K, the CAC alleges that the bolded statements above were materially false and misleading because Defendants did not disclose that the impending Fourth Treaty's new cross-operator monthly deposit limit was reasonably likely to have a material adverse effect on the Paysafe's future revenues. ¶¶ 51-118, 141.

In the months leading up to the FTAC shareholder vote on the merger, Defendants' message to investors remained the same.[7]  ¶ 94.  For example, in the Joint Proxy Statement and Prospectus, filed with the SEC on February 26, 2021, by both Paysafe and FTAC, Defendants repeated the same statements regarding the current state of regulations as the First and Second Amended Forms F-4, even though the German transitional regime had been implemented months earlier.  *Id*.

In addition to withholding or omitting material negative information from investors, the CAC alleges that in order to gain support for the merger, Defendants touted their ability to monitor and adapt to regulatory changes, and repeatedly highlighted their "significant" due diligence examinations.  ¶¶ 55, 56, 58, 59, 65–73, 195.  For example,

---

[7] According to the CAC, the language used in the December 21, 2020, Initial Form F-4 was repeated verbatim both before and after the merger was consummated, including in the following:  First Amended Form F-4, signed by McHugh and Dawood, and filed with the SEC on February 1, 2021;  Second Amended Form F-4, signed by McHugh and Dawood, and filed with the SEC on February 25, 2021; Joint Proxy Statement and Prospectus filed with the SEC on February 26, 2021—Foley signed on behalf of FTAC on Schedule 14A, and Paysafe filed as a Rule 424(b)(3) prospectus; and Form F-1 Registration Statement, signed by Foley, McHugh and Dawood, and filed with the SEC by Paysafe on May 19, 2021.  ¶¶ 139–151, 154–159.

The CAC alleges that Form 8-A, which was signed by McHugh, and filed with the SEC by Paysafe on March 30, 2021, "incorporated by refence" the initial Form F-4, First Amended Form F-4, Second Amended Form F-4, and the Joint Proxy Statement and Prospectus, and was materially false and misleading for the same reasons.  ¶¶ 152, 153.

Form 20-F, signed by McHugh, and filed with the SEC by Paysafe on April 1, 2021, included only the language regarding "Regulatory, Legal and Tax Risks," above.  ¶¶ 154, 155.  Form 6-K, signed by Dawood, and filed with the SEC by Paysafe on August 16, 2021, "incorporated by refence" the "Risk Factors" enumerated in the April 1, 2021, Form 20-F, and was materially false and misleading for the same reasons. ¶¶ 163, 164.

during the December 7, 2020 merger announcement discussed above, McHugh, discussing Paysafe's growth and status as a global leader, stated that they were  ". . . able to react locally when regulation changes, be it in the U.K. or Germany, as examples, where we're able to react very, very quickly and support our operators."  ¶ 178.  In their SEC filings, Paysafe stated:  "Given the importance of the online gambling sector to our business, we expend significant time and resources to ensure that we have an in-depth understanding of the regulatory environment in the main territories in which our gambling industry merchants operate and customers reside, monitoring closely the developing regulatory regimes in those territories and adapting our business acceptance policies where necessary."[8]  ¶ 179.

The CAC also alleges that FTAC's February 26, 2021 Joint Proxy Statement described in detail the comprehensive due diligence efforts that Foley, Massey, and Coy performed on Paysafe.  ¶ 191.  For example, on September 21, 2020, FTAC was granted access to a virtual data room containing non-public information relating to Paysafe's business "in order to facilitate FTAC's due diligence review . . ."  and subsequently, "from September 21, 2020 to December 7, 2020," to continue their broader due diligence review of PGHL's business[.]"  *Id.*  According to the Joint Proxy Statement, FTAC's due diligence included:  "conducting commercial due diligence, conducting financial, tax and legal due diligence, conducting discussions with Paysafe's management and FTAC's financial, tax and legal advisors concerning such due diligence examination of Paysafe."[9] ¶ 193.

---

[8] This language appears in Paysafe's Initial Form F-4, First Amended Form F-4, Second Amended Form F-4, and 2020 Form 20-F SEC filings.  ¶ 179.

[9] On October 28, 2020, FTAC executed a non-disclosure agreement with Paysafe in order to facilitate the exchange of confidential information.  ¶ 192.  From November 2020 through the announcement of the merger, "FTAC engaged in business, financial[,] and legal due diligence review of PGHL, and representatives of each party and certain of their respective advisors (acting at the direction of their respective party) held numerous calls in furtherance of that review."  *Id.*

The Joint Proxy Statement also disclosed that FTAC had determined not to obtain a third-party fairness opinion in connection with the merger, instead relying on FTAC's officers and directors to analyze the transaction's fairness.  ¶ 95.   It stated that "[t]he officers and directors of FTAC, including . . . Foley, have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and backgrounds . . . enabled them to perform the necessary analyses and make determinations regarding the [merger]."  ¶ 194. Ultimately, they determined that the merger was "in the best interests of FTAC and its stockholders[.]"  ¶ 95.

### b. *Post-Merger Statements*

### i. *Paysafe's June 2021 Blog Post*

 On March 30, 2021, FTAC and Paysafe issued a joint press release promoting the success of the merger and Paysafe's future prospects.  ¶ 97.  Yet, even after the merger, according to the CAC, Paysafe, McHugh, Dawood, and Foley continued to mislead investors regarding the likely impact of the German regulatory changes on Paysafe's revenues.  ¶ 98.  For example, in a blog post published in June of 2021, and titled "Enter a new iGaming era with my paysafecard," Paysafe stated:

> The new Inter-State Treaty on iGaming, which the German federal states signed up to in the summer of 2020, has been announced to come into force in Germany from 1 July 2021.  This puts online gambling in Germany on a legally uniform basis for the whole country for the first time.  In [the] future, every provider will be able to apply for a German iGaming licence if they operate a website with the .de extension and meet the new requirements.  The latter include a deposit limit of EUR 1,000 per player per month and a blacklist for players who are at risk of gambling addiction.  The deposit limit should also apply across platforms and be checked by the authorities.

¶ 161.  The CAC alleges that these statements were materially false and misleading because they failed to disclose the new cross-operator deposit limit, and that Defendants, by electing to discuss the "new Inter-State Treaty on iGaming" and specifically,  the

"deposit limit of EUR 1,000 . . . across platforms," had a duty to fully disclose all material facts regarding the Fourth Treaty and its likely impact on Paysafe's revenues.  ¶ 162.

### ii. *McHugh's September 10, 2021 Statement at the Deutsch Bank Technology Conference ("September 2021 Conference Statements")*

During the Deutsche Bank Technology Conference on September 10, 2021, McHugh was asked:

> eCash has been a really strong part of the story.  I think volumes were up something like 60% in the first quarter and then up 40% in the second.  I know you guys guided to a further—a little bit further of a deceleration there.  But how should we be thinking about that segment on a normalized basis going forward?

¶ 165.  In response, McHugh stated:

> Yes.  We did do incredibly well.  We will see a little bit of a partial slowdown as year-on-year comps kind of normalize.  **There are a few tax laws in Germany that are creating a bit of pullback in online sports betting in Germany, we think, for the next kind of 5, 6 months**.  So we just got to work through those pieces.

¶ 166.  The CAC alleges that these statements were materially false and misleading because they failed to disclose the new cross-operator deposit limit, and that Defendants, by electing to discuss the "pullback in online sports betting in Germany" had a duty to disclose all material facts regarding the cause for the "pullback," including the amendments to the German online gambling regulations.  ¶ 167.

### c. *The Truth Emerges*

On August 16, 2021, Paysafe issued a press release announcing its financial results for the second quarter of 2021, reporting both positive and negative results for investors.[10]  ¶ 103, 104.  Although they reported positive earnings for the quarter, including an 8% year-over-year increase in EBITDA, and $6.6 million in net income— compared to a net loss of $15.9 million in the second quarter of 2020, Defendants

---

[10] The second quarter of 2021 ended on June 30, 2021, the day before the effective date of the Fourth Treaty.  ¶ 103.

"surprised investors" by announcing that they expected Paysafe to generate just $360 million to $375 million in revenues during the third quarter of 2021, below the market consensus estimate of $389 million. *Id.*

Still, the CAC alleges, Defendants chose not to disclose that the Fourth Treaty's cross-operator deposit limit was reasonably likely to have a negative impact on Paysafe's revenues, and instead attributed the lowered guidance to "[s]easonally quieter summer gaming activity in Europe impacting eCash and Digital Wallets" and "a return to normalized post-COVID seasonality with quieter summer gaming activity in the European markets." ¶ 104. Defendants reassured investors that the lowered guidance was the product of mere transitory issues, assuring investors that Paysafe would "return to double-digit growth in the fourth quarter" and "reaffirming" the Company's full-year revenue target of $1.53 billion to $1.55 billion. *Id.* In response to the press release, the price of Paysafe common stock declined $1.58 per share, or more than 15%, from a close of $10.20 per share on August 13, 2021, to close at $8.62 per share on August 16, 2021. ¶ 105. Paysafe's stock traded on unusually high volume on August 16, 2021. *Id.*

According to the CAC, on November 11, 2021, Defendants "finally" informed investors that the Fourth Treaty had a material negative impact on Paysafe's revenues. ¶ 107. During an earnings conference call that day, Paysafe announced its financial results for the third quarter of 2021, disclosing revenues of only $353.6 million—$6 million below the low end of the revenue guidance Defendants provided to investors on August 16, 2021——as well as a lower than expected fourth quarter revenue guidance of $355 million to $365 million. *Id.* Additionally, they revised their full year revenue guidance downward to a rage of $1.47 billion to $1.48 billion. *Id.* Defendants attributed the results to "continued market softness, particularly due to the regulatory environment in Europe," with McHugh stating that "in Germany, the adoption of new regulations had a more meaningful impact than we anticipated with several operators reducing activity or leaving the market." ¶ 108. In response to analyst questioning, McHugh stated that

"[t]here is a cap on how much a single person can bet. So regardless of what the – it's not on a single operator, it's across all platforms. So when you – when we cater to higher-end bettors, that cap has a pretty high impact." ¶ 110. According to the CAC, higher-end bettors refer to gamblers who consistently wager large amounts of money. ¶ 76. Therefore, McHugh's statements meant that Paysafe was particularly vulnerable to a €1,000 cross-operator deposit limit. ¶¶ 76, 110, 183.

Furthermore, according to McHugh, Defendants "had anticipated" a negative impact from the "wave of European regulation coming through," including the "cap on how much a single person can bet" in Germany, claiming that those impacts had "been sharper and bigger than [they] expected." ¶¶ 110, 183. McHugh acknowledged that adopting to the Fourth Treaty was "a big adjustment" and that the German gaming market was "an extremely large market for [them]." ¶ 110. Based on this, on November 11, 2021, the price of Paysafe's common stock closed at $4.24 per share, declining $3.03 per share, or more than 41% from November 10, 2021. ¶ 111. Again, Paysafe's stock traded on unusually high volume on November 11, 2021. *Id.*

Later the same day, Dawood, in response to an inquiry regarding the German regulations, admitted that the negative impact of the Fourth Treaty on online gambling regulations "was anticipated." ¶ 184. He continued on to say that "even Flutter talked about it," referencing Flutter Entertainment plc's disclosure that it would reduce Paysafe's revenue expectations by €56 million due to the anticipated impact of the German gambling regulations. ¶ 185.

After the November 11, 2021 closing, Defendants would continue to discuss the impact of the Fourth Treaty on Paysafe's revenue. ¶ 113. For example, Dawood confirmed McHugh's earlier statement that Paysafe had "anticipated" that changes in German gambling regulations would negatively impact their revenues. *Id.* During Paysafe's March 2, 2022 earnings call, McHugh would state the following:

> [I]n the third quarter, we talked about the impacts of European iGaming regulation, which was sizable. And the 2 big features were, one, obviously, Germany, they put limits on sports betting, on gambling limits as well as taxes on games. And that had some pretty big impacts and some bigger impacts than expected with the operators … To give you a sense, the combine [sic] impact of those 2 in the fourth quarter earnings, that was a $15 million year on year impact in the quarter alone. So it is sizable in the fourth quarter. Now we have all these impacts baked into our guidance. What we see first is we expect to start to lap the German impacts in the third quarter, right? We'll start to baseline. That's when we started to feel the impacts.

¶ 115. Additionally, on March 28, 2022, Paysafe filed its annual Form 20-F, for the fiscal year ending December 31, 2021. ¶ 116. Allegedly for the first time, it contained a direct reference to the Fourth Treaty's cross-operator deposit limit, stating that "in Germany in 2021, the new German Interstate Treaty on Gambling allows for online gambling in Germany, but has set forth certain restrictive measures that could adversely impact the Company. The new German regulations have put in place a mandatory deposit limit of 1,000 euros per month across all providers for online gambling." *Id.*

### d. Regulatory Violations

Plaintiffs assert that Defendants' affirmative statements to investors were misleading because they omitted—and thus violated their duty to disclose—the material negative impact of the Fourth Treaty's deposit limit in violation of three regulations: SEC Regulation S-K, 17 C.F.R. § 229.10 *et seq.*, Item 303; Item 5(d) of Form 20-F; and Item 14(g)(1) of Form F-4. ¶¶ 119–129. Specifically, they contend that the February 26, 2021 Proxy Statement and Prospectus, March 30, 2021 Form 8-A, and May 19, 2021 Form F-1 Registration Statement violate Item 303 of Regulation S-K, *id.*, which requires registrants to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

Next, they allege that Paysafe's 2020 Form 20-F violates Item 5(D). ¶ 128. Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects,"

requires an issuer to disclose "management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods." ¶ 123. Specifically, Item 5(D), entitled "Trend information," provides, *inter alia*: "The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues[.]" *Id.*

Further, they allege that Paysafe's December 21, 2020 Initial Form F-4, February 1, 2021 First Amended Form F-4, and February 25, 2021 Second Amended Form F-4 violate Item 14(g)(1) of Form F-4, which requires the registrant to "furnish . . . information" responsive to Item 5 of Form 20-F. ¶ 129.

### B. Procedural Background

On December 10, 2021, Lisa Wiley, individually and on behalf of all others similarly situated, filed the initial complaint in the case. Doc. 1. On February 8, 2022, Donald John Lawrence moved the Court to consolidate the related actions, *Wiley v. Paysafe* (No. 21-cv-10611) and *O'Brien v. Paysafe* (No. 22-cv-567), and appoint lead plaintiff and counsel in the consolidated case. Doc. 16. On May 5, 2022, the Court consolidated the cases, and on May 10, 2022, appointed Viana and Price as Lead Plaintiffs, and approved their choice of counsel, Kessler Topaz Meltzer & Check, LLP. Docs. 66, 67. In her Order, Judge Katharine H. Parker directed Plaintiffs to file an amended complaint in the consolidated case within 45 days of the order, after which Defendants had 60 days to file a motion to dismiss. Doc. 67.

On May 15, 2024, Plaintiffs filed the CAC, alleging three counts: (1) Defendants made materially false or misleading statements and deceived investors in order to artificially inflate FTAC and Paysafe stock prices in violation of Section 10(b) and Rule 10b-5(b) promulgated thereunder; (2) Defendants made or disseminated materially false or misleading statements and deceived investors in order to artificially inflate FTAC and

Paysafe stock prices in violation of Section 10(b) and Rule 10b-5(a) and (c); and (3) the Individual Defendants were controlling persons of FTAC and Paysafe, and were culpable participants in the alleged fraud against investors in violation of Section 20(a).  Doc. 82.

On July 15, 2024, the Paysafe Defendants and FTAC defendants, respectively, filed separate motion to dismiss the CAC in its entirety.  Docs. 95, 98.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 555 (2007)); *see also id*. at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the

formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir. 2006)). Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Communications, Inc. v. Shaar Fund, Limited*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Furthermore, on a motion to dismiss, the Court can consider statements made in a company's public filings with the SEC. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). However, the Court can consider them "'only to determine what the documents stated,' and 'not to prove the truth of their contents.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer*, 937 F.2d at 774).

### B.  Rule 9(b)

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d

300, 306–07 (2d Cir. 2000).  Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b).  To satisfy that requirement, the complaint must:  "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent."  *ATSI Communications*, 493 F.3d at 99 (citing *Novak*, 216 F.3d at 306).  The PSLRA imposes similar requirements on claims brought under the Exchange Act:  "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission.  15 U.S.C. § 78u-4(b)(2)(A).  A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

## III.    DISCUSSION

### A.  Section 10(b) and Rule 10b-5 Liability

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), while Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security."  *In re OSG Securities Litigation*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).  Rule 10b-5, promulgated by the SEC to implement section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance."  *Press v. Chemical*

*Investment Services Corporation,* 166 F.3d 529, 534 (2d Cir. 1999) (citation omitted).

Under Rule 10b-5, it is unlawful for any person, directly or indirectly, by use of any

means specified in section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a private civil claim under section 10(b) and Rule 10b-5, a plaintiff must

plead that: (1) the defendant made a material misrepresentation or omission; (2) with

scienter, *i.e.*, a wrongful state of mind; (3) in connection with the purchase or sale of a

security; and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5)

causing economic loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42

(2005); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007).

Defendants contest only the first two elements.

### 1. Misrepresentation or Omission

Defendants argue that Plaintiffs fail to state a claim for a violation of the

Securities Exchange Act, asserting they have not sufficiently pleaded (1) an actionable

misstatement or omission, (2) materiality of the challenged statements, (3) scienter, and

(4) loss causation. Defendants also contend that the challenged statements constitute

non-actionable forward-looking statements, and that the growth statements constitute

non-actionable corporate optimism or puffery, and opinion statements.

According to Plaintiffs, Defendants made numerous materially false and

misleading statements that can be divided into four groups: (1) the growth statements;

(2) the statements about the German regulations; (3) Paysafe's June 2021 Blog Post; and

(4) the September 2021 conference statement.

24

As discussed above, the growth statements include statements from the December 7, 2020, Form 8-K, filed by FTAC, announcing the merger.  ¶ 130.  In the press release discussing the merger, Foley stated:[11]

> **"Paysafe delivers a unique value proposition in large and high-growth markets, such as gaming and e-commerce, enabling the company to generate strong organic revenue growth and margin expansion . . . [W]e believe Paysafe has significant long-term growth potential."**

¶ 130.  FTAC went on to describe Paysafe as a "[l]eading integrated payments platform processing nearly $100 billion of payment volume" with **"[s]ignificant growth opportunities"** and a "[l]ong history as the global market leader in iGaming payments."

¶ 131.  In the same press release, McHugh stated:  "**This transaction will allow us to accelerate our growth opportunities across the business, particularly in fast growth sectors such as iGaming where we are the payments partner of choice**."  ¶ 43.

Additionally, in a transcript from an analyst conference call held on the same day, Foley described Paysafe as "an attractive high growth payments company, with meaningful scale, **positioned in the highest growth vertical markets**" and claimed that Paysafe had "**unrivalled regulatory risk and technical expertise**."  ¶ 133.  In the call, McHugh stated:

> … **In Europe and the rest of the world, we're a global leader with over 1,000 operators.  We've continued to grow there, and we have great stories of being your global partner, but also able to react locally when regulation changes, be it in the U.K. or Germany, as examples, where we're able to react very, very quickly and support our operators**.

¶ 134.

The statements about the German regulations are generalized disclosures regarding the status of the regulatory regime in Europe and Germany and the general risks to Paysafe's business resulting from regulatory changes.  Beginning with Paysafe's

---

[11] Unless otherwise noted, the bolded text within quotations herein refers to specific language that Plaintiffs bolded and challenged in the CAC.

December 21, 2020 Initial Form F-4, and repeated throughout their subsequent SEC

filings and public statements is the following, with the challenged text in bold:

> . . . **For example, in March 2019 German regulators agreed on the Third Amendment to the Interstate Treaty on Gambling . . . In March 2020, German regulators subsequently agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters."**

> Although the generl [sic] trend in gambling regulation over the last ten years has been to seek to restrict the activities of online based operators, **in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition . . . (and Germany has moved from prohibition to controlled regulation) . . . changes . . . may impact us both positively (where the markets are liberalized or become regulated)** and negatively (where the markets are restricted or become prohibited)."

¶¶ 9, 10, 140–157;

Next, Plaintiffs challenge Paysafe's June 2021 Blog Post—published a month

before the Fourth Treaty went into effect, and titled "Enter a new iGaming era with my

paysafecard"—where they stated:

> The new Inter-State Treaty on iGaming . . . **puts online gambling in Germany on a legally uniform basis for the whole country for the first time** . . . [N]ew requirements … [will] include a deposit limit of EUR 1,000 per player per month and a blacklist for players who are at risk of gambling addiction. The deposit limit should also apply across platforms and be checked by the authorities.

¶ 161;

Finally, Plaintiffs challenge McHugh's statements during the Deutsche Bank

Technology Conference on September 10, 2021, where McHugh responded to an analyst,

stating:

> Yes. We did do incredibly well. We will see a little bit of a partial slowdown as year-on-year comps kind of normalize. **There are a few tax laws in Germany that are creating a bit of pullback in online sports betting in Germany, we think, for the next kind of 5, 6 months**.

¶ 166.

The challenged statements are alleged to have been false and misleading because Defendants failed to disclose the likely material negative impact of changing German regulations, specifically, that the Fourth Treaty's new cross-operator monthly deposit limit of €1,000 was reasonably likely to have a material adverse impact on Paysafe's future revenues.  ¶¶ 8, 51–118, 132, 138.

*a.  Half-Truth or Pure Omission*

The parties first dispute whether the challenged statements are properly analyzed as half-truths or pure omissions, as discussed in the recent Supreme Court case, *Macquarie Infrastructure Corporation v. Moab Partners, L. P.*, 601 U.S. 257 (2024).

Plaintiffs assert that Defendants' statements are actionable half-truths, which "create[d] a false and materially misleading impression by omitting certain information." *Moshell v. Sasol Limited*, 481 F. Supp. 3d 280, 292 (S.D.N.Y. 2020) (citation and internal quotation marks omitted).  Further, they assert that even if they are considered pure omissions under Section 10(b), Defendants' failure to disclose the material negative impact of the Fourth Treaty, information required by Item 303 of Regulation S-K, Item 5 of Form 20-F, and Item 14(g)(1) of Form F-1, "rendered their affirmative statements to investors misleading."[12]

Defendants contend that Plaintiffs' case rests on the flawed premise that Defendants characterized the Fourth Treaty only as a "positive," and failed to disclose any alleged anticipated negative impact.  However, as plainly quoted in the CAC, Defendants insist that they disclosed that changes in European gambling regulations may impact them both positively *and* negatively.  Further, they assert that because the larger

---

[12] Courts in this Circuit have treated Form F-1 and Item 5(d) of Form 20-F as requiring the same disclosures as Item 303 of Regulation S-K.  *See Wang v. Cloopen Group Holding Ltd., 661 F. Supp. 3d 208, 231 n.7 (S.D.N.Y. 2023* ("the SEC has stated that its interpretations of Item 303 apply to . . . disclosures drafted pursuant to Item 5 of Form 20-F . . . which is in turn[ ] incorporated into Form F-1 . . . .  Thus, courts in this Circuit have "treat[ed] Form F-1 as calling for the same disclosure as Item 303 of Regulation S-K.") (internal quotation marks and citations omitted) (first and third alterations in original).

than expected, negative impact from the Fourth Treaty's deposit limit is consistent with their statements that it could have positive and negative impacts, the alleged omission is "precisely the sort of 'pure omission' that *Macquarie* forbids."  While the Court ultimately agrees with Defendants that none of the statements Plaintiffs rely on are actionable, Defendants are wrong to suggest that Plaintiffs characterize them as pure omissions.  Rather, as discussed below, they are alleged as half-truths.

In addition to proscribing affirmative misstatements, Section 10(b) and Rule 10b-5(b) make it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  So, although the Supreme Court has made clear that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5," *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), a person must supply relevant material information concerning a given subject when that person makes a statement that would otherwise "be inaccurate, incomplete, or misleading without further context," *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (internal quotation marks omitted); *see also Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) ("the lack of an independent duty is not . . . a defense to Rule 10b–5 liability because upon choosing to speak . . . [one] ha[s] a duty to be both accurate and complete") (internal citations omitted).

In *Macquarie*, the Supreme Court held that "[a] pure omission occurs when a speaker says nothing, in circumstances that do not give any special significance to that silence."  601 U.S. at 263 (citation omitted).  Pure omissions, it held, "are not actionable under Rule 10b-5(b)."  *Id.* at 260.  On the other hand, it found that "[h]alf-truths" are 'representations that state the truth only so far as it goes, while omitting critical qualifying information.'"  *Id.* at 263 (citation omitted).  As an example, the Supreme Court stated:

> If a company fails entirely to file [a Management Discussion and Analysis ("MD&A")], then the omission of particular information required in the MD&A has no special significance because no information was disclosed.  Half-truths, on the other hand, are "representations that state the truth only so far as it goes, while omitting critical qualifying information.  *Id.* (citation omitted).  "A classic example of an actionable half-truth in contract law is the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property." *Id.* (citation omitted).  In other words, the difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert.

*Id.* at 263–64 (internal citations omitted).  The Supreme Court determined that half-truths are actionable.  *Id.*

Thus, as *Macquarie* reaffirmed, Rule 10b-5's prohibition on misleading omissions "requires disclosure of information necessary to ensure that statements already made are clear and complete[.]"  *Id.* at 264; *see also Omnicare, Inc. v. Laborers District Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).

The challenged growth statements each discuss Paysafe's history of growth or their ability to grow.  ¶¶ 130–132 (we believe Paysafe has a significant long-term growth potential); ¶ 133 (Paysafe is positioned in the highest growth vertical markets);  ¶ 134 ("In Europe and the rest of the world, [Paysafe is] a global leader with over 1,000 operators.  We've continued to grow there[.]").  According to Plaintiffs, therefore, Paysafe's alleged omission of the Fourth Treaty's material negative impact on their revenue, and therefore their growth, would make the challenged growth statements alleged half-truths, since their discussion of their growth purportedly gave special significance to the information that was allegedly not disclosed.  *Macquarie,* 601 U.S. at 263.

The same is true of the other challenged statements.  As discussed, one of the challenged statements concerns trends in EU and German gambling regulations and the corresponding risks for Paysafe.  ¶ 139 ("In March 2020, German regulators subsequently

agreed to additional legislation that will legalize online forms of certain gambling, such as casino and poker, within certain parameters."); ¶ 140 ("[I]n the EU [the trend to seek to restrict the activities of online-based operators] has generally resulted in a move towards controlled regulation, rather than absolute prohibition . . . Germany has moved from prohibition to controlled regulation . . . Changes in the regulation of online gambling . . . may impact [Paysafe] both positively . . . and negatively . . . ."). By discussing trends regarding EU and German gambling regulations and the potential risks thereof, Defendants' statements purportedly gave special significance to any specific EU or German regulation that could have a material negative impact on Paysafe. Therefore, these statements are alleging half-truths, not pure omissions. *See Macquarie,* 601 U.S. at 263.

The statements from Paysafe's June 2021 Blog Post are also alleged as half-truths. In the post, Paysafe states that the "new Inter-State Treaty on iGaming . . . puts online gambling in Germany on a legally uniform basis for the whole country for the first time[.]" ¶ 161. It goes on to say that the deposit limit "should also apply across platforms and be checked by the authorities." *Id.* Therefore, this statement is an alleged half-truth.

Finally, the September 2021 conference statement is also alleged as a half-truth. At the conference, an analyst asked McHugh how he, and thus the investing public, should think about the e-Cash segment since Paysafe was giving guidance that volumes would decelerate. ¶ 166. McHugh responded that "[w]e will see a little bit of a partial slowdown as year-on-year comps kind of normalize. There are a few tax laws in Germany that are creating a bit of pullback *in online sports betting in Germany*, we think, for the next kind of 5, 6 months." ¶ 166 (emphasis added). Plaintiffs emphasize that he made no mention of the allegedly anticipated negative impact of the Fourth Treaty or the already implemented deposit limit, via the transitional regime. ¶ 61

Accordingly, the challenged statements are alleged to be half-truths that are actionable under Sections 10(b) and 20(a).  However, for the reasons discussed below, Plaintiffs' claims are not sufficiently pleaded.

### b.  False or Misleading

The challenged statements were not false or misleading.  Under the PSLRA, Plaintiffs must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see ATSI Communications*, 493 F.3d at 99.

### i.  Growth Statements

Defendants assert that the growth statements are not misleading "simply because [Paysafe] faced a potential headwind in one geographic market in one segment of it its business."  According to Defendants, this would be true even if the Court were to assume that the Fourth Treaty's deposit limit was expected to have a material negative impact on revenue.  They argue that the challenged statements are not misleading "simply because [Paysafe] faced a "a potential headwind" in one geographic market within one segment of its business.  Plaintiffs disagree with Defendants' characterization of their argument and allege that Defendants knew, but concealed from investors, that the amendments to the gaming regulations in Germany . . . were reasonably likely to have a material adverse effect on the Company's overall revenues."

The CAC alleges that Defendants later acknowledged that "the German iGaming market was 'an extremely large market' for Paysafe during the Class Period."  ¶ 56.  Therefore, Defendants' suggestion that the negative impact of the Fourth Treaty was "simply" . . . "a potential headwind in one geographic market in one segment of the business," is unconvincing.

This information does not establish a plausible inference that it was reasonably likely that the cross-operator monthly deposit limit would have a material effect on Paysafe as a whole.  As defendants point out, the cross-operator monthly deposit limit was one of many changes to European regulations, including a separate change in German tax law and changes in regulations in the Netherlands. Germany, in turn, was just one of many markets in which Paysafe operated.  Moreover, Plaintiffs' generalized allegations lack the requisite particularity to satisfy the heightened pleading standard. *See In re Alcatel Sec. Litigation*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (dismissing securities fraud claims where the complaint pled "a similar (in most cases identical) laundry list of 'specific' reasons the statements were allegedly false" without providing a more particularized explanation).

## II.  The Statements About The German Regulations

Plaintiffs have not sufficiently pleaded how the statements about the German regulations are false or misleading.  As discussed, the statements refer to Defendants' repeated disclosures that ". . . **in the EU this has generally resulted in a move towards controlled regulation, rather than absolute prohibition** . . . **Germany has moved from prohibition to controlled regulation** . . . Changes in the regulation of online gambling in the markets described above and elsewhere **may impact us both *positively* (where the markets are liberalized or become regulated)** and *negatively* (where markets are restricted or become prohibited).  ¶¶ 9, 10, 140–157.

Plaintiffs argue that Defendants, by making the above bolded statements, told investors that the German regulations would be positive for Paysafe, yet misleadingly omitted mention of the impending negative effect of the Fourth Treaty and that Paysafe's "higher-end bettor" customer base rendered it particularly susceptible to the €1,000 monthly deposit cap within it.  Doc. 104 at 13 ("'Germany['s] . . . move[] from prohibition to controlled regulation' as a 'positive[]' for [Paysafe].").

32

Defendants assert that even if Paysafe anticipated the Fourth Treaty's negative impact,[13] the statements about the German regulations are not false or misleading, particularly the above italicized language where Defendants explained that ongoing changes to European gambling regulations might have both positive and negative impacts.

The Court finds that the above repeated statements about the German regulations are not false or misleading because they did not indicate to the investing public that the German regulations would have only a *positive* impact on Paysafe.  Doc. 104 at 8 ("Defendants affirmatively referenced Germany's gambling regulations but falsely represented to the market that '[c]hanges in the regulation of online gambling in [Germany] . . . may impact us . . . positively.'") (alternation in original).  Plaintiffs "cherry-pick" portions of the statements without regard to the full context.  A full reading of the above makes clear that regulation changes in online gambling within the EU *may* impact Paysafe both positively and *negatively.*  ¶¶ 9, 10, 140–157.

Further, the alleged omissions are not material because the relevant information was known to the market.  *Lau v. Opera Ltd*., 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021) (citation omitted) ("defendants' statements about Opera's market share could not be material because the 'truth' was publicly available").  As set forth above, the "Forward Looking Statements" portion of FTAC's merger announcement amply advised of the risks associated with the evolving regulatory environments in which Paysafe operated.  Plaintiffs do not allege the existence of a single contemporaneous report, projection or communication of any kind showing a negative anticipated impact from the German Regulations.  Rather, Plaintiffs allege solely that Defendants must, or should, have known that the German Regulations would have a negative impact because they

---

[13] Defendants dispute Plaintiffs' assertion that McHugh and Dawood's statements from a November 11, 2021 earnings conference call and in response to analyst questions the same day, respectively, constitute admissions that they anticipated that the Fourth Treaty would have a *material* negative impact on Paysafe. The Court will consider the dispute under "Scienter," below.

were aware of the forthcoming regulations and that Germany was a major market. CAC ¶¶ 55–56, 65–73. Both of these facts are matters of public record. *See* CAC ¶ 7 (German Regulations publicly available March 2020); Ex. 3 at 13, 27 (disclosing that Europe was a major market for Paysafe)*; see also Police & Fire Retirement Systems of the City of Detroit v. La Quinta Holdings Inc.,* No. 16- CV-3068 (AJN), 2017 WL 4082482, at *6 (S.D.N.Y. Aug. 24, 2017), *aff'd sub nom. Police & Fire Retirement Systems of City of Detroit v. La Quinta Holdings, Inc.,* 735 F. App'x 11 (2d Cir. 2018) (dismissing securities fraud claims in part because "all of this information [disclosed by the defendant and in the public domain], when combined, sufficiently apprised investors of the risks Plaintiff identifies.").

In opposition, Plaintiffs cite *Moshell*, 481 F. Supp. 3d at 280 and *Oklahoma Firefighters Pension & Retirement Systems v. Lexmark International, Inc.*, 367 F. Supp. 3d 16 (S.D.N.Y. 2019). In *Moshell*, the court held that plaintiffs had sufficiently alleged a half-truth that "create[d] a materially misleading impression" on "reasonable investor[s]" when defendants omitted information regarding the "the risk they warned of" by failing to disclose that the "risk had already transpired." *Id.* at 290–92 (quoting *Slayton v. American Express Company*, 604 F.3d 758, 770 (2d Cir. 2010). Here, however, Paysafe did indicate to the market that the regulation changes could be both positive and negative for Paysafe.

In *Oklahoma Firefighters*, the court held that defendants' "general disclosure of a phenomenon's existence, without describing its outsize rate of occurrence or the potential impact on an important source of revenue . . . could be materially misleading." *Oklahoma Firefighters Pension*, 367 F. Supp. at 34. Specifically, it was alleged that defendants disclosed that "they sought to harmonize prices" but "concealed the frequency of their price harmonization actions" and its "compounding effect[.]" *Id.* But *Oklahoma Firefighters* is inapposite. There, defendants disclosures were too vague to protect defendants from liability regarding their omissions. *Id.* (quoting *In re MF Global*

*Holdings Ltd. Securities Litigation*, 982 F.Supp.2d 277, 304 (S.D.N.Y. 2013) ("Vague disclosures of general risks will not protect defendants from liability."). Here, Paysafe repeatedly disclosed that European and German regulations could have both positive and negative impacts. That one specific German regulation could have a negative impact on one segment of Paysafe's business does not render their statements misleading. *See Lau*, 527 F. Supp. at 551 (citation omitted) ("[Defendants are] not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). Therefore, Plaintiffs have not sufficiently alleged that the statements about the German regulations were false or misleading.

   iii. *The September 2021 Conference Statement*

   McHugh's statement at the September 10, 2021 Deutsche Bank Technology Conference is also not actionable. Plaintiffs argue that McHugh—by electing to discuss the "pullback in online sports betting in Germany" when asked about possible factors contributing to Paysafe's anticipated deceleration in e-Cash volumes—"had a duty to disclose all material facts regarding the cause for the 'pullback,' including the amendments to the German online gambling regulations." ¶ 167. First, as even the CAC alleges, throughout the Class Period Paysafe did disclose that the European and German regulations could impact them both positively and negatively. McHugh's alleged failure to disclose that here does not render his statements false or misleading. As McHugh explains within the same statement, the cause of the "pullback" was "a few tax laws in Germany." ¶ 166. Again, Paysafe was not required to disclose every possible negative impact. *See Lau*, 527 F. Supp. at 551. Therefore, Plaintiffs have not sufficiently alleged that the September 2021 Conference statements were false or misleading.

   iv. *Paysafe's June 2021 Blog Post*

   The same can be said for Paysafe's June 2021 Blog Post. Plaintiffs challenge Paysafe's blog post informing the investing public that the Fourth Treaty "puts online gambling in Germany on a legally uniform basis for the whole country for the first time,"

and goes on to say that it included a €1,000 per player, per month deposit limit that would apply across platforms.  ¶¶ 64, 162.  However, that Defendants did not disclose the "likely impact of the amendments on Paysafe's revenues" does not render the above statement false or misleading:  the challenged statement discusses legal consistency, not Paysafe's financials.  Any material impact to Paysafe's revenue is not contemplated or inconsistent with the challenged statement.  Accordingly, Plaintiffs have not sufficiently pleaded that Paysafe's June 2021 Blog Post was false or misleading.

Accordingly, Plaintiffs have failed to sufficiently allege that the challenged statements were false or misleading.

### c.  Forward Looking Statements

Even if they had, the Growth statements, statements about the German regulations, and the September 2021 Conference statements are otherwise not actionable. First, the Parties dispute whether these statements are protected by the PSLRA's safe harbor for forward-looking statements.  *See Slayton*, 604 F.3d at 765 ("The PSLRA established a statutory safe-harbor for forward-looking statements.").  Forward looking statements are not actionable if:  (a) they are identified as forward-looking and accompanied by meaningful cautionary language; (b) they are immaterial; or (c) the plaintiff cannot prove they were made with actual knowledge of their falsity.  15 U.S.C. § 78u-5(c); *Slayton*, 604 F.3d at 765–66.

Defendants argue that the challenged statements are forward looking and thus protected by the safe harbor provision.  First, they argue that the growth statements, *e.g.*, "that Paysafe's anticipated '[s]ignificant growth opportunities' . . . and was 'positioned in the highest growth vertical markets,'" are textbook examples of forward-looking statements.  These statements, they assert, were accompanied by the meaningful cautionary language. For example, under the "Forward-Looking Statements" section of FTAC's merger announcement, they warned of risks associated with, *inter alia*, "changes in applicable laws or regulations" and stated that Paysafe "may be adversely affected by

other economic, business, and/or competitive factors." Defendants contend that the statements about the German regulations are true, address events that have not occurred, and are accompanied by meaningful cautionary language. Other examples of the cautionary language include:

> • Paysafe is "subject to extensive regulation and oversight in a variety of areas, all of which are subject to change and uncertain interpretation."
>
> • Paysafe focuses on "specialized and high-risk industry verticals, including iGaming" which are "extensively regulated, and their regulation is evolving and subject to frequent change and uncertain interpretation. As a result of regulatory action, we have had to exit a market altogether, limit services we provide, or otherwise modify our business in ways that have adversely impacted profitability."
>
> • "Regulations in the gaming and sports betting and foreign exchange trading sectors vary significantly among different countries and localities. In many cases, they may be unclear and may also change, sometimes dramatically, and such laws and regulations are constantly evolving and are often subject to conflicting interpretations."
>
> • "Changes in the regulation of online gambling in the markets where we operate may materially and adversely affect our results of operations and financial condition."

Plaintiffs respond the challenged statements are not forward looking: (1) the growth statements "invited the conclusion that the company would expand with ease" and thus "communicated present facts" that are not protected by the PLSRA; and (2) at the time the statements about the German regulations were made, the Fourth Treaty had already been enacted, and the risk it posed to Paysafe's business already existed. Additionally, by the time Defendants discussed the "pullback in online sports betting in Germany" on September 10, 2021, Paysafe had already experienced a negative impact on its revenues from the monthly deposit cap. Further, Plaintiffs assert that even if the challenged statements are deemed forward looking, they were not accompanied by meaningful cautionary language; Defendants' language was "hopelessly boilerplate" and

failed to warn investors about the unique factors that led to their losses or speak to the potential impact of the deposit limit.

    *i. Growth Statements*

The Court concludes that the growth statements are forward looking and protected by the safe harbor exception. In *In re WEBMD Health Corporation*, the court noted that "[a]t its core, a forward-looking statement is one that contains a projection of income or earnings, or one of 'future economic performance.'" *In re WEBMD Health Corporation Securities Litigation*, No. 11-cv-5382 (JFK), 2013 WL 64511, at *5 (S.D.N.Y. Jan. 2, 2013) (citing 15 U.S.C. § 78u–5(i)(1)(A), (C)). Here, each of the challenged growth statements refer to statements made by Defendants regarding Paysafe's potential or capacity to grow in the future. Therefore, they are text-book forward looking statements.

The case Plaintiffs rely on in opposition is unpersuasive. In *In re Fairway Group Holding Corporation*, the court held that statements made by defendants in public IPO filings, stating that the company had a "proven ability to replicate [its] store model" and "scalable infrastructure," "invite[d] the conclusion that the company will expand with ease" and "communicate[d] present facts," and were thus not protected by the PSLRA, insofar as they communicated present facts. No. 14-cv-0950 LAK, 2015 WL 249508, at *8, *9 (S.D.N.Y. Jan. 20, 2015) (citing *Iowa Public Employees' Retirement Systems v. MF Global, Limited*, 620 F.3d 137, 144 (2d Cir. 2010); *In re Bear Stearns Co., Securities, Derivative, & ERISA Litigation*, 763 F. Supp. 2d 423, 491–92 (S.D.N.Y. 2011); *In re Regeneron Pharmaceuticals, Inc. Securities Litigation,* 03-cv-3111 (RWS), 2005 WL 225288 at *13 (S.D.N.Y. Feb. 1, 2005) ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact.")). Here, however, the challenged growth statements invite no such conclusion.

    Additionally, the growth statements were accompanied by meaningful cautionary language. In addition to the cautionary language in the "Forward-Looking Statements"

section of FTAC's merger announcement, Defendants explicitly directed investors to Paysafe's forthcoming filings concerning the merger, including its Forms F-4 and "other documents filed with the SEC in connection with the proposed business combination," as even the CAC acknowledges. ¶ 36. These filings included the above bulleted language, which not only sufficiently cautioned investors regarding the potential of negative consequences due to regulation or legal change, but also sufficiently warned investors that "the future is [not] settled, or unattended by contingency." *Iowa Public Employees' Retirement Systems*, 620 F.3d at 141.

Citing *In re Vivendi*, Plaintiffs insist that Defendants' cautionary language was insufficient. *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 240 (2d Cir. 2016)). In *In re Vivendi*, the Second Circuit held that there was sufficient evidence that a jury could conclude that the alleged forward looking statements were not accompanied by meaningful cautionary language. *Id.* at 247. Specifically, the court held that many of the alleged disclaimers were irrelevant to the challenged statements, "oblique," or contained "garden-variety business concerns that could affect any company's financial well-being." *Id.* Not so here. Here, the cautionary language warned of the unique, substantive risks facing Paysafe, including risks related to "change and uncertain interpretation" of the "extensive regulation[s]" applicable to its iGaming business, and how those changes "may materially and adversely affect [Paysafe]." Therefore, Defendants have sufficiently proven that the PLSRA's safe harbor protection should apply to the challenged growth statements.

> ii. *The German Regulations*

The Court concludes that the statements concerning the German regulations are also protected by the safe harbor exception. First, these statements are textbook examples of forward looking statements and clearly discuss events that have not yet occurred. *In re WEBMD*, 2013 WL 64511, at *5 ("At its core, a forward-looking

statement is one that contains a projection of income or earning, or one of 'future economic performance.'").

In opposition, Plaintiffs argue that "when [Defendants] touted the changes to the German regulatory regime as a 'positive'" for Paysafe, the Fourth Interstate Treaty . . . had already been enacted, and the risk it posed to Paysafe's business already existed."

First, as discussed, the statements about the German regulations did not indicate that the regulation changes would be only positive for Paysafe.  Next, even if it's true that the Fourth Treaty had already been enacted when the statements were made——Defendants assert that "almost all" of the statements had been made before the enactment of the Fourth Treaty—the argument still fails.  Courts within this district have held that, "to the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'"  *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) (quoting *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009)).  Here, the German regulation statements described the current regulatory environment in Europe *before* suggesting that any changes may impact Paysafe both positively and negatively.

Plaintiffs cite *City of Austin*, where the court held that defendant's statements were not forward looking when they "double[d] down" on a previously announced construction schedule that was no longer feasible based on then existing information.  *City of Austin Police Retirement Systems v. Kinross Gold Corporation*, 957 F. Supp. 2d 277, 306 (S.D.N.Y. 2013).  However, there, defendants had present information contrary to their projections.  The same can be said about Plaintiffs' case, *In re Oxford Health Plans, Inc., Securities Litigation*, 187 F.R.D. 133 (S.D.N.Y. 1999).

Additionally, for the reasons discussed under "Growth Statements," the challenged statements are accompanied by meaningful cautionary language, and are

therefore "immaterial as a matter of law." *Shemian v. Research In Motion, Ltd.*, No. 11-cv-4068 (RJS), 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (quoting *Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (alterations in original) ("alleged misrepresentations in [a corporate communication] are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same [communication].")). Therefore, statements about the German regulations are protected by the safe harbor exception.

### iii. The September 2021 Conference Statement

The same is true for the September 2021 Conference statement. In asking for McHugh's insight "*going forward*" regarding continued deceleration in volumes, he stated that "[t]here are a few tax laws in Germany that are creating a bit of pullback in online sports betting in Germany, we think, for the next kind of 5, 6 months." This statement also clearly discusses events that have not yet occurred.

Accordingly, the growth statements, the statements about the German regulations, and the September 2021 conference statement are forward looking statements protected by the PLSRA's safe harbor provision.

### d. Corporate Optimism and Puffery

Next, Defendants correctly assert that the challenged growth statements are non-actionable statements of puffery and corporate optimism. Plaintiffs respond that Defendants' arguments ignore the important context in which the challenged growth statements were made: in an investor announcement partly designed to "shore up investor support," coupled with the alleged knowledge of the Fourth Treaty's impending negative impact.

"[B]road statements of optimism are non-actionable puffery." *City of Sterling Heights Police & Fire Retirement Systems v. Reckitt Benckiser Group PLC*, 587 F. Supp. 3d 56, 89 (S.D.N.Y. 2022). Unlike "specific, factual" statements, "vague descriptions

[that] offer only generally optimistic opinions" are not actionable under section 10(b) and Rule 10b-5. *In re Synchrony Financial Securities Litigation*, 988 F.3d 157, 170 (2d Cir. 2021). A speaker engages in puffery when he claims to be "pretty confident" and "pretty positive" about the future, or makes "[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices . . . ." *Id*. Such statements "are 'too general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be inactionable.'" *Id*. (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Company*, 553 F.3d 187, 206 (2d Cir. 2009)).

In *City of Sterling Heights*, the court held that where the defendant made statements touting a company's "growth opportunities," and that it had "a sustainable business" that can "find its true potential" were "general and vague" and would thus "not be relied upon by a reasonable investor." 587 F. Supp. 3d at 92; *see also id.* (quoting *In re Synchrony*, 988 F.3d at 170) ("Broad statements about value creation and seizing opportunities are the type of corporate-speak that 'offer only generally optimistic opinions' and are non-actionable as puffery."). So too here. Defendants' statements describing Paysafe as having "[s]ignificant growth opportunities" or stating that they believed that "Paysafe has significant long-term growth potential," was "positioned in the highest growth vertical markets" and had "unrivalled regulatory risk and technical expertise" were typical of the "type of corporate-speak that 'offer only generally optimistic opinions' and are non-actionable as puffery." *Id*. The same is true for Defendants' statements that "Paysafe delivers a unique value proposition in large and high-growth markets . . . " or that they are "a global leader" in "Europe and the rest of the world," and "able to react very, very quickly and support our operators." ¶ 134; *City of Sterling Heights*, 587 F. Supp. 3d at 89, 92 (concluding that the companies' statements that restructuring "is the right thing to do," that it "created a global leadership position," and that it is a "very, very, very solid platform" is non-actionable as puffery").

42

"[W]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Securities Litigation*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). Plaintiffs insist that the challenged growth statements are not puffery because they were made in an investor announcement partly designed to "shore up investor support," coupled with Defendants' alleged knowledge of the Fourth Treaty's impending negative impact. Defendants allegedly "painted" a "tableau" about growth that "did not match the tenor of the discussions inside the company" regarding the expected impact of the German regulations. *Vivendi*, 838 F. 3d at 235.

In *Vivendi*, the Second Circuit found that certain statements, *i.e.*, that Vivendi "posted RECORD-HIGH NET INCOME, and ha[d] cash available for investing," and representations that "[t]he results produced by Vivendi Universal in the second quarter are well ahead of market consensus," were not mere puffery or non-actionable, *id.* at 245, concluding that "[t]here was sufficient evidence for the jury to conclude that such statements were not so general that a reasonable investor could not have relied upon them[.]" *Id.* The Second Circuit distinguished instances where statements, like those here, "lack[ed] the sort of definite positive projections that might require later correction." *Id.* (quoting *In re Time Warner*, 9 F.3d at 259, 267 (2d Cir. 1993)); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801, 811 (2d Cir. 1996) (emphasis in original) (concluding that "general announcements," such as the defendant company's statement that it "*should* deliver income growth consistent with [its] historically superior performance" and was "optimistic about 1993" constituted puffery). This is also true in instances where the optimistic statements are in connection with a potential merger. *ECA, Local 134*, 553 F.3d at 206; *see In re Micro Focus International Plc Securities Litigation*, No. 18-cv-06763 (ALC), 2020 WL 5817275, at *7 (S.D.N.Y. Sept. 29, 2020) (emphasis in original) (statements that a merger presented "*a rare opportunity to achieve a significant increase*

*in . . . scale and breadth*, with the potential to *deliver enhanced [t]otal [s]hareholder [r]eturns*" were puffery).

Accordingly, the challenged growth statements are non-actionable puffery and statements of corporate optimism.

### e.   FTAC Defendants

The FTAC Defendants—Foley, Massey, and Coy—insist that Plaintiffs have not sufficiently alleged that the statements about the German regulations were either made by them or are otherwise actionable.[14]  Plaintiffs assert that the FTAC defendants are liable for the challenged statements because they were either signatories to the disclosures containing the misrepresentations or were persons with ultimate authority over the statements.

In *Janus*, the Supreme Court held that for the purposes of Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  In *In re Smith*, the court held that *Janus* is consistent with the longstanding rule that corporate officers who are "signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b–5(b)."  *In re Smith Barney Transfer Agent Litigation*, 884 F. Supp. 2d 152, 163–64 (S.D.N.Y. 2012) (collecting cases).  Here, Foley—chairman of the FTAC Board from December 7, 2020, until April 2021, and chairman of the Paysafe Board through November 11, 2021— signed the Joint Proxy Statement and Prospectus filed on February 26, 2021, and Paysafe's Form F-1 filed on May 19, 2021, which included the statements about the German regulations.  ¶¶ 26, 148, 156.   Additionally, the parties do not dispute that Foley had ultimate authority over the statements about the German regulations.

---

[14] For the instant motion, Plaintiffs do not dispute that the FTAC Defendants did not make or otherwise have ultimate authority over the September 2021 Conference statements.

On the other hand, Massey and Coy are not alleged to have signed any documents containing the statements about the German regulations.  Nor do the parties dispute that they did not sign the disclosures.  Accordingly, they are not responsible for any purportedly misleading statements in the SEC filings.  *City of Roseville Employees' Retirement Systems v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) ("However, two Individual Defendants . . . did not sign the November 2007 Registration Statement . . . Accordingly, [they] cannot be held liable for any alleged misstatements [therein].").

Still, Plaintiffs assert that "through their roles as the senior-most executives of FTAC with intimate involvement in the merger, Massey and Coy possessed 'ultimate authority over the statement[s],' including their content and whether and how to communicate them.'"  *Janus*, 564 U.S. at 142; *see also Puddu v. 6D Global Technologies, Inc.*, No. 15-cv-8061 (AJN), 2021 WL 1198566, at *8 (S.D.N.Y. Mar. 30, 2021).  Specifically, Plaintiffs allege that they had ultimate authority over the statements about the German regulations because (1) FTAC was small, *i.e.*, that it did not maintain any operations and was formed for the sole purpose of raising capital in order to enter into a merger, and (2) they were officers or directors who were involved in FTAC's due diligence.  However, neither of these allegations plausibly raises the inference that they were makers who controlled the "content and whether and how to communicate" FTAC's challenged statements.  *Janus*, 564 U.S. at 142.

Citing *Janus*, the court in *Puddu* held that in the ordinary case, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  *Puddu*, 2021 WL 1198566, at *8 (quoting *Janus*, 564 U.S. at 142–143.)  The court in *Puddu* also found that "in singling out 'ordinary case[s],' the [Supreme] Court implicitly recognized that the analysis extends beyond the narrower grounds of attribution."  *Id.*  Further, it held that a defendant had ultimate authority over a misstatement based "on inferential or

circumstantial evidence," without attribution. *Puddu*, 2021 WL 1198566, at *8 (quoting *In re Weight Watchers International Inc. Securities Litigation*, 504 F. Supp. 3d 244, 261 (S.D.N.Y. Nov. 30, 2020)).  However, the plaintiffs in *Puddu* had alleged that the defendant had "reviewed SEC filings, provided instructions on what to include and not include, and participated in conference calls concerning the preparation of [the documents to be filed with the SEC]."  *Id.*

Here, Plaintiffs merely allege that FTAC was a SPAC created solely to raise capital in order to enter a "business combination with one or more business" and that through Massey and Coy's roles as the senior-most executives of FTAC, with intimate involvement in the merger, they possessed ultimate authority over Paysafe's statements. But courts within this District have held that "an officer's position within a company— without more—is [not] enough to render that officer a 'maker' of the company's statements."  *Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 362 (S.D.N.Y. 2022). That the company was formed for the sole purpose of raising funds to enter into a merger does not change this conclusion, and Plaintiffs provide no support suggesting otherwise. Further, Massey and Coy's involvement in FTAC's due diligence, does not lend sufficient support for the conclusion that they were therefore involved in or controlled FTAC's statements.  *Id.*  Therefore, Plaintiffs' allegations do not plausibly allege ultimate authority over the "content and whether and how to communicate" the statements about the German regulations.  *Janus*, 564 U.S. at 142.

Accordingly, Plaintiffs have sufficiently alleged that Foley made the statements about the German regulations, but have not for Massey and Coy.

2.  *Materiality*

Plaintiffs have not sufficiently alleged materiality of the supposed omissions. Defendants contend that the alleged omissions are immaterial given that the relevant information was known to the market.  Specifically, Defendants argue that the alleged omission cannot be material because the market knew that (1) Germany was a major

market and (2) the Fourth Treaty would have a negative impact.  Plaintiffs concede that "investors may have been aware" of both of these facts, but insist that the market did not know that Paysafe catered to high-value bettors and was thus particularly susceptible to the Fourth Treaty's deposit limit.  However, Plaintiffs' assertion is unpersuasive.

To be actionable under Section 10(b) and Rule 10b–5, the alleged misstatement or omission must be material.  *Basic*, 485 U.S. at 238.  That is, there must be a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction.  *See id.* at 231.

Plaintiffs provide no support for the allegation that the market did not know that that Paysafe catered to high-value bettors.  In actuality, the market had all relevant information to judge the risks associated with the merger.  Defendants disclosed:  the potential negative impact of the German regulations, the percentage of its iGaming business in the German market, and that its business involved per transaction fees.  Accordingly, Plaintiffs have not sufficiently alleged materiality regarding the misleading statements.

### 3. *Scienter*

The CAC does not sufficiently plead scienter.[15]  Under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA, a plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs*, 551 U.S. at 314.  The question "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322–23 (emphasis in original).

---

[15]  Because Plaintiffs have not adequately pleaded scienter pursuant to Section 10(b), their Item 303 claims fail.  "For [d]efendants' breach of their Item 303 duty to be actionable under Section 10(b), Plaintiff[ ] w[as] required adequately to plead each element of a 10b–5 securities fraud claim."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (affirming dismissal of Item 303 claim on the basis that complaint did not give rise to a strong inference of scienter).

A plaintiff can establish an inference of fraudulent intent either (1) "by alleging facts to show that defendants had both motive and opportunity to commit fraud," or (2) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

"While 'the absence of a motive allegation is not fatal," *Tellabs*, 551 U.S. at 325, absent a showing of motive, "the strength of [Plaintiff's] circumstantial allegations must be correspondingly greater." *ECA, Loc. 134*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142). In sum, "[t]he inquiry on a motion to dismiss is as follows: '[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scottish Re Group Securities Litigation*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007).

Under the "conscious misbehavior or recklessness" prong, to qualify as "strong," the inference of scienter from the facts alleged "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton*, 604 F.3d at 777. An inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citation omitted); *see also City of Pontiac General Employees' Retirement System v. Lockheed Martin Corporation*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). "But generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard[.]" *Campo v. Sears Holdings Corporation*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009) (internal quotation marks and citation omitted), *aff'd*, 371 F. App'x 212 (2d Cir. 2010). "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud,

48

will not satisfy even a relaxed standard.'" *Elliott Associates, L.P. v. Covance, Inc.*, No. 00-cv-4115 (SAS), 2000 WL 1752848, at *6 (S.D.N.Y. Nov. 28, 2000) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987)).

The Second Circuit has held that, "[a]t least four circumstances may give rise to a strong inference of the requisite scienter [under the second prong]:  where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *ECA, Loc. 134*, 553 F.3d at 199 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).  For the reasons discussed below, Plaintiffs have not sufficiently alleged an inference of scienter as to the Defendants.

     *a.  Scienter of The Paysafe Defendants*

     *i.  Individual Paysafe Defendants*

Plaintiffs contend that their allegations give rise to a strong inference of scienter because the Defendants:  "(1) had a motive to commit fraud and (2) knew facts or had access to information suggesting that their public statements were not accurate."  The individual Paysafe Defendants, McHugh and Dawood, assert that Plaintiffs have not sufficiently pleaded motive nor the requisite "correspondingly greater" "showing of conscious misbehavior or recklessness," when motive is absent.[16]

As the Paysafe Defendants assert, Plaintiffs do not respond to their arguments regarding motive and therefore concede them.  Instead, in their opposition to the instant motion, Plaintiffs include a footnote stating that '[a]llegations of motive are not necessary to plead scienter" where the plaintiff created an inference of scienter based on facts

---

[16] In their motion papers, the parties argue scienter for the individual Paysafe defendants, McHugh and Dawood, and separately for Paysafe's corporate scienter.  For the purposes of the instant motion, the Court will do the same.

plausibly alleging that defendants knew or should have known that the challenged statement were false or misleading.  Doc. 104 at 25 n. 18 (citing *Villella v. Chemical and Mining Co. of Chile, Inc.*, No. 15-cv-2106 (ER), 2017 WL 1169629, at *14 (S.D.N.Y. Mar. 28, 2017)).  Plaintiffs assert that the Paysafe Defendants admitted that they were aware of facts that contradicted their statements to the investing public about the German regulations.  Specifically, "the Paysafe Defendants publicly characterized the German regulations as a positive for [Paysafe]," while "privately anticpat[ing] that the regulations would negatively impact [them]."

First, Plaintiffs argue that the Paysafe Defendants had actual knowledge of information *contradicting* their statements, which is a scenario that the Second Circuit has held alone suffices to plead scienter based on a theory of strong circumstantial evidence of recklessness in a securities fraud case.  *Rudani v. Ideanomics, Inc.*, No. 19-cv-6741 (GBD), 2020 WL 5770356, at *6 (S.D.N.Y. Sept. 25, 2020) (scienter plausibly alleged where defendants issued a revenue guidance contrary to contemporaneous internal financial knowledge); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024) (scienter plausibly alleged where defendant had actual knowledge contrary to public statements).  Plaintiffs cite *Heller* for the proposition that allegations of actual knowledge contradicting the challenged statements "alone are enough to satisfy the pleading requirement for scienter."  *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008).  In *Heller*, the plaintiff plausibly alleged that defendants had knowledge of facts regarding the then current undercapitalization of a fund that "explicitly contradicted their public statements" that a prominent investor had committed $40 million to that fund.  *Id.*  Yet here, the information that the Paysafe Defendants allegedly had actual knowledge of, *i.e.*, that the Fourth Treaty would have a material negative impact on Paysafe, does not contradict statements that the changes in EU and German regulations may impact Paysafe both positively and negatively or that the Fourth Treaty includes the deposit limit.

50

Accordingly, this case is not analogous to the instances above which the Second Circuit has held suffice alone to plead scienter.

The Parties also dispute whether statements by McHugh and Dawood constitute "admissions" indicating that they had knowledge that the Fourth Treaty would have a *material* negative impact on Paysafe. According to Plaintiffs, during the November 11, 2021 earnings conference call, McHugh responded to analyst questioning regarding regulatory changes that Paysafe was facing by stating "[t]here is a cap on how much a single person can bet . . . So when you – when we cater to higher-end bettors, that cap has a pretty high impact." ¶ 110. McHugh further acknowledged that adapting to the Fourth Treaty was "a big adjustment" and that the German gaming market was "an extremely large market for [them]." *Id.* Later the same day, Dawood, in response to an inquiry regarding the German regulations, admitted that some negative impact of the Fourth Treaty on online gambling regulations "was anticipated." ¶ 184.

The Paysafe Defendants argue that Plaintiffs have again "cherry-picked" favorable parts of their statements, omitting information that belies their assertions. For example, McHugh's unabridged response stated: "So we certainly saw there's been a wave of European regulation coming through. So we had anticipated some of it, but some of the impacts have been -- certainly been sharper and bigger than we expected." Dawood's response stated that the impact of the German Regulations "was anticipated - put [sic] the impact was far greater - even Flutter talked about it." When considered in full, while McHugh and Dawood's statements show that knew that the Fourth Treaty would have *some* negative impact on Paysafe, Plaintiffs have not sufficiently shown that they "admitted" or knew that that the Fourth Treaty would have a *material* negative impact. In fact, they explicitly state the opposite, *i.e.*, that the eventual impact of the German regulations was "far greater" and "sharper … than . . . expected." ¶ 110.

Next, Plaintiffs contend that the Paysafe Defendants acted consciously or recklessly in knowing or not knowing facts contrary to the challenged statements by

"touting" their "in-depth understanding" of the changing regulatory landscape and "ability to monitor and adapt" accordingly.  In support of their of their argument, Plaintiffs cite multiple cases:  *Stadium Capital LLC v. Co-Diagnostics, Inc.*, No. 22-cv-6978 (AS), 2024 WL 456745 at *6 (S.D.N.Y. Feb. 5, 2024) (defendants' actions and statements, *inter alia*, that "we keep a close eye" on orders and "we are . . . able to monitor the daily influx of demand" supported inference of scienter); *San Antonio Fire & Police Pension Fund*, 732 F. Supp. 3d at 319 ("If, on the other hand, [defendants] didn't monitor these topics but made definitive statements as if they did, they still might have been reckless."); *Wang v. Cloopen Group Holding Limited*, 661 F. Supp. 3d 208, 236 (S.D.N.Y. 2023) (finding "strong circumstantial support for an inference that the substantial 4Q 2020 changes in customer retention and payment were known" to defendants based on their "constant[] monitoring [of] these very subjects[.]); *Citiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter adequately alleged where defendants, *inter alia*, "told the investing public that they monitored the value of their portfolio on a nearly real-time basis").

However, each of these cases is inapposite for the singular reason that in each, facts were alleged adducing information from which defendants either knew or should have known that their public statements were false or misleading.  Here, Plaintiffs have not alleged facts indicating that the Paysafe Defendants anticipated a material negative impact, such that their statements were misleading.  *See Saraf v. Ebix, Inc.,* No. 23-1182-cv, 2024 WL 1298246, at *3 (2d Cir. Mar. 27, 2024) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.")).  Additionally, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* (citing *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)).  Here, Plaintiffs have not.

Plaintiffs also contend that the inference of scienter is "strengthen[ed]" by the Paysafe Defendants speaking "repeatedly" and "specifically" about the German gaming regulations during the Class Period.  However, the cases that Plaintiffs identify do not support their position.  For example, in *City of Pontiac*, the defendants made "specific statements about the projections and performance" of a division with Lockheed Martin. *City of Pontiac Gen. Employees' Retirement Systems*, 875 F. Supp. 2d at 372.  From this, the court held that "the specificity of these statements regarding [the division] is strong circumstantial evidence that [defendants] were receiving some form of specific information on [the division]."  *Id.*  Here, however, the repeated statements regarding the German regulations—similar to the "touted" due diligence statements above—do not indicate that the Paysafe Defendants had access to information from which they knew or should have known that the Fourth Treaty would have a material negative impact on Paysafe.[17]

Finally, Plaintiffs suggest that scienter can be inferred based on the core operations doctrine, "[g]iven that the iGaming and German markets were significant revenue drivers for [Paysafe]."  The core operations doctrine "allows courts to draw an inference of scienter where misrepresentations and omissions allegedly made by defendants were about their core operations."  *City of Omaha Police & Fire Ret. Systems v. Evoqua Water Technologies Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020) (citation omitted).  Core operations are "'critical to the long term viability' of the company and events affecting a 'significant source of income.'"  *In re Express Scripts Holding Co. Securities Litigation*, No. 16-cv-3338 (ER), 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1,

---

[17] Plaintiffs' other cited cases are also inapposite.  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) (holding that scienter was plausibly alleged where CFO made assurances to investors despite receiving direct reports and attending a meeting where he would have received facts to the contrary);  *In re Ambac Financial Group, Inc. Securities Litigation,* 693 F. Supp. 2d 241, 268 (S.D.N.Y. 2010) (holding that "it strains credulity that [the CFO] could remain ignorant of the company's lowered underwriting standards" where the complaint plausibly alleged that "the CEO and other senior managers were aware of them.").

2017) (citation omitted).  The operation must constitute matters that "make up nearly all of a company's business or be essential to its survival."  *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 320 (S.D.N.Y. 2021) (citation omitted).

"The Second Circuit has not expressly determined if the core operations doctrine remains applicable to proving scienter after the enactment of the PSLRA."  *In re Plug Power, Inc. Securities Litigation*, No. 21-cv-2004 (ER), 2023 WL 5577276, at *21 (S.D.N.Y. Aug. 29, 2023) (citation omitted).  "However, the Second Circuit has suggested that the doctrine can provide additional support for an inference of scienter but could not establish scienter on its own."  *Id.* (citing *Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017) (emphasis omitted).

In support of their arguments, Plaintiffs allege that for the years 2019 through 2021, Paysafe reported iGaming revenues of $455.1 million, $503.3 million, and $536 million, respectively, accounting for approximately 33%, 36%, and 36% of the Paysafe's total revenues, respectively.  ¶ 171.  For the same years, Paysafe's German revenues were $115 million, $146 million, and $127 million, respectively.  ¶ 172.  However, as the Paysafe Defendants assert, German gaming revenues only comprised 10% of Paysafe's "revenue from external customers" at the time of the alleged omissions.  This is insufficient to constitute a core operation.  *See In re Plug Power,* 2023 WL 5577276, at *21 ("The operation must constitute matters that 'make up nearly all of a company's business or be essential to its survival.'") (citation omitted).

Accordingly, for the reasons discussed above, Plaintiffs have not sufficiently alleged an inference of scienter "at least as strong as any opposing inference[.]" *In re Scottish,* 524 F. Supp. 2d at 383.  Here, the "more compelling" inference is that the Paysafe Defendants believed that their disclosures regarding the Fourth Treaty were sufficient.  *In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d 564, 587 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (rejecting a finding of recklessness where defendants reasonably believed they had no disclosure obligations).

b. *FTAC Defendants' Scienter*

Plaintiffs also have not sufficiently alleged an inference of scienter as to the FTAC Defendants. They allege that the FTAC Defendants were highly motivated to ensure that the merger was consummated. According to the CAC, in order for the merger to be consummated, at least three conditions needed to be met: (1) Paysafe's fair market value had to remain at or above 80% of the assets held in FTAC's trust account, which stood at $1.467 billion as of December 31, 2020, *i.e.*, FTAC's fair market could not fall below $1.17 billion; (2) the merger had to be approved by a majority of FTAC's shareholders; and (3) Defendants needed to ensure that a significant number of FTAC shareholders did not exercise the redemption rights granted to them pursuant to the IPO, which permitted them to redeem their FTAC shares for approximately $10 per share in lieu of receiving Paysafe shares. ¶¶ 39–41. If such redemptions caused the total amount of available cash to fall below a certain pre-determined level or prevented Paysafe from meeting the listing conditions imposed by the NYSE, the merger would fail. ¶ 41.

First, Plaintiffs allege that Foley was "highly motivated to ensure that the merger was consummated" because if not, his investment, worth "approximately $738 million" would be rendered worthless." ¶¶ 187, 190. Specifically, Plaintiffs allege that Foley's initial pre-merger investments, *i.e.*, $25,000 investments in FTAC Class B common stock and $31,340,669 in FTAC warrants, had a post-merger value of $738 million which he would not receive if the merger was not successful. ¶¶ 187, 190. This, they say, is sufficient to plead an inference of scienter. The Court does not agree.

In *Lottery*, plaintiffs alleged that "[d]efendants[, corporate executives,] had sufficient motive to commit fraud[.]" *In re Lottery.com, Inc. Securities Litigation*, 715 F. Supp. 3d 506, 553–54 (S.D.N.Y. 2024). Specifically, defendants, in the SPAC context, had been awarded restricted stock, contingent upon the merger being consummated. *Id.* Plaintiffs argued that "[i]f the merger had not taken place . . . the[] executives 'would not have been able to divest themselves of such a substantial number of shares in a liquid

market.'"  *Id.*  The court found plaintiffs' arguments unpersuasive, instead holding that "[t]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter."  *Id.* (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).  So too here.

In response, Plaintiffs state that the court in *Lottery* cited the plaintiffs' "failure to identify actionable statements or omissions from the pre-merger period" in determining that the scienter allegations were inadequate.  Here, they argue, actionable pre-merger omissions have been alleged.  First, however, as discussed above, Plaintiffs have not sufficiently alleged actionable pre-merger omissions.  Moreover, in *Lottery*, the court determined that plaintiffs' motive theory as to the executives was insufficient because "[i]f scienter could be pleaded [based on an inflated stock price increasing a defendant's compensation], virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Lottery*, 715 F. Supp. at 554 (quoting *Acito*, 47 F.3d at 54).

Furthermore, in *Swanson*, the Second Circuit determined that scienter had not been sufficiently pleaded where plaintiffs alleged that a SPAC director "was under pressure to ensure completion of merger to avoid having to return investors' capital and bear the costs incurred in taking [the SPAC] public."  *Swanson v. Danimer Scientific, Inc.*, No. 23-7674-cv, 2024 WL 4315109, at *3.  In so concluding, the Second Circuit held that the alleged financial incentives are no different from the "generalized financial motives' of corporate officers in non-SPAC business contexts" that "could be attributed to the directors and officers of any corporation looking to complete an acquisition transaction." *Id*. (citation omitted).

The same is true for Massey and Coy.  Plaintiffs contend that Massey and Coy's scienter can be inferred from "various available facts," or "red flags" that "should have put [them] on notice that the public statements were false."  These red flags, Plaintiffs assert, should have been noticeable from Massey and Coy's pre-merger due diligence,

including "eschewing a third-party valuation or opinion."  However, Plaintiffs cite no cases or facts supporting why the due diligence conducted by Massey and Coy suffices to show that they knew or should have known that the Fourth Treaty's deposit limit would have a material negative impact on Paysafe.   Additionally, as stated above, Plaintiffs have not proffered sufficient evidence indicating that their due diligence adduced facts contrary to their statements.  *Saraf,* 2024 WL 1298246, at *3 ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.") (citation omitted).

Accordingly, Plaintiffs have not sufficiently pleaded an inference of scienter as to the FTAC Defendants

### c.  Paysafe's Corporate Scienter

Next, the CAC fails to allege the corporate scienter of Paysafe.  The Second Circuit has determined that "[w]here the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference" that, among other things, "someone whose intent could be imputed to the corporation acted with the requisite scienter[.]"  *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities*, *LLC*, 797 F.3d 160, 177 (2d Cir. 2015).  Further, courts routinely attribute the scienter of both control persons or more junior executives to corporate defendants where they were involved in the underlying fraud.  *See, e.g.*, *id.* at 177–78 (imputing corporate scienter from knowledge of managing director involved in underlying scheme).  "It is [also] possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."  *Dynex*, 531 F.3d at 195.

Here, however, Plaintiffs have not sufficiently pleaded scienter as to any of the Individual Defendants, nor have they otherwise provided allegations supporting an inference of Paysafe's scienter.

*4.  Rule 10b-5(a) and (c) Scheme Liability*

Plaintiffs also claim that, in addition to alleging liability under Rule 10b-5(b) for their false and misleading statements, "the FTAC Defendants violated Rule 10b-5(a) and (c) by engaging in a scheme to inflate FTAC's share price and ensure that the merger was consummated." ¶¶ 5, 82. Specifically, they allege that the FTAC Defendants engaged in a scheme to (1) "disseminat[e]" the above alleged false statements to the public, (2) omit mention of the anticipated material negative impact of the Fourth Treaty's deposit limit, and (3) engaged in other acts, such as "eschew[ing] a third-party fairness opinion when conducting due diligence into Paysafe.

Scheme liability arises when defendants engage in deceptive conduct in conjunction with deceptive statements. *See Lorenzo v. SEC*, 587 U.S. 71, 78–82 (2019). To state a claim for scheme liability, a plaintiff must present facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance. *Puddu*, No. 15-cv-8061 (AJN), 2021 WL 1198566, at *9; *see also Menaldi v. Och-Ziff Capital management Group LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017); *In re Turquoise Hill Resources Limited Securities Litigation*, 625 F. Supp. 3d 164, 247 (S.D.N.Y. 2022).

As discussed above, Plaintiffs have not sufficiently pleaded scienter for Defendants. Therefore, Plaintiffs' scheme liability claims also fail as to them. *Menaldi*, 277 F. Supp. at 517 ("[s]cheme liability claims are subject to the PSLRA pleading standard with respect to scienter.").

*5.  Loss Causation*

The CAC also alleges loss causation through two corrective disclosures by Defendants:  (1) Paysafe's August 16, 2021 earnings press release and earnings call which reported positive second quarter earnings but anticipated third quarter revenue results below consensus; and (2) Paysafe's November 11, 2021 third quarter earnings press release and earnings call which reported third quarter results below guidance.  ¶¶

198, 200–01. In response, Defendants assert that the disclosures were based on facts that were already known to the public and did not reveal undisclosed facts in regard to Defendants' alleged misrepresentations and omissions. For the reasons discussed below, Plaintiffs have not sufficiently alleged loss causation regarding either the November 11, 2021 or August 16, 2021 earnings press releases and earnings calls.

"Loss causation is the 'causal connection between the material misrepresentation and the loss.'" *In re E-House Securities Litigation*, No. 20-cv-2943 (ER), 2021 WL 4461777, at *16 n. 11 (S.D.N.Y. Sept. 29, 2021), *aff'd sub nom. Maso Capital Investments Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968 (2d Cir. June 10, 2024) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). To plead loss causation, Plaintiffs must "link the defendant's purported material misstatements or omissions with the harm ultimately suffered." *ODS Cap. LLC v. JA Solar Holdings Co.,* No. 18-cv-12083 (ALC), 2020 WL 7028639, at *14 (S.D.N.Y. Nov. 30, 2020) (quoting *In re Bristol Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008)). If the relationship between the loss and the information concealed or misstated by the defendant is "sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id.* (quoting *Bristol Myers*, 586 F. Supp. 2d at 163).

"Plaintiffs must allege not only the but-for causation of their losses but also the proximate causation, or that the fraud 'concealed something from the market that, when disclosed,' would foreseeably and 'negatively affect[ ] the value of the security.'" *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)). To meet this standard, "a plaintiff can allege either (1) 'the existence of a cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud' or (2) 'that the loss was

foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Rosi v. Aclaris Therapeutics, Inc.,* No. 19-cv-7118 (LJL), 2021 WL 1177505, at *25 (S.D.N.Y. Mar. 29, 2021) (quoting *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34 (2d Cir. 2014)).

"To plead loss causation through the materialization of a concealed risk, plaintiffs must show that their losses were:  (1) foreseeable, that is, the 'materialized risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor;' and (2) caused by the materialization of the concealed risk concealed by the fraud, *i.e.*, 'that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *In re Omega Healthcare Investor, Inc. Securities Litigation,* 563 F. Supp. 3d 259, 267 (S.D.N.Y. 2021) (citing *Lentell*, 396 F.3d at 173); *see also In re Lehman Brothers Securities & ERISA Litigation,* 799 F. Supp. 2d 258, 304–05 (S.D.N.Y. 2011) (listing cases and summarizing standard).

Plaintiffs allege that "Defendants' fraud concealed from investors a material risk that Paysafe's revenues were reasonably likely to decline due to . . . changes to the German gambling regulations.  When Paysafe informed investors, during their August 16, 2022 earnings press release and earnings call, that they would be lowering their earnings guidance the first quarter after the new German regulations took effect, that "concealed risk began to materialize."[18]  Plaintiffs assert that Defendants prevented the full truth from being revealed to investors by attributing the guidance reduction to "seasonally quieter summer gaming activity in Europe impacting eCash and Digital Wallets, resulting in the full truth not being disclosed until November 11, 2021.  ¶ 198.  On that day, the full materialization of the risk occurred, Plaintiffs contend, when Defendants "finally"

---

[18] According to the CAC, on August 16, 2021, Defendants "surprised investors" by announcing that they anticipated that Paysafe would generate $360 million to $375 million in revenues during the third quarter of 2021, below the market consensus estimate of $389 million.  ¶ 104.

informed investors that the Fourth Treaty had a material negative impact on Paysafe's revenues. [19]

However, Plaintiffs have not sufficiently alleged that the August 16, 2021 disclosure represented a materialization of the risk that the Fourth Treaty would have a material negative impact on Paysafe. The August 16, 2021 disclosure makes no reference of the Fourth Treaty at all, instead attributing the decline in expected revenue for the third quarter to a return to normalized post-COVID seasonality, with quieter summer gaming activity in the European markets. Plaintiffs assert that this lower than expected guidance was in part due to the Fourth Treaty. Still, they do not sufficiently make a connection between the Fourth Treaty's impact and the August 16, 2021 disclosure. Just because the Fourth Treaty would take effect the month before the third quarter does not sufficiently support that the lower than expected guidance for that month was a materialization of the risk posed by the Fourth Treaty.

Additionally, Plaintiffs have not sufficiently alleged that the November 11, 2021 disclosure represented a materialization of the risk that the Fourth Treaty would have a material negative impact on Paysafe. Plaintiffs assert that in the November 11, 2021 disclosure, Defendants informed investors, for the first time, of the expected material negative impact of the Fourth Treaty. ¶¶ 196–198. According to them, "the risk that materialized and caused investors' losses—reductions in revenues attributable to Germany's amended gambling regulations—is not only 'within the zone of risk' that was concealed from investors," it is the same risk. *Lentell*, 396 F.3d at 173. However, as discussed above, Plaintiffs have not sufficiently alleged that Defendants made false or misleading statements, nor the requisite inference of scienter thereof. Therefore,

---

[19] According to the CAC, on November 11, 2021, Defendants fully informed investors about the material negative impact of the Fourth Treaty on Paysafe's revenues, which included disclosing revenues of $353.6 million, and a "lower than expected fourth quarter revenue guidance of $355 million to $365 million." ¶ 107. Additionally, they revised their full year revenue guidance downward to a rage of $1.47 billion to $1.48 billion. ¶ 107.

Plaintiffs cannot establish a plausible causal link between their loss and any misrepresentation or omissions of Defendants. *See Dentsply Sirona*, 732 F. Supp. 3d at 323 ("The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations.").

Accordingly, Plaintiffs have not alleged loss causation for either the November 11, 2021 or August 16, 2021 earnings press releases and earnings calls.

### B. Section 20(a) Liability

Section 20(a) liability is derivative of Section 10(b) liability. *See e.g., In re OSG Securities Litigation*, 12 F. Supp. 3d 622, 631 (S.D.N.Y. 2014) (finding that, in the absence of a primary violation under Section 10(b), "control person" liability under Section 20(a) cannot exist). For the reasons discussed above, Plaintiffs have not sufficiently alleged a violation of Section 10(b), and thus have not alleged a violation of Section 20(a).

## IV. LEAVE TO AMEND

The Second Circuit has instructed Courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shabazz v. Bezio*, 511 F. App'x. 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)) (internal quotation marks omitted). Here, while the Court has already granted Plaintiffs the opportunity to amend their original Complaint, it was not in the context of a motion to dismiss and the Court has therefore not provided guidance as to how their claims may be adequately made. In *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160 (2d Cir. 2015), the Second Circuit reaffirmed that the "liberal spirit" of the Federal Rule of Civil Procedure 15 embodies a "strong preference for resolving disputes on the merits." *See id.* at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011)). *Loreley* thus counsels strongly against the

dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. *Id.* at 190–91.

As it is not apparent that any further opportunity to amend would be futile, Plaintiffs will be permitted to replead turnover claims under TRIA and CPLR § 5225.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion is GRANTED.

Plaintiffs may file a Second Consolidated Amended Complaint, if at all, by April 21, 2025.  If they do not do so, the case will be closed.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 95, 98, and 106.

It is SO ORDERED

Dated:    March 31, 2025
            New York, New York

_____
            EDGARDO RAMOS, U.S.D.J.